UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JERRY RAY DAVIDSON, | |
| Petitioner, | Case No. 3:16-cv-1334 |
| v. | Judge Trauger<br>Magistrate Judge Newbern |
| JOHNATHAN LEBO, | |
| Respondent. | |

## MEMORANDUM AND ORDER

Pending before the Court is Petitioner Jerry Ray Davidson's motion for discovery related to his petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 51.) The State of Tennessee has filed a response in opposition (Doc. No. 56), to which Davidson has replied (Doc. No. 59). Because Davidson has not established good cause for the discovery he requests, his motion is DENIED.

## I.      Procedural History

In June 2016, Davidson filed a petition for a writ of habeas corpus, an application for leave to proceed *in forma pauperis*, and a motion to appoint counsel. (Doc. Nos. 1, 2, 3.) The Court denied Davidson's application to proceed *in forma pauperis* and Davidson paid the $5.00 filing fee on July 21, 2016 (Doc. No. 13). The Court granted Davidson's motion to appoint counsel, finding that Davidson has significant cognitive impairments that would significantly hinder his ability to effectively litigate his case, that Davidson's case presents unusual complexities, and that his case is not without merit. (Doc. Nos. 3, 19.) The Court appointed the Federal Public Defender

for the Middle District of Tennessee to represent Davidson and gave counsel thirty days to file an amended petition with the aid of counsel. (Doc. No. 19, PageID# 297.)

Davidson filed a motion for additional time to file the amended petition (Doc. No. 23), which the Court granted (Doc. 24). Davidson's amended petition was timely filed on March 28, 2017 (Doc. No. 25). The State filed several motions for more time to respond to the petition (Doc. Nos. 27, 29, 31), all of which were granted (Doc. Nos. 28, 30, 32). The State timely filed a response and the voluminous state court record on August 14, 2017. (Doc. Nos. 34, 35, 36, 38). Davidson moved for additional time to file a reply and to set a briefing schedule for the litigation of the case. (Doc. No. 42.) The Court granted Davidson's motion and directed the parties to file an agreed schedule for discovery, dispositive motions, and any motion for an evidentiary hearing. (Doc. No. 44.) Davidson timely filed his reply. (Doc. No. 47.)

The parties filed an agreed-upon scheduling order (Doc. No. 45) which was adopted as the order of the Court (Doc. No. 46). The briefing schedule was revised at Davidson's request (Doc. Nos. 48, 49), and the Court issued a revised scheduling order (Doc. No. 50). Under the revised scheduling order, Davidson timely filed his motion for discovery on February 16, 2018. (Doc. No. 51.)

## II.     Statement of Facts

In 1997, a jury of the Dickson County, Tennessee, Criminal Court convicted Davidson of first degree premeditated murder and sentenced him to death. *State v. Davidson*, No. M1998-00105-CCA-R3CD, 2002 WL 15381, at *1 (Tenn. Crim. App. Jan. 7, 2002). The jury also convicted Davidson of aggravated kidnapping, for which he received a twenty-year sentence. *Id*. Davidson appealed to the Tennessee Court of Criminal Appeals (TCCA), which denied Davidson's

claims and affirmed his convictions and sentences.[1] *Id.* at *21 (Tenn. Crim. App. Jan. 7, 2002).

The TCCA set forth the facts established at Davidson's trial as follows:

Guilt Phase

The victim, Virginia Jackson, arrived via taxi at Bronco's Bar in Dickson, Tennessee around 8:00 or 8:30 p.m. on September 26, 1995. The bartender, Carol Owens, refused to allow the victim to bring her dog inside. The victim was carrying her purse and a pillow, and she was wearing multi-colored clips in her hair. The appellant [Davidson], who had been in the establishment since 4:00 or 5:00 p.m., was sitting at the bar when the victim arrived. Mary Ann Wheat, Owens and the victim were conversing, but the appellant, who happened to be sitting next to the victim, was not involved in the conversation. According to Owens, the entire time the appellant was in Bronco's he sat quietly at the bar and drank beer. According to Wheat, the victim did not appear intoxicated, and she only saw the victim drink two beers over the three hour period they were together. Owens also testified that the victim only ordered two beers. Owens further testified that the appellant had consumed about twelve beers while he was there. When Wheat left at approximately 11:00 p.m., Owens, the victim and the appellant were the only persons remaining. Owens called the victim a cab, but the company was closed for the night. The appellant then offered to give the victim a ride. Until that time, Owens had not seen the appellant and the victim converse. The two individuals left in appellant's red pick-up truck.

Just prior to the murder in this case, the appellant was employed by St. Thomas Hospital in Nashville as a janitor in the department where surgical instruments were cleaned. The appellant had worked at the hospital for five years. However, September 25, 1995 was the last day he had shown up for work. Tyrone Upshaw, the appellant's supervisor, testified that the appellant was a good worker; he was independent and always showed up for work. The appellant did not contact anyone at work concerning his absence, and he was eventually fired. Rebecca Deloach car-pooled to work from Dickson with the appellant. Deloach testified that the last time she rode in appellant's truck, the passenger seat appeared to be normal and intact.

The appellant lived with his mother, Aline Davidson. The appellant failed to come home for several days after the 25th. The appellant's mother became worried and filed a missing persons report with the police. On October 8, 1995, the appellant telephoned his mother and told her he was going to stop by the house. He also told his mother that some creditors might be calling on him, so he was going to lay low for a while. He said that he was alright and that he was in Knoxville. When the appellant stopped by the house about a week later, Ms. Davidson gave her son some

---

[1]     Because the Court does not need to decide any issues related to Davidson's exhaustion of or failure to exhaust any of his claims, the Court does not review the claims Davidson raised in his appellate or post-conviction proceedings in this order.

money. The appellant also retrieved some clothes and the camper top for his red pick-up truck.

The appellant again visited Bronco's Bar on October 9, 1995. Because the victim's son had previously inquired of Owens about his mother's disappearance, Owens asked the appellant where he took the victim that night. After asking why Owens wanted to know, the appellant replied that he dropped the victim off at a Kroger grocery store. Later that same day, Detective Tim Eads of the Dickson County Sheriff's Department came into the bar to question Owens about the victim's disappearance. The appellant was still present in the bar at the time, and Owens indicated to Eads that the appellant had given the victim a ride on September 26. The appellant also told Eads that he had dropped the victim off at a Kroger around midnight. After Eads left, the appellant watched his car pull out of the parking lot, and then about ten minutes later the appellant also left the bar. After that day Owens never again saw the appellant in the bar.

The victim's family became worried after noticing that her car remained parked for several days behind a gas station near her house. On September 30, 1995, Charles Daniel, the victim's brother-in-law, observed some clothing on an access road on the Jackson family farm. Several days later, Daniels decided to move the clothing out of the road. The clothing consisted of a pair of socks, a pair of women's panties, a sweater, as well as some hair clips and a bed pillow. The authorities later found the victim's cellular telephone in some nearby brush. Jennifer Koch, the victim's daughter, identified these items as her mother's. Koch last saw her mother at a family wedding on September 23, 1995. After noticing her mother's car parked behind the gas station for several days, Koch became worried and filed a missing person's report on October 1, 1995. The door to the victim's house was unlocked, which, according to Koch, was very unusual. Also, according to one of the appellant's witnesses, the back tires on the victim's truck had been slashed several days before she was reported missing.

Melinda Jones, who lives in the country on Old Yellow Creek Road in Dickson near the Houston County line, observed a small red truck she did not recognize drive down the road past her house sometime between October 4 and 6, 1995. She had also observed this same truck drive by about a week prior to this time. Jones testified that there was not much traffic on her road and that she recognized most vehicles traveling it. Jones did not recognize the driver, and she noticed something wrapped tightly, in "something white, maybe a sheet," in the cab of the truck fall onto the driver's shoulder, which the driver had to "push off." Jones later saw the appellant's picture on television and realized then that the appellant was the person driving the red truck. The victim's partially buried body was discovered on October 18, 1995 by two hunters in the woods about a mile and half down from Jones' house on Old Yellow Creek Road.

Teresa Smith, an employee of a convenience store near Old Yellow Creek Road, testified that the appellant came into the store in the morning sometime between

October 2 and 6, 1995. Smith had never seen the appellant before. According to Smith, the appellant's pants were dirty, "like he'd been digging in like a garden or something." The appellant sat in the store for about an hour and drank a cup of coffee. The appellant was driving a red pick-up truck with a camper top. About a week later, the appellant came back to the store, bought a drink, and sat inside for about an hour.

On October 12, 1995, Darla Harvey was working at Lakeview Tavern in Cumberland City. The appellant came in the bar at approximately 2:30 p.m. He sat at the bar and ordered a beer. Harvey testified that the appellant's pants and shoes were covered in red dirt. Harvey further testified that the appellant just sat at the bar without saying a word and "blatantly stare[d] at me for a long period of time," about an hour and fifteen minutes. Harvey felt uncomfortable because she did not know the appellant, so she walked outside to look at his vehicle. The appellant was driving a small red pick-up truck with a camper top that had been spray painted red. Harvey looked through the window of the camper and saw a sleeping bag soiled by red clay, a dirty shovel, a chain and two Rubbermaid containers. According to Harvey, the cab of the truck was "really, really messy," "like he had been living in there." After Harvey returned inside, the appellant eventually went outside to grab something from his truck and then came back inside the bar with one hand in his pant's pocket. Harvey testified that she became scared because the appellant continued to sit at the bar without saying a word. Around 5:30 p.m., more patrons started arriving, and Harvey told some of them that she was afraid of the appellant. Some of the men told the appellant to leave, or they would escort him out of the bar. The appellant left. During the three hours the appellant was in the bar he had ordered only one beer.

On October 19, 1995, Betty Lutts was working at Robert's Creek Bar near Cuba Landing. The appellant came into the bar about 1:00 or 2:00 p.m. and ordered a beer. The appellant quietly sat at the bar. Lutts testified that she felt uneasy because the appellant just stared at her. At approximately 6:00 p.m., Sheriff Ronnie Toungette of Humphreys County entered the bar and arrested the appellant. The appellant was in possession of a .25 automatic pistol, a chrome "knuckle knife" and a pair of handcuffs. A full length shotgun and a sawed-off shotgun, along with some shells, a knife, various tools, a shovel, a tent, a sleeping bag, a camping stove, coolers, some clothing, food and Marlboro cigarettes, among other items, were also recovered from the appellant's truck. The truck did not have a camper top at that time. The passenger seat had a chain with a padlock wrapped around it. Bloodstains were found on the passenger seat. DNA testing revealed that the victim could not be excluded as a possible contributor of the blood.

Five spent shotgun shells found at a campsite in the woods that were found approximately 2,500 feet across the road from where the victim's body was found were determined to have been fired from one of the shotguns recovered from appellant's truck. Also, a knife, a pair of handcuffs similar to ones found on the appellant when he was arrested (the same key fit both pairs), a can of red spray

paint matching the brand of a can found in appellant's truck, a prescription pill bottle belonging to the victim, the victim's wallet containing some of her identification cards, the victim's leather cigarette case, two ATM receipts reflecting a withdrawal from appellant's bank account on October 4, 1995, an empty box that had once contained the same brand of tent recovered from the appellant's truck, men's underpants and t-shirt matching the size and brand of underwear recovered from the appellant's truck, a pair of pants matching the brand of a pair found in appellant's truck, a flashlight matching the brand and color of one found in appellant's truck, and empty packs of Marlboro cigarettes, as well as numerous other items, were found around the campsite. There was also some general trash and debris in the same area, which was described by witnesses as a dumping site.

On October 20, 1995, Dr. Murray Marks, a forensic anthropologist, examined the victim's body on site and concluded that the body had been there for about a month. The victim was found laying face down. The victim's left forearm had been gnawed by animals, and the left hand was missing. The victim's head was also missing. There was evidence of animal activity on the upper left portion of the back and the neck region. Dr. Marks determined that the shallow grave in which the body was found was prepared with a space for the head to rest. Dr. Marks opined that the victim was buried with her head intact, and sometime thereafter her head was removed. Dr. Marks observed both what he believed were incision marks and evidence of animal activity. According to Dr. Marks, it is possible that the victim's neck was cut, she was buried with her head intact, and then the head was removed by animals sometime thereafter. He also stated it was possible that the head could have been removed by a person sometime thereafter. The skull, however, was never found. The anterior portion of the victim's torso was cut cleanly from the neck to the navel. In and around the grave, Dr. Marks found a cigarette butt and a chunk of dirt consistent in shape and size with having been lodged in the handle of a shovel near the blade. Dr. Marks testified that the victim may not have been killed at the grave site because they did not find any significant amount of blood in the dirt around the body. Dr. Marks viewed the body before the autopsy was performed and thereafter reviewed the medical examiner's findings.

Detective Eads and Ted Tarpley interviewed the appellant after his arrest on October 19 and 20, 1995, from 9:40 p.m. until 5:00 a.m. Eads asked appellant if they could search his truck but the appellant declined to give consent, stating that there might be something in the truck he did not want the police to find. According to Eads, appellant was referring to the sawed-off shotgun. Appellant denied any knowledge of the victim's whereabouts and insisted that he dropped her off at a Kroger grocery store. Appellant stated that after he left the victim at Kroger he went to a bar in Nashville until about 4:00 a.m., and the next morning he left for Knoxville and Chattanooga. Eads asked appellant, hypothetically, where he thought the victim might be, and the appellant responded, hypothetically, that someone may have chained her to a tree. The appellant also stated that the victim's head and hands might be missing to keep anyone from identifying the body. In response to being

asked why he quit his job, the appellant stated that things were getting too tense, and he just needed to take a leave.

Dr. Charles Warren Harlan, Assistant Medical Examiner, performed the autopsy of the victim. The victim's liver tested positive for alcohol and Prozac, and the kidney tested positive for Prozac. However, given the state of decomposition, Dr. Harlan could not determine how much alcohol or Prozac was present. Dr. Harlan testified that the state of decomposition in this case was consistent with death occurring within twenty-four hours after the last time the victim was seen alive. Dr. Harlan could not make a definitive conclusion as to the cause of death, but opined that it was the result of a homicide. Dr. Harlan opined that the incision to the victim's torso occurred postmortem and would most likely have been made with a reasonably sharp knife. He also opined that the victim's head was removed after death by a person with a sharp instrument and that it was not removed by an animal. He stated that the victim may have died as the result of wounds to the neck or head.

Dr. Frank Joseph Peretti, Associate Medical Examiner and Forensic Pathologist at the Arkansas State Crime Laboratory, testified on behalf of the appellant. Dr. Peretti testified that there is no way of knowing, given the condition of the victim's body, whether she was killed within twenty-four hours of last being seen alive. According to Dr. Peretti, it was not possible to determine whether the knife wounds to the victim were inflicted before or after death. Dr. Peretti further stated that it was not possible to determine what caused death in this case. Because Dr. Harlan did not allow Dr. Peretti to remove the soft tissue from the neck bones, he was not able to positively determine how the head was separated from the body. He did state that the incision to the victim's chest was very smooth and that the bones exhibited some tool marks. On cross-examination, Dr. Peretti agreed that he and Dr. Harlan entertained different opinions in this case concerning the removal of the head.

The defense introduced evidence that the victim was being prescribed Prozac in April and September 1995, that she suffered severe drug overdoses in 1990, 1985, 1983, 1982, 1980 and 1978. The defense also presented testimony from a DNA expert who could not exclude the victim as the donor of the blood found inside his truck.

Penalty Phase

The appellant has previous convictions for assault and battery with intent to commit rape (1971), felonious crime against nature (1983), felonious sexual battery (1983), and assault and battery with intent to ravish and have unlawful carnal knowledge of a female over twelve years of age (1976). The state also presented testimony regarding the mutilation of the body.

Appellant offered the testimony of his mother who testified about his childhood and stated that before his arrest in this case he helped her more than anyone else. Appellant's father was not a member of the household. Appellant did not complete

his education and spent about two years in a mental institution. Appellant's younger brother was killed in Vietnam. Appellant's co-workers all testified about his good work ethic and quiet and kind temperament. Also, Rev. Joseph Ingle testified that the appellant has a genuine concern for others and can make a productive contribution in the prison environment.

*Id.* at *1–5.

Because he was sentenced to death, Davidson's case was automatically docketed before the Tennessee Supreme Court, which concluded that the death penalty was not arbitrarily imposed, that "the evidence support[ed] the jury's finding of the statutory aggravating circumstances, that the evidence support[ed] the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt, and that the sentence [wa]s not excessive or disproportionate." *State v. Davidson*, 121 S.W.3d 600, 623 (Tenn. 2003).

Davidson filed a petition for post-conviction relief in the Dickson County Circuit Court. (Doc. No. 37-2, PageID# 6890–6995.) The post-conviction court held an evidentiary hearing (Doc. Nos. 37-7–37-11), after which it denied relief (Doc. Nos. 37-4; 37-5, PageID# 7324). Davidson appealed to the TCCA, which denied Davidson's claims and affirmed his convictions and death sentence. *Davidson v. State*, No. M2010-02663-CCA-R3PD, 2013 WL 485222, at *1 (Tenn. Crim. App. Feb. 7, 2013).

Davidson filed an application for permission to appeal to the Tennessee Supreme Court, which was granted on June 14, 2013. The Tennessee Supreme Court affirmed Davidson's convictions, but vacated his death sentence and remanded the case for a new capital sentencing hearing. *Davidson v. State*, 453 S.W. 3d 386, 389 (Tenn. 2014). The court found that Davidson received ineffective assistance at trial when his counsel failed to present mitigation evidence, developed during post-conviction proceedings, that Davidson had brain damage, cognitive disorders, and mental illnesses, and that counsel's deficient performance had prejudiced Davidson.

*Davidson*, 453 S.W.3d at 405. Justice Gary R. Wade, dissenting in part, found that the evidence developed during the post-conviction proceedings also demonstrated that Davidson was incapable of premeditating the offenses of which he was convicted and supported the order of a new trial. *Id.* at 406–07. On remand, the state court sentenced Davidson to life without parole. (Doc. No. 37-33.)

In his amended petition, Davidson raises nineteen claims for relief, many with multiple sub-claims. (Doc. No. 25.) He seeks discovery to develop the evidence regarding six of his claims: four claims of ineffective assistance of trial counsel and two claims under *Brady v. Maryland*, 373 U.S. 83 (1963). The claims for which Davidson seeks discovery are: (1) Claim 2c, alleging ineffective assistance of trial counsel for failing "to make a complete objection [under *Batson v. Kentucky*, 476 U.S. 79 (1986)] supported by all available evidence to the prosecution's race-based exclusion of the sole African-American juror in the jury venire" (Doc. No. 25, PageID# 309–16); (2) Claim 2h, alleging ineffective assistance of trial counsel for "failing to object to members of the victim's family being seated at the prosecution table not only during jury selection but during trial" (*Id.* at PageID# 323–24); (3) Claim 2i, alleging ineffective assistance of trial counsel for failing "to object to unconstitutional and/or improper arguments made by the prosecution during closing argument at the guilt phase of trial" (*Id.* at PageID# 325); (4) Claim 2z, alleging that counsel was ineffective for failing "to object to the prosecution's guilt phase opening in which the prosecution made prejudicial and irrelevant remarks concerning our inability to know the pain the victim endured" (Doc. No. 25, PageID# 329.); (5) Claim 11, alleging that "the prosecution withheld notes from witness Melinda Jones's initial interview with District Attorney Investigator Ted Tarpley, which could have been used to impeach Jones at trial about the accuracy of her description of what she saw and was able to identify when a truck drove past her at or around the

time of the homicide" (*Id.* at PageID# 337); and (6) Claim 18, alleging that "the prosecution withheld exculpatory impeachment evidence showing Dr. Harlan's [the prosecution's expert forensic pathologist] malfeasance or errors in other cases during the time frame before the trial" (*Id.* at PageID# 338). To develop these claims, Davidson seeks to depose Tarpley, District Attorney Dan Alsobrooks, and Assistant District Attorney Suzanne Lockert, and to subpoena Tarpley's "notes and documents . . . regarding his interview of witness Melinda Jones". (Doc. No. 52, PageID# 11051.)

Davidson argues that the discovery he seeks "is relevant to [his] attempts to overcome the procedural default of various ineffective-assistance claims under *Martinez v. Ryan*, 566 U.S. 1 (2012) and to ultimately secure relief on such claims under *Strickland v, Washington*, 466 U.S. 668 (1984)." (Doc. No. 52, PageID# 11048.) Specifically, Davidson argues that, to prove Claim 2c of ineffective assistance with respect to trial counsel's failure to fully develop a *Batson* violation, he must "explore what reasons (if any) . . . Alsobrooks would allege for the disparity of treatment [between the sole African-American juror on the venire and similar white jurors], so that [Davidson] may dispel any assertion that the prosecution's actions were proper under *Batson* and/or *Foster v. Chatman* [ ___ U.S. ___, 136 S.Ct. 1737 (2016)]." (*Id.* at 11049.) As good cause for discovery with respect to Claim 2h, Davidson argues that he must examine "[Alsobrooks's and Lockert's] reasons for having the victim's daughter [Jennifer Koch] with them at counsel table [because] their actions toward and discussion with her are relevant to the questions of intent to influence the jury, as well as the historical facts of what the jury actually saw in interactions with [the prosecution team and Koch] that prejudiced the fairness of [Davidson's] trial." (Doc. No. 52, PageID# 11049–50.) With respect to Claim 2i, Davidson argues that good cause exists to obtain discovery because deposing Also brooks and Lockert will allow him to find out if they "knew that

the arguments [they] were making were questionable or improper but made them anyway," which would support Davidson's argument that "any competent counsel should have objected to such arguments." (*Id.* at PageID# 11050.) Further, Davidson argues that, because he has also asserted in Claim 2z that "the prosecution improperly argued the pain of the victim in opening statements," deposing Alsobrooks and Lockert may allow him to establish that the prosecution "inten[ded] to inflame the jury," which would suggest that competent counsel would have objected to the prosecution's opening. (*Id.*)

With respect to Claim 11, Davidson argues that the prosecution withheld notes from Tarpley's interview of witness Melinda Jones and that discovery of these notes "may enable [Davidson] to ultimately secure relief by showing that Jones's story as told at trial was not accurate and/or differed from her initial statement(s)." (*Id.* at PageID# 11052.) With respect to Claim 18, Davidson argues that the prosecution may have withheld "evidence of Dr. Charles Harlan's malfeasance," which Alsobrooks may have learned in his position as "president of the Tennessee District Attorney General's Conference." (*Id.* at PageID# 11051.) If Alsobrooks learned information about Harlan's malfeasance, "*Brady* would have required him to disclose such impeachment [evidence] to the defense." (*Id.*)

In opposition, the State argues that discovery should be denied because he has failed to show good cause to obtain any discovery; because his claims are either procedurally defaulted or are fully exhausted, so Davidson is not entitled to discovery under *Cullen v. Pinholster*, 563 U.S. 170 (2011); and because Davidson failed to avail himself of state court discovery procedures to obtain the evidence he now seeks. (Doc. No. 56, PageID# 11062–11068.) As to Davidson's *Brady* claims, the State argues that Claim 11 is procedurally defaulted and Claim 18 was fully exhausted in state court. (*Id.* at PageID# 11068–72.) Additionally, with respect to Claim 11, the State argues

that discovery should be denied because it is merely "a conclusory allegation based on pure speculation;" that Davidson could have discovered Tarpley's notes from his interview with Jones during his state post-conviction proceeding; that, because Jones was already "extensively" cross-examined, the discovery Davidson seeks would only provide an additional basis on which to challenge Jones's credibility; and that Davidson has failed to demonstrate that the discovery he seeks would prove the merits of his defaulted *Brady* claim. (*Id.* at PageID# 11069.) With respect to Claim 18, the State argues that Davidson failed to use "should not be allowed to fish for facts in these proceedings" after failing to use state discovery procedures and that Davidson has failed to demonstrate how the discovery he seeks will establish his *Brady* claim. (*Id.* at PageID# 11071.)

## III.    Legal Standard

A petitioner seeking a writ of habeas corpus is not entitled to discovery as a matter of course, but only in the court's discretion upon a fact-specific showing of good cause. Rule 6(a), Rules Governing § 2254 Cases; *Bracy v. Gramley*, 520 U.S. 899, 904–09 (1997); *Harris v. Nelson*, 394 U.S. 286, 300 (1969); *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). Before determining whether discovery is warranted, the court must first identify the essential elements of the claims on which discovery is sought. *Bracy*, 520 U.S. at 904 (citing *United States v. Armstrong*, 517 U.S. 456, 468 (1996). The requested discovery must be materially related to claims raised in the habeas petition and must be likely to "resolve any factual disputes that could entitle [the petitioner] to relief." *Willliams v. Bagley*, 380 F.3d 932, 975 (6th Cir. 2004); *see also Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (recognizing that "a district court may . . . permit discovery in a habeas proceeding if the 'petitioner presents specific allegations showing reason to believe that the facts, if fully developed, may lead the district court to believe that federal habeas relief is appropriate'" (quoting *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001). The burden of

demonstrating the materiality of the information requested is on the moving party. *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).

Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations." *Williams*, 380 F.3d at 974; *see also Stanford*, 266 F.3d at 460. The petitioner "must set forth specific allegations of fact." *Id.* Moreover, if "[t]he discovery sought by [the petitioner] would not resolve any factual disputes that could entitle him to relief, even if the facts were found in his favor, the petitioner's motion must be denied." *Id.*

## IV.     Analysis

### A.      Ineffective Assistance of Counsel

In *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To succeed, the petitioner must prove:   (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the petitioner, resulting in an unreliable or fundamentally unfair outcome. *Id.*  To establish deficiency, a petitioner must show that counsel's performance involved "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. This requires a showing that counsel's conduct "fell below an objective standard of reasonableness," *Tucker v. Prelesnik*, 181 F.3d 747, 754 (6th Cir. 1999), and that counsel's "identified acts and omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. In making this determination, a court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Tucker*, 181 F.3d at 754. The petitioner "bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy." *Id.* Courts must not evaluate a trial with the privileged vision of hindsight,

but must evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *See McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir.1996), *vacated on other grounds by Bell v. Abdur'rahman*, 545 U.S. 1151 (2005).

To establish prejudice, the petitioner must demonstrate that there "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The essential question is, therefore, "whether better lawyering would have produced a different result." *McQueen*, 99 F.3d at 1311.

Because Davidson has failed to establish good cause for the discovery he seeks in connection with his ineffective assistance of counsel claims, the Court need not consider the State's alternative arguments for denying discovery.

### 1.    Claim 2c

This claim alleges that trial counsel was ineffective "for failing to make a complete objection supported by all available evidence to the prosecution's race-based exclusion of the sole African-American juror in the jury venire, Barbara Springer." (Doc. No. 25, PageID# 309–10.) A trial attorney who fails to "object to the prosecutor's use of peremptory challenges to eliminate African-Americans from the jury panel, despite the fact that the prosecutor did not strike Caucasians who held similar views," may have provided ineffective assistance. *Drain v. Woods*, 902 F. Supp. 2d 1006, 1025 (E.D. Mich., Nov. 2, 2012) (finding that "counsel's passivity in light of an obvious pattern of strikes against minority prospective jurors fell below an objective standard of reasonableness and amounted to deficient performance"); *see also Drain v. Woods*, 595 F. App'x 558, 582–83 (6th Cir. 2014) (finding that, where the trial court determined that a *Batson* violation had occurred but allowed voir dire to continue, trial counsel performed deficiently when

he failed to object to the court's decision to proceed without first remedying the violation by recalling dismissed jurors or seating an entirely new venire). Davidson seeks to depose Alsobrooks to "fully explore" what reasons (if any) he would give for the disparity of treatment between Springer and similar white jurors. (Doc. No. 52, PageID# 11049.)

Davidson has not set forth good cause for deposing Alsobrooks at this stage of the litigation to learn why he exercised a peremptory challenge against Springer in 1997. Davidson has not demonstrated that obtaining additional evidence about why Alsobrooks struck Springer "would . . . resolve any factual disputes that could entitle him to relief" on his claim of ineffective assistance of counsel. *Stanford*, 266 F.3d at 460. Alsobrooks testimony today would not shed light on what Davidson's counsel knew at the time he argued to the trial that Alsobrooks struck Springer from the jury because of her race. Alsobrooks's reasons for striking Springer—which formed the basis of the trial court's decision to deny Davidson's *Batson* challenge—are already part of the record. (Doc. No. 34-22, PageID# 2763–67.) Davidson has failed to establish that anything more Alsobrooks has to say about why he struck Springer would help Davidson show that his trial counsel was deficient for failing to properly support his *Batson* challenge to the prosecution's striking of Springer from the jury. (Doc. No. 25, PageID# 316.)

## 2. Claims 2h, 2i, and 2z

These claims allege that trial counsel was ineffective for failing to object to the prosecution's allegedly improper behavior and remarks. Claim 2h concerns trial counsel's failure to object to Koch's presence at the prosecution table during voir dire and at trial. (Doc. No. 25, PageID# 323–24.) Claims 2i and 2z concern trial counsel's failure to object to remarks made by the prosecutors during opening statements and closing argument.

With respect to Claim 2h, Davidson argues that allowing Koch to sit at the prosecution table unfairly prejudiced the jury against him, thereby denying him a fair trial and violating his right to due process. (*Id.*) Davidson argues that he must depose Alsobrooks and Lockert to understand "their reasons for having [Koch] with them at counsel table and their actions toward and discussion with her . . . as well as the historical facts of what the jury actually saw in [Koch's] interactions with [Alsobrooks and Lockert]." (Doc. No. 52, PageID# 11050.) Davidson explains that the testimony Alsobrooks and Lockert give during their depositions may help him to determine whether they "intended to influence the jury." (*Id.*)

With respect to Claims 2i and 2z, Davidson alleges that his trial counsel was ineffective for failing to object "to unconstitutional and/or improper arguments made by the prosecution during closing argument at the guilt phase of trial" (Doc. No. 25, PageID# 325) and for "fail[ing] to object to the prosecution's [improper remarks made in] guilt phase opening [statements]" (*Id.* at PageID# 329). Specifically, Davidson alleges that trial counsel was ineffective for failing to object to improper comments in closing arguments regarding Davidson's "failure to present evidence, including failure to explain away the circumstances of the offense, failure to tell investigators that their suspicions of him were crazy, and including his alleged failure to present evidence regarding a tool box;" improper argument that the jury should "focus[ ] on the victim and the victim's purported rights;" improper statements "vouch[ing] for their own investigation;" and improper labeling of Davidson as "a predator." (*Id.* at PageID# 325.) With respect to opening statements, Davidson alleges that "the prosecution made prejudicial and irrelevant remarks concerning our inability to know the pain the victim endured." (*Id.* at PageID# 329). Davidson argues that, if he can show that the prosecution made "intentional or grossly negligent use of . . . improper arguments," he "may be able to establish his entitlement to relief for counsel's failure to

object." (Doc. No. 52, PageID# 11050.) This is so, he argues, because "if even [Alsobrooks and Lockert] knew that [their] arguments were questionable or improper but made them anyway, competent counsel should have objected to such arguments and [Davidson] was denied the effective assistance of counsel." (*Id.*)

Trial counsel's failure to object to the prosecution's attempt to improperly influence the jury can amount to ineffective assistance of counsel. *See Girts v. Yanai*, 501 F.3d 743, 757 (6th Cir. 2007) (finding trial counsel deficient where "trial counsel's failure to object allowed the prosecutor's improper and prejudicial statements to reach the jury uncontested and without the proper admonition from the trial court"); *Hodge v. Hurley*, 426 F.3d 368, 385–86 (6th Cir. 2005) (concluding that "trial counsel's failure to object to any aspect of the prosecutor's egregiously improper closing argument was objectively unreasonable" where prosecutor "comment[ed] on witness credibility and made derogatory statements"); *Gravley v. Mills*, 87 F.3d 779, 785 (6th Cir. 1996) (finding counsel "incompeten[t] [for] her failure to object to very serious instances of prosecutorial misconduct" where the prosecution "was continually making improper comments concerning [petitioner's] post-arrest silence"). Nevertheless, Davidson has failed to establish good cause for discovery on this issue because he has not demonstrated how deposing the prosecutors will help him establish that trial counsel performed deficiently.

With respect to Claim 2h, Davidson fails to explain how questioning Alsobrooks and Lockert about why they had Koch sit at the prosecution table, how they behaved toward Koch, and what they talked to her about will help him establish that his trial counsel was deficient for failing to object to Koch being present at the prosecution table. Moreover, Davidson does not explain how deposing Alsobrooks and Lockert will help him determine "what the *jury* actually saw in interactions" between the prosecution team and Koch. (Doc. No. 52, PageID# 11050.)

Even assuming that Alsobrooks or Lockert admitted at deposition that they had Koch sit at the prosecution table because they wanted to influence the jury, the *Strickland* standard requires that the Court "evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *Strickland*, 466 U.S. at 690 (emphasis added). Davidson does not explain how whatever he learns from Alsobrooks and Lockert in 2018 about why they had Koch sit at the prosecution table will enable him "to demonstrate that he is . . . entitled to relief" on his claim for ineffective assistance of trial counsel, *Bracy*, 520 U.S. at 908, when analysis of that claim requires the Court to focus on counsel's performance "at the time of" voir dire and trial, *Strickland*, 466 U.S. at 690.

With respect to Claims 2i and 2z, Davidson explains that he wants to depose Alsobrooks and Lockert about whether they "knew that [their] arguments were questionable or improper but made them anyway," on the theory that, if Alsobrooks and Lockert knew their remarks were improper, "competent counsel should have objected to such arguments." (Doc. No. 52, PageID# 11050.) However, even if Alsobrooks and Lockert admitted at deposition that they intentionally made improper remarks during opening statements and closing arguments, that would shed little light on why Davidson's counsel made the decisions that he did not to object. The Court must make its "highly deferential" assessment of counsel's performance without "the distorting effects of hindsight" and by "evaluat[ing] the conduct from counsel's perspective at the time." *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689 (alterations in original)). That assessment will not be materially aided by additional testimony from Alsobrooks or Lockert.

For these reasons, the Court finds that Davidson is not entitled to discovery with respect to any of his claims for ineffective assistance of trial counsel.

## B.    *Brady* Claims

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.   There are three components to a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Green*e, 527 U.S. 263, 281–82 (1999).  Prejudice is shown "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A petitioner who establishes a *Brady* violation demonstrates cause and prejudice to excuse any procedural default of the *Brady* claim. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

### 1.    Claim 11

In Claim 11, Davidson alleges that the prosecution failed to disclose Tarpley's notes from his initial interview with witness Melinda Jones, "which could have been used to impeach Jones at trial about the accuracy of her description of what she saw and was able to identify when a truck drove past her at or around the time of the homicide." (Doc. No. 25, PageID# 337.) Davidson seeks to obtain those notes and any other documents regarding Tarpley's interview with Jones. (Doc. No. 52, PageID# 11052.) Davidson also seeks to depose Tarpley to confirm that Tarpley has produced all of his notes and so that Davidson "can inquire about the meaning of any such notes." (*Id.*)

To show good cause, Davidson argues that the Tennessee Supreme Court found that "'[a]ll of the evidence of Davidson's role in the killing is circumstantial,' *State v. Davidson*, 121 S.W.3d 600, 608 (Tenn. 2003), but Melinda Jones claimed to have seen Davidson in his truck with a large wrapped object next to him, *id.* at 607, which the prosecution claimed to be the victim.'" (Doc. No. 52, PageID# 11052.) Davidson takes this statement to mean that Jones was the only witness who directly linked Davidson to the location where the victim's body was found and the only witness to testify that she saw what may have been the victim's dead body in the passenger seat of Davidson's truck. (Doc. No. 34-25, PageID# 3241–71.) Davidson therefore requests Tarpley's notes and documents regarding his interview with Jones because they may establish that Jones's testimony at trial "was not accurate and/or differed from her initial statement(s)" to Tarpley. (Doc. No. 52, PageID# 11052.)

In opposition, the State argues that this claim is procedurally defaulted because it was not raised in the state court on direct or post-conviction appellate review.[2] The State further argues that Davidson did not take advantage of an opportunity to obtain this discovery during his state post-conviction proceedings and has not shown how this discovery would support the merits of his claim. Finally, the State points out that Jones was "extensively cross-examined . . . about what she witnessed" and the discovery Davidson now seeks would merely "furnish an additional basis on which to challenge" Jones's credibility. (Doc. No. 56, PageID# 11069.)

To establish a *Brady* violation, Davidson must prove that the prosecution withheld evidence that was favorable to him because it was exculpatory or impeaching and that there is a reasonable probability that, if the evidence been disclosed, the result of the proceeding would have been different. *Youngblood*, 547 U.S. at 870. If, as Davidson suggests, Jones told Tarpley

---

[2]     Davidson does not dispute that Claim 11 is procedurally defaulted.

something in her interview that differed from what she testified to at trial, Davidson may be able

to establish that the prosecution withheld impeachment evidence. However, Davidson has not

shown that impeaching Jones could have caused a different outcome to his trial. While there is no

other witness testimony that puts Davidson in contact with the victim's body, there was extensive

physical evidence offered at trial to place Davidson at the location where the victim's body was

found. Davidson makes no argument that this evidence has been called into doubt or would be

outweighed by impeaching Jones's testimony that she saw Davidson in his truck with a "large

wrapped object."

As the TCCA found, the evidence at trial established that, when Davidson was arrested, he

was in possession of a pair of handcuffs and:

> a .25 automatic pistol, a chrome 'knuckle knife' and a pair of handcuffs. A full
> length shotgun and a sawed-off shotgun, along with some shells, a knife, various
> tools, a shovel, a tent, a sleeping bag, a camping stove, coolers, some clothing, food
> and Marlboro cigarettes

*Davidson*, 2002 WL 15381, at * 3. The evidence at trial also established that there was a campsite

2,500 feet from where the victim's body was found. *Id.* at *4. At the campsite, law enforcement

recovered five shotgun shells that were later determined to have come from one of the shotguns

recovered in Davidson's truck, a knife, a pair of handcuffs similar to the ones found in Davidson's

possession when he was arrested, and key that fit both pairs of handcuffs. *Id.* Additionally, law

enforcement personnel recovered from the campsite:

> a can of red spray paint matching the brand of a can found in [Davidson's] truck, a
> prescription pill bottle belonging to the victim, the victim's wallet containing some
> of her identification cards, the victim's leather cigarette case, two ATM receipts
> reflecting a withdrawal from [Davidson's] bank account on October 4, 1995, an
> empty box that had once contained the same brand of tent recovered from
> [Davidson's] truck, men's underpants and t-shirt matching the size and brand of
> underwear recovered from [Davidson's] truck, a pair of pants matching the brand
> of a pair found in [Davidson's] truck, a flashlight matching the brand and color of

> one found in [Davidson's] truck, and empty packs of Marlboro cigarettes, [the same
> brand found in Davidson's possession when he was arrested].

*Id.* Even if Jones had entirely made up her testimony and Davidson could establish her ruse by obtaining Tarpley's notes, her testimony was far from the only evidence putting Davidson in proximity of the victim's body. In light of this evidence, there is no reasonable probability that Davidson would have obtained a different outcome at trial if Jones's testimony were proven false or misleading.

For these reasons, the Court will deny Davidson's motion to obtain Tarpley's notes and documents regarding his interview with Jones and to depose Tarpley.

### 2.     Claim 18

In Claim 18, Davidson alleges that his due process rights were violated when "the prosecution withheld exculpatory impeachment evidence showing Dr. Harlan's malfeasance or errors in other cases during the time frame before the trial, including at least three incidents between 1995 and 1997." (Doc. No. 25, PageID# 338.) Davidson does not describe the three alleged instances, but notes that they came to light in the case "*In re Harlan*, No. 17.18-022307A ([b]efore the Tennessee Board of Medical Examiners)."[3] (Doc. No. 25, PageID# 339.) Davidson seeks to depose Alsobrooks regarding any information he had, but failed to disclose, regarding Dr. Harlan's inappropriate acts or omissions. Recognizing that the Sixth Circuit held in *Sutton v. Carpenter*, 617 F. App'x 434, 441 (6th Cir. 2015), that a prosecutor is not required to investigate or disclose evidence about Harlan's malfeasance or misfeasance under *Brady*, Davidson states that Alsobrooks was the "president of the Tennessee District Attorney General's Conference for many

---

[3]     Although not reflected in Davidson's amended petition, *In re Harlan*, No. 17.18-022307A was decided on May 4, 2005, before the Board of Medical Examiners. *See* Final Order of the Board of Medical Examiners, https://apps.health.tn.gov/Licensure/Discipline.aspx (last visited Aug. 28, 2018).

years and in that position of leadership . . . he may have heard about or had personal knowledge of Harlan's malfeasance through any number of channels." (Doc. No. 52, PageID# 11051.)

Davidson has not established a sufficient factual basis for discovery. First, while the Court is mindful that it may be difficult to establish a *Brady* claim without discovery, *Payne v. Bell*, 89 F. Supp. 2d 967, 971 (W.D. Tenn. 2000), Davidson must offer something beyond his speculation that Alsobrooks might have known some exculpatory information about Harlan at the time of his trial because of his position with the District Attorney General's Conference. *See Williams*, 380 F.3d at 976 (noting that, even when raising a *Brady* violation, a petitioner seeking discovery must identify what he "expects to uncover"). Davidson does not state when Alsobrooks was president of the organization so it is impossible to know if he was president during a relevant time period;[4] nor does he specify any particular circumstances associated with Alsobrooks's role that might have led him to obtain such information.

Perhaps most importantly, however, Davidson fails to set out any facts to give the Court "reason to believe that [he] may, if the facts are more fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908–09. To establish his *Brady* claim, Davidson must demonstrate that he was prejudiced by the State's failure to provide him with exculpatory evidence about Harlan's misconduct. *Strickler*, 527 U.S. at 281. To establish prejudice, Davidson must "show [ ] that the suppressed evidence is 'material' (*id.*), meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood*, 547 U.S. at 870. Davidson fails to explain how evidence that

---

[4]     In his memorandum, Davidson cites "Exhibit 1," presumably to direct the Court's attention to a document that would establish the years in which Alsobrooks acted as president of the Tennessee District Attorney General's Conference. However, no exhibit is attached to the motion or memorandum.

Harlan was guilty of some kind of misconduct or errors in three cases over the course of two years would have resulted in a different outcome at his trial. The Court will not grant Davidson's request to take Alsobrooks's deposition to "explore" what he knew about Harlan's misconduct and errors at the time of trial.

## IV.    Conclusion

For the reasons discussed herein, the Court DENIES Davidson's motion for discovery. (Doc. No. 51.)

It is so ORDERED.

ALISTAIR E. NEWBERN
United States Magistrate Judge