UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JERRY RAY DAVIDSON, | |
| Petitioner, | Case No. 3:16-cv-01334 |
| v. | Judge Eli J. Richardson |
| KEVIN GENOVESE, | Magistrate Judge Alistair E. Newbern |
| Respondent. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

In 1997, a Tennessee jury convicted Petitioner Jerry Ray Davidson of first-degree premeditated murder and aggravated kidnapping and sentenced him to death. *See State v. Davidson*, No. M1998-00105-CCA-R3-CD, 2002 WL 15381, at *1 (Tenn. Crim. App. Jan. 7, 2002). In 2014, the Tennessee Supreme Court vacated Davidson's death sentence on post-conviction appeal, finding that trial counsel's failure to investigate and present mitigating evidence of Davidson's intellectual and cognitive deficits during the sentencing phase of his trial violated Davidson's Sixth Amendment right to the effective assistance of counsel. *Davidson v. State*, 453 S.W.3d 386, 406 (Tenn. 2014). Davidson is currently serving a sentence of life imprisonment without the possibility of parole. (Doc. No. 37-33.)

In an amended petition for a writ of habeas corpus brought under 28 U.S.C. § 2254, Davidson argues that his trial counsel also provided constitutionally deficient representation by failing to investigate and present evidence of Davidson's intellectual and cognitive deficits at trial and that the Tennessee Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S.

668 (1984), in distinguishing between the adequacy of counsel's investigation for purposes of guilt and sentencing. (Doc. No. 25.) Davidson also argues that his trial counsel was ineffective for other reasons, that there was insufficient evidence of premeditation to support his first-degree murder conviction, and that his confinement is unconstitutional under the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. (*Id.*) The State of Tennessee answered Davidson's amended petition and filed the state-court record. (Doc. Nos. 34–38.) Both parties filed supplemental briefing as ordered by the Court. (Doc. Nos. 76, 80, 83, 86.)

Having considered the parties' arguments and the underlying record under the exacting standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the Magistrate Judge will recommend that Davidson's amended petition be granted in part and denied in part.

## I. Background

### A. Factual Background

On direct appeal, the Tennessee Supreme Court provided the following summary of the evidence introduced during Davidson's trial, which the Tennessee Court of Criminal Appeals (TCCA) adopted on post-conviction review:

> Between 8 and 9 p.m. on September 26, 1995, the victim, Virginia Jackson, and her dog arrived in a taxi cab at Bronco's Bar in Dickson, Tennessee. Jackson was carrying a large purse and a white bed pillow and wearing multicolored hair clips. When Jackson arrived at Bronco's Bar, the defendant, Jerry Ray Davidson, was sitting quietly by himself drinking beer. Jackson spent the next several hours at the bar drinking two beers and talking with the bartender, Carol Owens, and other bar patrons. Although Jackson and Davidson sat next to one another at one point, the two did not converse, and the evidence does not suggest that they were acquainted. By closing time, only Jackson, Davidson, and Owens remained in the bar. Owens tried to call a cab for Jackson, but the cab company was closed for the night. Jackson accepted a ride home from Davidson and was last seen alive around 11:30 p.m., carrying her purse and pillow as she got into Davidson's red pickup truck with her dog.

Members of Jackson's family became worried when they did not hear from her for several days. On October 1, 1995, her family filed a missing person report with law enforcement officials, who began an investigation of her disappearance.[1]

On September 30, 1995, only a few days after Jackson was last seen, Jackson's brother-in-law observed a pile of clothing lying along a farm road leading to her house. At that time, he did not connect the clothing with her disappearance. On October 18, however, he reported the clothing to law enforcement authorities. On October 18 and 19, law enforcement officers found the following items belonging to Jackson along the farm road: hair clips, a cell phone, panties, a pillow, a sweatshirt, and a sock. On October 19, 1995, two deer hunters found Jackson's decomposing, nude body. The body was partially buried in a shallow grave several miles from her house in a wooded area off an old logging road along the Houston/Dickson County line.

At trial, the condition of Jackson's body was described by Dr. Murray Marks, the forensic anthropologist who disinterred the body, and by Dr. Charles Harlan, the forensic pathologist who performed the autopsy on the body. Dr. Marks stated that the body was found lying chest down. The head was missing, although it appeared that a space had originally been dug for it in the grave. Part of the torso and left arm of the body were exposed, and the left hand was missing. There was evidence that animals had gnawed on the left arm, the neck, and the shoulder area. However, other trauma to the body was inconsistent with animal activity. Dr. Harlan observed that the skin at the front and back of the neck had been cut; the trachea exhibited a clean, sharp cut; the hyoid bone, which is located in the upper throat, had also been cut; and there was clear disarticulation of the cervical vertebral column. In addition, the torso, including the breast bone, had been cleanly cut open with some type of sharp instrument. This incision ran almost the entire length of the torso from the sternum to the navel and exposed the internal organs. Several superficial cuts had been made in the soft tissue next to the large incision. Dr. Harlan opined that both the major incision and the lesser cuts were inflicted after death. Toxicology tests revealed the presence of alcohol and Prozac in the body, although the quantity of these substances was not determined. According to Dr. Marks, it was possible that Jackson's neck had been cut and her head removed after death by either animal or human activity. Dr. Harlan opined that a human being, not an animal, had removed the head after death. Relying on changes in the body's color and texture, Dr. Marks concluded that Jackson had been dead for four to six weeks. Based on the degree of the body's decomposition, Dr. Harlan testified that death had probably occurred within twenty-four hours of Jackson's departure from Bronco's Bar on September 26, 1995. A cause of death could not be determined from Jackson's remains. Dr. Harlan, however, expressed his belief that her death was a result of homicide and that she could have died from wounds to her neck or head.

---

[1] "Jackson's dog was found at her home." *State v. Davidson*, 121 S.W.3d 600, 605 n.2 (Tenn. 2003).

All of the evidence regarding Davidson's role in the killing is circumstantial. For example, Davidson was a janitor in a hospital department where surgical instruments were cleaned. Although he had been a good and reliable employee, he did not return to work as scheduled after September 26, 1995. He did not contact anyone at work about his absence, and he was eventually fired. In addition, he did not return to his residence at his mother's home for almost three weeks after Jackson's disappearance. On October 2, 1995, Davidson's mother informed the Dickson police that he was missing. Mrs. Davidson withdrew the missing person report on October 8, 1995, after Davidson telephoned her. Davidson later returned to his mother's house, once spending the night, and a second time retrieving a camper top for his pickup truck.

There was also evidence that Davidson was in the area where the body was found in the days following Jackson's disappearance. Between October 4 and 6, 1995, approximately a week after Jackson disappeared, Melinda Jones saw Davidson driving a red truck very slowly down Old Yellow Creek Road in Dickson County. Jones saw an object in the passenger seat that was tightly wrapped in a white sheet and was about as high as Davidson's shoulder. As the truck went by, Jones saw the white object fall over onto Davidson, who pushed it away. Later that evening, Jones observed the same truck traveling in the opposite direction at a high rate of speed. Jones also testified that she remembered seeing the same truck go down the road a few days to a week earlier, shortly after Jackson disappeared. At that time, the truck was going very slowly, and Jones, who was able to see inside the vehicle as it passed, noticed that "there was something that wasn't right about the passenger's seat." Jackson's body was discovered about one and a half miles from Jones's home.

Additionally, between October 2 and 6, 1995, around 8 to 9 a.m., Davidson came into Kim's One Stop Market not far from Jones's home. He was wearing work pants and was covered with dirt to his waist. According to one witness, Davidson looked "like he'd been digging in like a garden or something." Davidson sat in the store drinking a cup of coffee for about an hour before driving away in a red pickup truck with a camper top. A week later he returned to the market to purchase a soft drink.

The State's proof also showed that on September 29 and 30, 1995, Davidson made purchases at a grocery store and at a Wal–Mart in Waverly, Tennessee, in the county just southwest of the area where Jackson's body was found. On October 4, 1995, around the time Melinda Jones saw Davidson driving his truck down Old Yellow Creek Road, Davidson also made a withdrawal from an automatic teller at a bank in Erin, Tennessee, in Houston County. All of these transactions place Davidson in the vicinity where Jackson's body was found at a time shortly after her disappearance.

Other sightings of Davidson after Jackson's disappearance also connect him with the killing. For example, on October 9, 1995, Davidson reappeared at Bronco's Bar in Dickson. When Owens, the bartender, asked him where he had taken Jackson on September 26, 1995, Davidson told her that he had dropped Jackson off at a Kroger

grocery store. Later that same day, when Timothy Eads of the Dickson County Sheriff's Department went to Bronco's Bar to speak with Owens, Davidson was still there. After Owens identified Davidson as the man who had taken Jackson home, Eads questioned Davidson about Jackson for several minutes. Davidson informed Eads that he had left Jackson at the Kroger parking lot around midnight. Davidson appeared nervous and uncomfortable during his conversation with Eads and left the bar soon after Eads. When Eads tried to contact Davidson again, Davidson could not be located. On October 18, 1995, Eads executed a search warrant at Davidson's residence. He seized an expended 20–gauge shotgun shell that was later determined to have been fired from a shotgun found in Davidson's truck.

On October 12, 1995, Davidson came into the Lakeview Tavern in Cumberland City and ordered a beer. The bartender, Darla Harvey, testified that his pants and shoes were covered with dirt. For over an hour, Davidson sat in the bar and stared at Harvey while sipping his beer. Disturbed by Davidson's appearance and behavior, Harvey went outside and examined Davidson's truck. At that time, the bed of the truck was covered with a camper top that had been spray painted red everywhere but the back window. Harvey looked inside the camper and saw a dirty sleeping bag, a dirty shovel, a chain, and two Rubbermaid containers. According to Harvey, the truck was "very messy," as if Davidson had been living in it. Harvey informed some of the bar patrons that she was afraid of Davidson, who then left the bar at the patrons' request.

On October 19, 1995, Davidson was arrested at Robert's Creek Bar near Cuba Landing in Humphreys County. At the time of the arrest, Investigator Ted Tarpley spoke with Davidson. Davidson denied giving Jackson a ride on September 26. After Officer Eads joined the interrogation, Davidson changed his story and stated that he had left Jackson at the Kroger parking lot before driving to Nashville. He claimed that he stayed in Nashville until 3 or 4 a.m., returned home, and then left the next morning for East Tennessee. Eads and Tarpley did not inform Davidson that Jackson's body had been found. When asked to hypothesize about what might have happened to Jackson, Davidson responded, "Maybe somebody got her and chained her to a tree." Davidson also told Eads and Tarpley that they might find Jackson with her head and hands missing to keep anyone from identifying the body. After Davidson was informed that the body had been found, he was asked what he had done with the head, and he replied, "I haven't told you that I killed her yet." Davidson later said that he might have something to say but could not say it yet. He also told the officers that he had quit his job because "things were just getting tense" and he decided to leave.

Searches of Davidson, his truck, and the area where the body was discovered yielded several items linking him to the killing. On his person, the arresting officers found a .25 caliber automatic pistol, a chrome knuckle knife with the blade open, a pair of handcuffs, a box of .25 caliber bullets, and a live 20–gauge shell. The pistol was loaded and ready to fire. At the time of his arrest, Davidson's truck did not have a camper top on it. His truck appeared to have been driven through mud and

vegetation. Moreover, the truck contained the following items: an Ozark Trails tent, two shotguns, a knife, handcuff keys, clothing, flashlights, cans of red spray paint, and Marlboro cigarettes. Officers also found numerous items at the campsite or grave site[2] that belonged to either the defendant or to Jackson. The items included a box for an Ozark Trails tent, shells that had been fired from the shotgun found in Davidson's truck, a knife, handcuffs that matched the keys discovered in the Davidson's truck, packages and fragments of Marlboro cigarettes, a tool box resembling one previously seen on Davidson's truck, cans of red spray paint, clothing and flashlights similar to those in Davidson's truck, and two receipts reflecting a withdrawal from Davidson's bank account on October 4, 1995, at an automatic teller in Erin, Tennessee. Personal items belonging to Jackson, such as her sandals, billfold, a hair clip, a brush, a prescription bottle, and cigarette case, were found at the campsite as well.

In addition, the bottom of the passenger seat in Davidson's truck had been cut out. A chain and padlock found around the passenger seat were arranged in such a manner that they could be used to restrain a passenger. Blood on the passenger seat and head rest tested positive for human blood. DNA testing indicated that the blood samples from the truck did not match Davidson's DNA. Instead, the samples were consistent with Jackson's DNA. According to a report from LabCorp, Inc., only one in 265,000 people would be expected to have DNA matching that of Jackson.

The defense presented evidence attempting to counter the prosecution's circumstantial evidence. There was testimony that two tires on Jackson's truck had been punctured by a knife about two days before she disappeared. In addition, a forensic pathologist who testified for the defense criticized the manner in which the State's forensic pathologist had performed the autopsy and preserved the body. The defense pathologist also complained that the quantity of alcohol and Prozac in Jackson's body should have been determined. The defense introduced Jackson's medical records reflecting her hospitalizations between 1978 and 1995 for depression and drug and alcohol abuse in an attempt to show that Jackson might have died from an overdose of alcohol and/or Prozac. Her medical records include a report that she had once overdosed on the drug Soma and had been pronounced dead. In addition, a bottle labeled for a prescription for thirty pills of Prozac dispensed on September 25, 1995, contained only five tablets when found at Jackson's home after her disappearance. To counter the inference that Davidson could have used a surgical instrument from his workplace to cut Jackson's body, the defense presented testimony that no surgical instruments had been reported missing from Davidson's place of employment. Finally, the defense presented the testimony of a DNA expert who was unable to corroborate the findings of the State's experts. The expert challenged the opinion that the DNA test ruled out

---

2       "For purposes of investigation, the general location where the body and other evidence was found was broken down into two areas: the grave site area where the body was actually found and the campsite area across the logging road from the grave." *State v. Davidson*, 121 S.W.3d at 608 n.3.

Davidson as the source of the blood found on the passenger seat of his truck. The defense expert admitted, however, that she had made no independent examination or analysis and was only reviewing LabCorp, Inc.'s findings.

*State v. Davidson*, 121 S.W.3d 600, 605–09 (Tenn. 2003); *see also State v. Davidson*, No. M2010-02663-CCA-R3-PD, 2013 WL 485222, at *1–5 (Tenn. Crim. App. Feb. 7, 2013) (same), *aff'd in part and rev'd in part*, 453 S.W.3d 386.

## B.     Procedural History

### 1.     Conviction and Sentencing

The Tennessee Supreme Court summarized Davidson's conviction and sentencing proceedings as follows:

> At the conclusion of the evidence, the jury convicted Davidson of first degree premeditated murder and aggravated kidnapping. The trial then moved to the sentencing phase to determine the punishment.
>
> During the sentencing phase, the State presented proof that Davidson had been convicted in 1971 for assault and battery with the intent to commit rape, in 1976 for assault and battery with the intent to ravish and to have unlawful carnal knowledge of a female over 12 years of age, and in 1983 for felonious crime against nature and for felonious sexual battery. A Tennessee Bureau of Investigation agent testified that Jackson's body had been mutilated by cutting the neck area and torso. Photographs showing the mutilation were re-introduced.
>
> In mitigation, the defense presented the testimony of Davidson's mother, several of his co-workers, and his minister. Davidson's mother related that, as a child, he had lived with his grandparents and had not completed school because he was always in trouble with the law. She described her son as a quiet boy who had few friends. He had no contact with his father throughout his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. Davidson's mother testified about how badly Davidson had taken his younger brother's death in Vietnam and how he had helped her at home. Next, several of Davidson's co-workers testified that he was a good worker, a good friend, and a nice, considerate man who would help anyone. They found Davidson's involvement in Jackson's murder inconsistent with his behavior when he was around them. The last witness for the defense was Joe Ingle, a minister, who described Davidson as quiet and passive, with an interest in the Bible's prophetic books and an openness to learning new things. Ingle opined that Davidson would not be a threat in prison and would participate in work or educational programs.

7

Based on this proof the jury found that the State had proven beyond a reasonable doubt the following statutory aggravating circumstances: (1) the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed by the defendant while in the commission of a kidnapping; and (3) the defendant knowingly mutilated the body of the victim after death. Tenn. Code Ann. § 39–13–204(i)(2), (7), (13) (1991 & Supp. 1995). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Davidson to death for the murder of Virginia Jackson.

*State v. Davidson*, 121 S.W.3d at 609–10 (footnote omitted); *see Davidson v. State*, 2013 WL 485222, at *5.

### 2. Direct Appeal

Davidson appealed his conviction and sentence with the assistance of counsel. The TCCA summarized the issues Davidson raised on appeal as follows:

(1) Whether the trial [court] erred when it denied the appellant's motions to change venue, strike the venire and grant additional peremptory challenges;

(2) Whether the evidence is sufficient to sustain the convictions;

(3) Whether a witness for the prosecution should have been allowed to offer opinion testimony;

(4) Whether the trial court correctly instructed the jury about the unanimity of its verdict;

(5) Whether the jury's verdict is proper;

(6) Whether the prosecutor has unlimited discretion in seeking the death penalty;

(7) Whether the death penalty is imposed in a discriminatory manner; and

(8) Whether Tennessee courts employ an adequate proportionality review.

*State v. Davidson*, 2002 WL 15381, at *1.

The TCCA affirmed Davidson's convictions and sentence. *Id.* at *21. Because Davidson received a death sentence, his appeal was automatically docketed before the Tennessee Supreme Court. *State v. Davidson*, 121 S.W.3d at 604. A divided Tennessee Supreme Court affirmed the

TCCA's decision, *id.* at 623, with two justices dissenting on grounds that, among other things, the State had not introduced sufficient evidence to show that Davidson engaged in the kind of premeditation necessary to sustain a conviction for first-degree murder under Tennessee law, *id.* at 625–29 (Anderson, J., dissenting); *id.* at 629–31 (Birch, Jr., J., dissenting).

### 3.      State Post-Conviction Proceedings

Davidson filed a pro se petition for post-conviction relief in Dickson County Circuit Court on August 12, 2004. (Doc. No. 37-1.) The post-conviction court summarized Davidson's pro se claims for relief as follows:

(1) That Petitioner's conviction was based upon the use of a coerced confession;

(2) That Petitioner's conviction was based upon the use of evidence gained pursuant to an unconstitutional search and seizure;

(3) That Petitioner's conviction was based upon the use of evidence obtained pursuant to an unlawful arrest;

(4) That Petitioner's conviction was based upon a violation of the privilege against self-incrimination;

(5) That Petitioner's conviction was based upon the unconstitutional failure of the prosecution to disclose to Petitioner evidence favorable to Petitioner;

(6) That Petitioner was denied the effective assistance of counsel;

(7) That Petitioner's conviction was based upon the use of illegal evidence;

(8) That introduction of victim impact evidence at the trial of innocence or guilt violates due process and fair trial protections found in the Sixth and Fourteenth Amendments and the analogous Tennessee Constitution provisions;

(9) There was prosecutorial misconduct committed by the prosecutor arguing that the jury should rely on victim impact evidence and conjecture at the closing argument in the innocence or guilt trial which violated Petitioner's right to due process and a fair trial under the Sixth and Fourteenth Amendments and analogous Tennessee Constitution provisions.

(10) That the prosecutor committed misconduct in violation of Petitioner's right to due process and a fair trial by denigrating Petitioner's DNA expert in the innocence/guilt trial closing argument and making arguments not based upon her testimony.

(Doc. No. 37-4, PageID# 7138–39.)

The post-conviction court appointed counsel to represent Davidson (Doc. No. 37-1), and counsel filed an amended petition on Davidson's behalf adding the following claims for relief:

(11) Denial of a fair trial venue;

(12) Jury tampering/jury misconduct;

(13) Prosecutorial misconduct;

(14) Unconstitutionally conducted Voir Dire;

(15) Victim Impact evidence;

(16) Execution of Petitioner would violate the Constitution as he is severely mentally ill;

(17) Additional grounds for ineffectiveness of counsel;

(18) The evidence introduced at trial was insufficient to sustain Petitioner's convictions;

(19) Petitioner's Due Process rights were violated;

(20) The record of the proceedings against Petitioner were incomplete;

(21) The Tennessee death penalty is unconstitutional;

(22) Substantive Proportionality Claim;

(23) Procedural Proportionality Claim;

(24) Petitioner's jury was not required to reach a unanimous verdict regarding all factual findings concerning aggravating and mitigating circumstances under *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000),] and *Ring* [*v. Arizona*, 536 U.S. 584 (2002)];

(25) Failure to sequester prospective jurors during the voir dire process and prior to the commencement of the trial;

(26) Execution by lethal injection violates the United States and Tennessee Constitutions;

(27) The death sentence violates Petitioner's fundamental right to life;

(28) The death penalty system is so broken, so fraught with errors and inequities, that imposition [of] death in this case violates the State and Federal Constitutions;

(29) The absolute discretion vested in the prosecutor to seek the death penalty violates due process, equal protection, effective assistance of counsel, and freedom from cruel and unusual punishment;

(30) The death penalty is in violation of International Law; [and]

(31) The cumulative effect of all errors at trial violated Petitioner's constitutional rights.

(Doc. No. 37-4, PageID# 7139–40.)

After holding an evidentiary hearing over five days between 2006 and 2009, the post-conviction court denied Davidson's amended petition in a 188-page opinion issued on November 10, 2010. (Doc. No. 37-4.) The TCCA affirmed the post-conviction court's denial of Davidson's amended petition. *Davidson v. State*, 2013 WL 485222, at *48; (Doc. No. 37-25).

The Tennessee Supreme Court affirmed Davidson's convictions, but vacated his death sentence on ineffective-assistance-of-counsel grounds. *Davidson v. State*, 453 S.W.3d at 406. The four-justice majority held that Davidson's trial "counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial" but that "counsel's investigation and presentation of mitigation evidence" related to Davidson's "brain damage and cognitive disorders" during sentencing "fell short of [the] competence demanded of attorneys in criminal cases" and "prejudiced [ ] Davidson at his capital sentencing hearing." *Id.* at 403–05. One justice concurred in part and dissented in part, finding that "the majority [ ] properly ruled that the failure of trial counsel to present mental health evidence as mitigation during the penalty phase resulted in prejudice to [Davidson]" and "that the same rationale should extend to the guilt phase of trial. Because of their inadequate preparation as to [Davidson's] medical history, his trial attorneys were unable to make an informed choice to forgo the presentation of this important evidence at trial." *Id.* at 409 (Wade, J., concurring in part and dissenting in part).

On remand, Davidson waived his right to a second sentencing hearing and accepted a sentence of life imprisonment without the possibility of parole for the first-degree murder conviction. (Doc. Nos. 37-32, 37-33.) He is currently serving that sentence, with the sentence for aggravated kidnapping to run consecutively. (Doc. No. 37-33.)

### 4.     Federal Post-Conviction Proceedings

Davidson initiated this action by filing a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1.) The Court appointed counsel, "finding that Davidson has significant cognitive impairments that would significantly hinder his ability to effectively litigate his case, that Davidson's case presents unusual complexities, and that his case is not without merit." (Doc. No. 60, PageID# 11084 (citing Doc. Nos. 3, 19).) Davidson filed an amended petition with the assistance of counsel. (Doc. No. 25.) The amended petition includes nineteen enumerated claims for relief, many with multiple sub-claims that raise the total number of asserted claims to more than sixty. (*Id.*) Among other issues, Davidson's amended petition addresses ineffective assistance of trial counsel (IATC), sufficiency of the premeditation evidence underlying his first-degree murder conviction, ineffective assistance of post-trial and appellate counsel, discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the prosecution's failure to disclose evidence to his counsel under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*)

The State of Tennessee filed the state-court record and answered the amended petition. (Doc. Nos. 34–38.) The State argues that Davidson has not exhausted state review procedures for all of the claims he asserts as AEDPA requires, that Davidson has not shown that he is entitled to relief on any of the claims he has properly exhausted, and that Davidson has not shown the required cause and prejudice for the Court to excuse his failure to exhaust the remaining claims in his amended petition. (Doc. No. 38.)

Davidson filed a reply, arguing, among other things, that ineffective assistance of post-conviction counsel excuses his procedurally defaulted claims under *Martinez v. Ryan*, 566 U.S. 1 (2012).[3] (Doc. No. 47.)

Davidson moved for discovery to develop the evidence related to some of his IATC claims. (Doc. No. 51.) The Court denied the motion, finding that Davidson had failed to establish good cause for the requested discovery. (Doc. No. 60.) Davidson then moved for an evidentiary hearing under *Martinez* regarding his procedurally defaulted claims. (Doc. No. 70.) The Court denied the motion, finding that Davidson had failed to "explain why an evidentiary hearing is necessary to establish cause and prejudice for his procedurally defaulted claims" and failed to "identify or describe any new evidence regarding his post-conviction counsel's ineffectiveness or the substantial nature of [his] underlying IATC claims that he would offer at a hearing." (Doc. No. 75, PageID# 11174.) The Court further found that it is prohibited from considering new evidence regarding claims in Davidson's amended petition that the state post-conviction court considered on the merits. (Doc. No. 75.)

After resolving these motions, the Court found that, "[i]n his filings made to date, Davidson ha[d] offered legal argument to support only a subset of the more-than-sixty claims presented in his amended petition" and that the forty claims for which he "ha[d] made no legal argument [were]

---

[3]     In *Martinez*, the Supreme Court held that ineffective assistance of post-conviction counsel may, in some circumstances, establish cause to overcome the procedural default of a substantial IATC claim. 566 U.S. at 17.

waived." (Doc. No. 76, PageID# 11183.) The Court found "that Davidson ha[d] provided sufficient argument to allow the following claims to proceed" for further briefing:

- Exhausted Claims:

    o **1a**: that there was insufficient evidence to support Davidson's first-degree murder conviction;

    o **2d**, **2e**, **2f**, **2aa**: IATC claims regarding failure to fully investigate and argue Davidson's mental health and competency;

    o **2g1**: IATC claim regarding failure to object to the trial court's "intentional" jury instruction;

    o **2h & 2y**: IATC claims regarding failure to object to the victim's daughter sitting at the prosecution table during jury selection and failure to object to testimony from the victim's daughter during the guilt phase of trial;

    o **2ab**: IATC claim regarding failure to object to the prosecution's attacks on defense witness Dr. Foreman;

    o **19**: that the cumulative effect of all errors in the trial and appeal deprived Davidson of a fair and reliable trial and direct appeal.

- Procedurally Defaulted Claims:

    o **2a**: IATC claim regarding failure to investigate gender discrimination in the selection of the grand jury foreperson;

    o **2b**: IATC claim regarding failure to move to quash the indictment or to move to dismiss the charges because the grand jury did not comprise thirteen members;

    o **2c**: IATC claim regarding failure to make a complete and supported *Batson* objection to the prosecution's striking of Juror Springer;

    o **2g2**: IATC claim regarding failure to object to guilt-phase jury instructions on the prosecution's burden of proving all essential elements of the offense beyond a reasonable doubt;

    o **2g3**: IATC claim regarding failure to object to the trial court's failure to instruct the jury on the lesser included offense of reckless homicide;

    o **2ad**: IATC claim regarding failure to raise any or all of the constitutional challenges in Davidson's amended petition;

14

- o **4**: that women were discriminated against, systematically excluded, and underrepresented in the selection of and service as grand jury foreperson in violation of due process, equal protection, and the right to a grand jury selected from a fair cross section of the community;

- o **5**: that the grand jury only had twelve members instead of the thirteen members required by Tennessee law;

- o **6**: that Juror Springer was unconstitutionally excluded from the jury based on her race;

- o **7**: that the guilt-phase jury instructions relieved the prosecution of its burden of proving all elements beyond a reasonable doubt;

- o **8**: that Davidson was incompetent to stand trial;

- o **9**: that Davidson's conviction was based on the use of a coerced confession;

- o **10**: that Davidson's conviction was based on a violation of his constitutional right against self-incrimination;

- o **11**: that the prosecution withheld notes from District Attorney Investigator Tarpley's interview with Witness Jones in violation of *Brady v. Maryland*;

- o **12**: that the prosecution improperly relied on victim impact evidence to induce the jury to convict Davidson;

- o **13**: that Davidson was deprived of a fair trial because of extensive pre-trial publicity in the areas from which the jury was selected;

- o **14**: that Davidson was deprived of a fair trial and a fair and impartial jury because of comments that a bailiff and a correctional officer made to jurors about Davidson;

- o **15**: that the prosecution engaged in various kinds of misconduct during opening and closing statements and while questioning witnesses;

- o **16**: that the trial court failed to adequately determine the extent of pretrial publicity and its impact on jurors; improperly allowed the victim's daughter to sit at the prosecution table; and failed to excuse Juror Jackson for cause;

15

  o  **17**: that the guilt phase of Davidson's trial was improperly tainted with victim impact evidence, including emotional reactions by the victim's daughter while testifying.

(*Id.* at PageID# 11184–86 (footnotes omitted).) The Court ordered the parties to file supplemental briefs addressing these claims and instructed that "[t]he parties also may address the Court's finding that Davidson has waived the unargued claims in his amended petition." (*Id.* at PageID# 11187.)

  Davidson filed a supplemental brief making specific arguments regarding the identified exhausted claims and general arguments regarding the procedurally defaulted claims. (Doc. No. 80.) Davidson's supplemental brief does not address or challenge the Court's finding that he waived the remaining claims in his amended petition. The State filed a supplemental brief reiterating its arguments that Davidson has failed to show that any of his exhausted claims have merit and failed to show that cause and prejudice allow the Court to consider any of Davidson's procedurally defaulted claims. (Doc. No. 83.) Davidson filed a reply stating that he "rests on his previous briefing[.]" (Doc. No. 86, PageID# 11233.)

## II.  **Legal Standard**

  Davidson's amended petition is governed by 28 U.S.C. § 2254(d), as amended by AEDPA. Section 2254(d) provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). To be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." 28 U.S.C. § 2254(d)(2). The statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA "standard is difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102; *see also Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); *see also Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "'[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State'" with respect to each claim, or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair

opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting *id.* at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39 (exhaustion of remedies)).

"Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Under the doctrine of procedural default, a petitioner who may no longer present claims in state court because he or she failed to meet state procedural requirements must "demonstrate cause for his [or her] state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The one exception to this doctrine "is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that [the federal habeas court's] failure to review his [or her] federal claim will result in a fundamental miscarriage of justice." *Id.*

## III.     Analysis

The claims asserted in Davidson's amended petition fall into three procedural categories. (Doc. No. 76.) There are approximately ten claims that the State concedes are exhausted and ripe for this Court's review, twenty claims that Davidson concedes are procedurally defaulted but argues can be considered with an adequate showing of cause and prejudice, and forty claims that

19

Davidson concedes are waived. (*Id.*) This Report and Recommendation addresses only the claims that Davidson has not waived.

### A.     Exhausted Claims

#### 1.     Ineffective Assistance of Trial Counsel Claims

Davidson's principal arguments in favor of a writ of habeas corpus address the effectiveness of his representation by trial counsel (Doc. Nos. 25, 47, 80.)

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court held in *Strickland v. Washington* that "the right to counsel is the right to the effective assistance of counsel." 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *see also id.* at 685 ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

Deficient performance under *Strickland* is "measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 687, 688); *see also Wiggins*, 539 U.S. at 521 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (alteration omitted) (quoting *Strickland*, 466 U.S. at 688)). "[I]n applying *Strickland* [ ] , hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' [ ] decisions are made and by giving a 'heavy measure of deference to counsel's judgments[.]'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691).

To establish prejudice under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 390 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

Under AEDPA, a federal court's evaluation of an IATC claim decided on the merits in state court is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The court must "take a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Id.* (first quoting *Strickland*, 466 U.S. at 689; and then quoting *Knowles*, 566 U.S. at 121 n.2)). In other words, the court must "give[ ] both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15. Viewed through AEDPA's "'deferential lens'" *Cullen*, 563 U.S. at 190 (quoting *Knowles*, 566 U.S. at 121 n.2), "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" *Harrington*, 562 U.S. at 105.

> **a. Claims 2d, 2e, 2f, 2aa: Investigation and Presentation of Evidence of Davidson's Intellectual Limitations and Mental Health History**

Davidson argues that his trial counsel was ineffective under *Strickland* because they failed to timely and adequately investigate, obtain, and present evidence of Davidson's intellectual limitations and mental health history during the guilt phase of his trial and that such investigation would have led to evidence showing that Davidson was incapable of premeditation, an essential element of first-degree murder under Tennessee law. (Doc. Nos. 25, 47, 80.) Davidson argues that the state courts unreasonably applied *Strickland* in denying these IATC claims. (Doc. Nos. 25, 47,

80.) The State concedes that Davidson exhausted these claims by raising them in his state post-conviction proceedings before the TCCA and the Tennessee Supreme Court. (Doc. No. 38.) It argues, however, that Davidson is not entitled to relief because the state courts reasonably applied *Strickland*. (Doc. Nos. 38, 83.)

### i. The State Courts' Findings

The TCCA analyzed these IATC claims as follows:

The Petitioner argues that trial counsel should have presented evidence demonstrating that he was incapable of forming the requisite culpable mental state required for a finding of first degree premeditated murder instead of challenging the sufficiency of the State's evidence. According to the Petitioner's argument, counsel did not invest enough time into investigating his mental health, and thus they were unable to make an informed decision to forego a diminished capacity type of defense in favor of the theory they ultimately pursued at trial.

The Petitioner is challenging trial counsel's strategy. Mr. Goodlett[, one of two trial attorneys,] did not believe the State would be able to prove that the Petitioner committed first degree premeditated murder. The record does not dispute Mr. Goodlett's testimony that defense counsel thoroughly investigated the facts of the crime. In addition, counsel obtained the services of independent experts to challenge those of the State regarding the autopsy findings and the DNA analysis of blood found in the Petitioner's vehicle. The State's proof in this case was entirely circumstantial. On direct appeal, although the majority of the supreme court concluded that the convicting evidence was sufficient, they acknowledged that "the question is close in this case." 121 S.W.3d at 615. Contrary to the Petitioner's suggestion, though, the fact that his convictions were affirmed by a three to two vote does not equate with a presumption that trial counsel should have chosen a different defense strategy. The Petitioner is still required to demonstrate that counsel's performance was deficient and that prejudice resulted.

The Petitioner was evaluated for almost a month at [the Middle Tennessee Mental Health Institute (MTMHI)] prior to trial. Mr. Goodlett testified that he reviewed the MTMHI report. According to that report, the Petitioner was deemed competent to stand trial and there was no support for an insanity defense. The report acknowledged the Petitioner's lengthy criminal record and history of mental health treatment. The report commented on the Petitioner's tendency to exaggerate and his ability prior to his arrest to maintain successful employment. It also noted that the Petitioner declined to answer certain questions about his whereabouts or functioning during the time of the crimes because he was concerned about his legal situation. The Petitioner was determined to have a low-average to average I.Q. MTMHI diagnosed the Petitioner with a personality disorder, not otherwise specified, with schizoid, antisocial and avoidant traits.

Mr. Goodlett testified that he was aware of the Petitioner's criminal background and long history of mental health treatments. Mr. Goodlett acknowledged, though, that the Petitioner had never been declared incompetent to stand trial or otherwise insane. During the evidentiary hearing, Mr. Goodlett acknowledged that information contained in many of the reports from the Petitioner's past evaluations would have been extremely damaging to the defense and that he weighed the probability of that information being exposed to the jury during cross-examination by the State when evaluating his trial strategy. Although the Petitioner faults trial counsel's limited investigation into his mental health, even only a cursory review of the Petitioner's records would have caused any reasonable attorney to strongly consider an alternative approach to the defense. Included in those reports is the following information, including statements attributable to the Petitioner, which Mr. Goodlett testified were included in his case files: the Petitioner was viewed as being manipulative, uncooperative and prone towards lying; the Petitioner was considered a dangerous parolee and would be inclined to commit rape and murder in the future; the Petitioner stated that his problem was that he liked to rape women; the Petitioner stated that he raped over 100 women between 150 and 200 times; the Petitioner stated there are two types of relationships with women, courtship and rape, and that he was no good at courtship; the Petitioner stated that it was difficult to rape because there were a lot of things going on in his mind at the time; the Petitioner said he would continue to assault women after his release from custody; the Petitioner remarked that one of his favorite activities when he was younger was raping girls, that he raped over 100 women, "if you use the legal definition," and that the only difference between making love and committing rape was whether or not the woman enjoyed it; the Petitioner accepted a significant number of rape myths and he saw violence as a way of controlling women; and the Petitioner said he would risk incarceration to spend time alone with a particular woman and said that she would let him lock a chain around her and drive her to East Tennessee. Even trial counsel's mitigation specialist admitted that the Petitioner's records were some of the most unfavorable she had ever encountered.

In support of his argument, the Petitioner relies upon Dr. [Peter I. ]Brown's opinion that the Petitioner could not have formed the requisite premeditation given the facts of this case. Dr. Brown testified that he read the supreme court's opinion, but he admitted that he did not read the trial transcript. Dr. Brown testified that he based his opinion upon his review of the Petitioner's personal records and other "clinical information." Dr. Brown believed it was more likely that the Petitioner reacted to the situation rather than having planned the crimes in advance. And although he stated that the Petitioner did not do a good job concealing his involvement, Dr. Brown agreed that the Petitioner's actions after the murder did represent attempts to conceal his involvement and avoid detection. Moreover, Dr. Brown acknowledged that the Petitioner was not incapable of ever forming the culpable mental state for first degree murder.

The Petitioner insists that trial counsel did not conduct a thorough enough investigation into his mental health. However, counsel did thoroughly investigate the facts of the crime. This is not a case where trial counsel did not engage in any

trial preparation. Instead, the Petitioner simply disagrees with counsel's chosen strategy. Mr. Goodlett testified that counsel discussed trial strategy with the Petitioner and that the Petitioner was aware of the negative information contained in his records. Mr. Goodlett was also aware of the Petitioner's lengthy mental health history but, given the negative information contained in many of the reports, decided that the best defense was to challenge the State's circumstantial evidence.

Reviewing courts must indulge a strong presumption that the conduct of trial counsel falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Our supreme court has stated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Hellard*[ *v. State*], 629 S.W.2d [4,] 9 [(Tenn. 1982)] (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.* This Court must defer to counsel's trial strategy and tactical choices when they are informed ones based upon adequate preparation. *Id.*

As noted earlier, criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. *Denton*[ *v. State*], 945 S.W.2d [793,] 796 [(Tenn. Crim. App. 1996)]. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." *Vermilye v. State*, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987).

The Court has reviewed the lengthy trial record in light of the Petitioner's post-conviction claim and the evidence presented at the evidentiary hearing. The Court cannot conclude, however, that the decision to challenge the strength of the State's evidence was objectively unreasonable. The Petitioner does not explain how counsel's chosen strategy was erroneous in and of itself. Instead, he argues that trial counsel should have chosen a different strategy altogether. The evidence in this case was entirely circumstantial. The supreme court acknowledged this was a close case. However, just because the jury concluded that the State proved its case beyond a reasonable doubt does not mean that counsel's performance was deficient. Contrary to the Petitioner's argument, trial counsel's decision was an informed one, and one to which deference will be given.

*Davidson v. State*, 2013 WL 485222, at *18–20.

The Tennessee Supreme Court "agree[d] with the Court of Criminal Appeals that counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial." *Davidson v. State*, 453 S.W.3d at 403–04 (citing *id.* at *19–20). The court held that:

> Counsel was legitimately concerned that presenting any psychological evidence could open the door for the State to show the jury the alarming statements from Mr. Davidson's mental health records that revealed his malignant misogyny and his propensity to commit sexual violence. Ensuring that this evidence remained inadmissible was a reasonable strategy.

*Id.* at 404. With respect to the sentencing phase of Davidson's trial, however, the Tennessee Supreme Court reversed the TCCA and vacated Davidson's death sentence, holding that counsel "were deficient in their investigation and presentation of mitigating evidence" regarding Davidson's intellectual limitations and mental health. *Id.* at 403. "In all other respects, [the Tennessee Supreme Court] affirm[ed] and adopt[ed] the reasoning of the Court of Criminal Appeals." *Id.* at 406. The Tennessee Supreme Court's holding that counsel's investigation of Davidson's mental health and intellectual capacity was adequate for purposes of trial cannot be squared with its holding that the same investigation was inadequate for purposes of sentencing and constitutes an unreasonable application of *Strickland*.

### ii.        Trial Counsel's Deficiency

In *Strickland*, the Supreme Court addressed how counsel's duty to investigate a case before trial relates to trial strategy. The court held that standards of effective representation

> require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate

must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91. In *Wiggins v. Smith*, the Supreme Court explained that the "principal concern in deciding whether [counsel] exercised 'reasonable professional judgment[t]'" in deciding not to further investigate is "whether the investigation supporting counsel's decision . . . was *itself reasonable*." 539 U.S. at 522–23 (second alteration in original) (quoting *Strickland*, 466 U.S. at 691). This standard applies equally to counsel's investigation efforts before trial and before sentencing. *See Ramonez v. Berghuis*, 490 F.3d 482, 488 (6th Cir. 2007) (citing *Wiggins*, 539 U.S. at 522–23)).

The Supreme Court has "long [ ] referred" to the standards of defense representation articulated by the American Bar Association (ABA) as "guides to determining what is reasonable." *Wiggins*, 539 U.S. at 525 (quoting *Strickland*, 466 U.S. at 688). In *Williams v. Taylor*, the Supreme Court cited commentary to the ABA's Standards for Criminal Justice to support its finding that defense attorneys have a professional "obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p.4–55 (2d ed. 1980)); *see also id.* at 415 (O'Connor, J., concurring) (noting defense counsel's duty "to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances"). This obligation encompasses the guilt and sentencing phases of trials. *See, e.g.*, Standard 4-4.1 Duty to Investigate, ABA Standards for Criminal Justice: Prosecution Function and Defense Function (3d ed. 1993) [hereinafter 1993 ABA Standards for Criminal Justice]. For example, the commentary to the version of the ABA standards in place during Davidson's trial explains that defense counsel "has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing." Standard 4-4.1 commentary, 1993 ABA Standards for Criminal Justice at 183.

"Investigation is essential to fulfillment of these functions." *Id.* "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* "Such information may lead the prosecutor to defer or abandon prosecution and will be relevant at trial and at sentencing." *Id.* The commentary further notes that counsel's investigation of the defendant's background is crucial because, "[i]n many criminal cases, the real issue is not whether the defendant performed the act in question but whether the defendant had the requisite intent and capacity." *Id.* at 182.

The Tennessee Supreme Court's assessment of Davidson's counsel's investigation efforts shows why those efforts were deficient for trial and sentencing alike.

The Tennessee Supreme Court found that trial counsel had obtained mental health records for Davidson that showed the need for further investigation well before the August 1997 trial date:

> Before trial, Mr. Davidson spent twenty-seven days at the Middle Tennessee Mental Health Institute ("MTMHI"), where he was observed and psychologically tested. His brain was scanned. Although the records from Mr. Davidson's stay at MTMHI ("MTMHI Records") acknowledge his mental illness and his troubled social history, his evaluators did not find that he was incompetent to stand trial or incapable of committing a premeditated murder.

> . . .

> Among the MTMHI Records are a CT scan of Mr. Davidson's head, performed on March 24, 1997. The opinion of the doctor who reported the scan was that Mr. Davidson had "[s]light prominence of the sulci, particularly in the posterior fossa[,] compatible with mild atrophy." At a post-conviction hearing, psychiatrist Peter I. Brown explained that this finding meant that Mr. Davidson suffered from cerebral atrophy: "a significant shrinking . . . an actual decrease in the amount of brain tissue."

> The MTMHI Records also contain a report of an EEG of Mr. Davidson's brain activity. The report identified an "[a]bnormal EEG because of a slight excess of asynchronous slowing in all quadrants." Dr. Brown later explained to the post-conviction court that this meant the electrical activity in Mr. Davidson's brain was

27

"out of beat." This abnormality would interfere with Mr. Davidson's executive functioning[4] and his ability to behave coherently.

Mr. Davidson's counsel also possessed the older [Tennessee Department of Correction (TDOC)] Records which chronicled Mr. Davidson's interactions with mental health professionals during the decades leading up to the murder. These records were examined (at least in part) by the neuropsychologist and the mitigation specialist who counsel belatedly retained prior to trial.

The TDOC Records reveal Mr. Davidson to be a very mentally disturbed individual. A 1979 letter from a forensic psychiatrist in Chattanooga to a state judge explains that Mr. Davidson "does have a rather serious defect of judgment based on his mental illness, which prevents him from being fully aware of the social consequences of all his behavior." A September 1980 social history report includes Mr. Davidson's self-report that he had been diagnosed with "undifferentiated schizophrenia" in the tenth grade . . . .

Another psychological report from [the early 1980s] noted that Mr. Davidson was "maladjusted mentally," had "severe psychiatric disturbance," and "is impulsive and is unable to control his impulses." A psychological evaluation from March 1984 stated that at times Mr. Davidson "may have difficulties controlling his impulses and may act out without thought of his consequences to his behavior." The report also said he "seems to accept violence as a way of maintaining control over women."

*Davidson v. State*, 453 S.W.3d at 390, 396–97.

"[L]ess than one month before the scheduled trial date, the defense team filed a motion seeking funds for expert assistance from a neuropsychologist." *Id.* at 398. The Tennessee Supreme Court granted the motion four days after it was filed and authorized $3,000.00 for counsel to retain Dr. Pamela Auble, a neuropsychologist, to evaluate Davidson. *See id.* at 390–91, 398. But the tardiness of counsel's request and counsel's failure to provide Dr. Auble with Davidson's most recent and extensive mental health records left her expertise largely untapped.

---

[4] "Executive functioning involves 'the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. It involves a person's ability to develop and carry out plans, to form analogies, to obey social rules, to solve problems, to adapt to unexpected circumstances, to do several tasks simultaneously, and to place episodes in time and place.'" *Davidson v. State*, 453 S.W.3d at 396 n.4 (quoting *In re Conservatorship of Groves*, 109 S.W.3d 317, 338 n.78).

[Trial counsel] provided Dr. Auble with Mr. Davidson's TDOC Records but not his MTMHI Records. Dr. Auble interviewed Mr. Davidson for three hours and performed several basic screening tests, but she did not have time to perform the neuropsychological tests she would have normally performed. Like the mitigation specialist, Dr. Auble wrote counsel a letter expressing her concern that she lacked adequate time to properly evaluate Mr. Davidson. Neither Dr. Auble nor the mitigation specialist testified at trial.

. . .

Dr. Auble's involvement in the case was [ ] limited. During her testimony at the September 2008 [post-conviction] hearing, Dr. Auble explained that she worked on the case for "only twenty days basically. . . . I didn't have very much time to devote to this case." The materials she reviewed for the defense included "basically some prison records and some evaluations that were done at the Department of Corrections. There's a chaplain's report. It's not very much. It's just a few things . . . . It might be twelve pages." Dr. Auble said she did not know the MTMHI Records even existed.

Dr. Auble spent three hours interviewing and testing Mr. Davidson. She explained that although she was a neuropsychologist, all she did was a basic evaluation. She stated that "I interviewed him and did psychological testing. I didn't do neuropsychological testing. There wasn't time for that and I didn't have enough information to know that there was a need for that." Dr. Auble testified that she had evaluated fifty people who had been on death row, including thirty current occupants. She said Mr. Davidson was the only one for whom she did not perform neuropsychological testing. Dr. Auble testified that although she had been authorized to do thirty hours of work, she had only done 7.5 hours. "There just wasn't enough time," she said, to do even the minimal screening she would normally perform for a death penalty defendant.

Dr. Auble sent counsel a four-page report in July 1997. In her report, Dr. Auble concluded that Mr. Davidson was not "floridly psychotic" at the time of her interview, and that he "appeared competent to stand trial." Her "diagnostic impression," however, was that he suffered from "adjustment disorder with anxiety in a schizotypal personality disorder." He had "the potential for psychotic episodes under stress," "difficulty relating to others effectively," and "his thinking may get in the way of his accurate perceptions of situations." Dr. Auble's report also briefly described Mr. Davidson's "difficult childhood," poor performance in school, and his "long history of mental illness."

*Id.* at 390–91, 399.

As the Tennessee Supreme Court found, trial counsel was not able to provide "a satisfactory explanation" for this "cursory" and unduly "truncated investigation" into Davidson's mental health and intellectual capacity. *Id.* at 398, 399, 401.

> Mr. Davidson's lead counsel at trial was Collier Goodlett, an attorney with the public defender's office in Clarksville. His co-counsel was Mike Love, an attorney in private practice whose health issues rendered him unavailable to testify at the post-conviction hearings. Mr. Goodlett appeared before the post-conviction court on November 14, 2006, and testified that at the time of the trial he was familiar with the ABA Death Penalty Guidelines, as well as related materials produced by the Tennessee Association of Criminal Defense Lawyers.

> . . .

> Mr. Goodlett explained that his office was overworked and understaffed in the months leading up to Mr. Davidson's trial. Mr. Goodlett had a full caseload in addition to two capital cases during this time period. He had no secretary, and an independent organization recommended doubling the number of attorneys in his office. Additionally, Mr. Love was suffering from significant health problems . . . .

> . . .

> When he appeared at a November 2006 post-conviction hearing, Mr. Goodlett was unable to give a satisfactory explanation for his truncated investigation other than that he was harried and overworked. Post-conviction counsel asked Mr. Goodlett about documents he possessed which showed Mr. Davidson had been diagnosed as schizophrenic as far back as the 1960s: "Was there any reason not to want to revisit that diagnosis for the trial?" "No," answered Mr. Goodlett, "we should have done that."

> At the post-conviction hearing, Mr. Goodlett was given a copy of the report by mitigation specialist Gloria Shettles. When asked if he read the whole report, Mr. Goodlett responded, "I don't know that I did." Although Ms. Shettles's report highlighted key documents in Mr. Davidson's medical records, Mr. Goodlett could not recall whether he had read those highlighted records.

> Mr. Goodlett testified that he retained Dr. Auble "ever so briefly" before trial, but that she did not give him anything "helpful" to his case. Mr. Goodlett was also asked about the MTMHI Records, which Dr. Auble later testified she never received:

>> Q: Were you aware that Mr. Davidson had an abnormal EEG and some atrophy according to the CT scan prior to trial?

>> A: I don't know that I was.

> Q: Were you the one that was charged with the responsibility of reviewing this or was that Mr. Love or somebody else?
>
> A: I suspect that I reviewed it, but unfortunately it would have, I guess, been fairly cursory unfortunately.
>
> Q: Do you know whether this full [MTMHI Records] was supplied to Dr. Auble?
>
> A: I do not know.

*Id.* at 397–400.

The Tennessee Supreme Court found that testimony provided at Davidson's post-conviction proceedings shed light on what a more fulsome pretrial investigation of Davidson's psychological condition and intellectual capacity could have revealed:

> Neuropsychologist Dr. Malcolm Spica examined Mr. Davidson twice in 2006 and reviewed his mental health records. Dr. Spica determined that Mr. Davidson had a full-scale I.Q. of 89, but that his nonverbal processing score was 79, "ranking below 92% of the general population and only nine points above the threshold of mental retardation." Mr. Davidson's "higher-order reasoning" skills were equivalent to those of a ten[-]year[-]old on one test, and at the level of a nine year old on another. Dr. Spica said that when under pressure, Mr. Davidson performed at a "much lower (severely impaired range)." To Dr. Spica, these findings "sharply raise[d] the possibility of a formal thought disorder." This "instability" of judgment and reasoning was a type "often associated with frontal cerebral lobe dysfunction." In addition to Mr. Davidson's "instability of reasoning," Dr. Spica expressed concern with Mr. Davidson's "deficits in discriminating between actual information and distorted approximations." Dr. Spica diagnosed Mr. Davidson as having cognitive, depressive, and anxiety disorders—all not otherwise specified.
>
> At a September 2008 post-conviction hearing, Dr. Spica explained his report and testified that he was confident that Mr. Davidson had not malingered or otherwise feigned his symptoms. While Mr. Davidson was able to engage people effectively in conversations, Dr. Spica found that beyond that language proficiency he was "a man of limited internal resources, limited cognitive power, and his reasoning is more like a much younger individual. It's nine or ten years old, although at other times he performed far below that. It's the picture of brain dysfunction."
>
> Psychiatrist Peter I. Brown also interviewed Mr. Davidson and reviewed previous mental health records, including Dr. Spica's report. Dr. Brown found that Mr. Davidson exhibited "clear, consistent, and severe deficits" in regard to reasoning, abstraction and generalization, and executive function. Dr. Brown opined in his report that Mr. Davidson's "cognitive processes are not only defective

but fragile," and "particularly vulnerable to external influences, such as situations that produce strong emotions," which seriously compromised his ability to, for example, premeditate. Dr. Brown diagnosed him with not otherwise specified cognitive disorder and schizotypal personality disorder. "[T]he clinical data," he said, "are consistent with the emotional and social functioning of, at most, a child in the primary to middle school range," which indicates "significant impairments in his capacities to plan, consider or evaluate and effectively carry out behavior"—a condition he described as "frontal lobe dysfunction (or 'functional lobotomy')." Mr. Davidson, Dr. Brown said, is "'socially and emotionally retarded' with a functional level corresponding at most to those of a ten[-]year[-]old."

Dr. Brown elaborated on these findings in his testimony at a hearing in September 2008. Having studied Mr. Davidson's mental health records, Dr. Brown noted that the people who had treated Mr. Davidson previously "met with almost no progress because of the lack of cognitive and affective and social skills." He characterized Mr. Davidson's thinking as "primitive" and highly disorganized. Mr. Davidson was unable to accurately interpret and respond to social cues, he said. Although Mr. Davidson could function perfectly well in a highly-structured environment, such as a prison, Dr. Brown testified that outside such environments, he would have "a great deal of difficulties and very few resources." Not only was Mr. Davidson mentally impaired, but he also lacked the support of any close friends or colleagues or family members. While he acknowledged that Mr. Davidson had at least attempted to rape women in the past, he believed Mr. Davidson's statements about raping hundreds of women were fantasies and exaggerations. While he acknowledged that people who treated Mr. Davidson in the past thought Mr. Davidson was lying or malingering, Dr. Brown believed these people had misconstrued Mr. Davidson's responses to questions because Mr. Davidson's thinking was disorganized and he was highly prone to suggestion.

*Id.* at 400–01.

Having summarized the trial and post-conviction proceedings, the Tennessee Supreme Court applied *Strickland* to determine whether, "[i]n light of the evidence that defense counsel possessed before trial, the cursory investigations done by Dr. Auble and Ms. Shettles, and in light of the later diagnoses of Drs. Spica and Brown, . . . counsel's performance in relation to the sentencing hearing fell short of professional norms and prejudiced their client." *Id.* at 401–02. The court began its analysis by "distill[ing] from recent United States Supreme Court case law the

following principles that are specific to mitigation at capital sentencing." *Id.* at 402. The court

held:

> Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability. *Porter v. McCollum*, 558 U.S. [30,] 41 [(2009)]; *Williams v. Taylor*, 529 U.S. at 393. Accordingly, capital defense attorneys have an obligation to conduct a thorough investigation of the defendant's background. *Williams v. Taylor*, 529 U.S. at 396. Defense counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce. *Wiggins v. Smith*, 539 U.S. at 524.
>
> To provide effective representation, counsel must make either a reasonable investigation or a reasonable decision that particular investigations would be unhelpful or unnecessary. *Wiggins v. Smith*, 539 U.S. at 521. Either way, counsel's decision must indicate a reasoned strategic judgment. *Wiggins v. Smith*, 539 U.S. at 526. Defense counsel should investigate the defendant's medical history, educational history, employment and training history, family and social history, adult and juvenile correctional experiences, and religious and cultural influences. *Wiggins v. Smith*, 539 U.S. at 524.
>
> Counsel is not required to investigate every conceivable line of mitigating evidence, no matter how unlikely it is to help the defense. Nor must counsel present mitigating evidence in every case. But "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitation of the investigation." *Wiggins v. Smith*, 539 U.S. at 533 (internal quotation marks omitted). To determine whether counsel's actions were reasonable, a reviewing court should "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. at 527.
>
> If the reviewing court finds that counsel was deficient, then the "prejudice" prong of *Strickland* depends on whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. To assess the probability of a different outcome, a reviewing court should consider the totality of the available mitigation evidence—including evidence known before trial and evidence discovered by post-conviction counsel. *Sears v. Upton*, 130 S. Ct. [3259,] 3266–67 [(2010)].

*Id.*

Applying these well-established standards, the Tennessee Supreme Court found that

"Davidson's trial attorneys were deficient in their investigation and presentation of mitigating

evidence." *Id.* at 403. The Tennessee Supreme Court described trial counsel's deficient representation at sentencing as follows:

> Before trial, counsel possessed several decades worth of TDOC Records that habitually characterize Mr. Davidson as mentally ill. These records describe Mr. Davidson as having "a rather serious defect of judgment," "a remarkable lack of insight into his behavior," "severe psychotic disturbance," and "difficulties controlling his impulses." The TDOC Records allude to a diagnosis of "undifferentiated schizophrenia" when Mr. Davidson was a teenager. Before trial, counsel also possessed Mr. Davidson's records from MTMHI, which document his abnormal CT and EEG scans. The mitigation specialist Ms. Shettles read many of these records and alerted counsel that these documents contained useful mitigation evidence. But counsel kept this information to themselves.

> Before trial, counsel possessed Dr. Auble's report in which she noted Mr. Davidson's "long history of mental illness" and tentatively diagnosed Mr. Davidson as suffering from "adjustment disorder with anxiety in a schizotypal personality disorder." Dr. Auble's report noted Mr. Davidson's "potential for psychotic episodes under stress," and opined that his cognitive difficulties prevented him from relating to other people and from accurately perceiving situations. Dr. Auble's report also noted Mr. Davidson's "troubled" childhood and difficulties in school. But Dr. Auble did no neuropsychological testing and was never called to testify.

> Post-conviction counsel, with the help of Drs. Spica and Brown and mitigation specialist Ms. Harden, followed up on these leads. Drs. Spica and Brown opined that Mr. Davidson had the reasoning skills of a nine- or ten-year-old. They also believed that the MTMHI Records showed that Mr. Davidson's brain had atrophied. Drs. Spica and Brown diagnosed Mr. Davidson with a frontal lobe dysfunction, and Dr. Brown described Mr. Davidson's social and emotional development as stunted. Ms. Harden uncovered an "extraordinary" amount of mitigation evidence, most of which was not presented at trial. If counsel had used their neuropsychologist and mitigation specialist effectively, they also could have uncovered and utilized this information. *See Porter v. McCollum*, 558 U.S. at 36 (noting that the defendant, like Mr. Davidson, was found by the post-conviction neuropsychologist to be someone who "suffered from brain damage that could manifest in impulsive, violent behavior").

> . . .

> Despite the damaging nature of the evidence in Mr. Davidson's records, we find that defense counsel violated professional norms when counsel failed to inform the jury—at sentencing—of Mr. Davidson's brain damage and cognitive disorders. In *Williams*, the Supreme Court noted that not all of the unutilized evidence was favorable to the defense. *Williams v. Taylor*, 529 U.S. at 396. Mr. Williams had "a record of violent conduct that could have been introduced by the State." *Wiggins v.*

34

*Smith*, 539 U.S. at 537. Similarly, the United States Supreme Court in *Sears* found it "unsurprising" that post-conviction counsel discovered "adverse evidence" in the defendant's records. However, the Court believed that counsel could have turned that evidence "into a positive," and presented a "cognitive deficiency mitigation theory." *Sears v. Upton*, 130 S. Ct. at 3264.

Similarly, Mr. Davidson's counsel could have used their client's threatening statements about raping women to illustrate his cognitive deficiencies. The post-conviction experts Drs. Spica and Brown explained how Mr. Davidson's violent history and disturbing fantasies revealed the woundedness of his ramshackle mind. Had Dr. Auble been given Mr. Davidson's MTMHI Records and adequate time to conduct neuropsychological testing, she could also have discovered before trial that Mr. Davidson had the executive function of a fourth grader, and she could have framed his chilling statements about women in the context of his troubled past and his misshapen psyche. The records that defense counsel possessed pre-trial (including the CT and EEG reports from MTMHI) raised clear red flags that Mr. Davidson's mental functioning and social capabilities were quite impaired. Counsel's failure to develop this line of evidence does not strike us as a reasonable determination that further investigation would have been fruitless. The problem, rather, was inattention and a disturbing lack of time and resources.

Although we began with the presumption that trial counsel rendered effective assistance, we find that this presumption has been rebutted in Mr. Davidson's case. Although his attorneys' caseload was lamentable, counsel's investigation and presentation of mitigation evidence fell short of competence demanded of attorneys in criminal cases. Counsel held in their hands compelling evidence that Mr. Davidson has a broken brain and a tragic past. Their failure to submit any of this neuropsychological evidence to the sentencing jury falls short of the professional norms that prevailed at the time of trial.

We are not persuaded by the State's argument that presenting mental health mitigation evidence would contradict defense counsel's chosen theory of residual doubt. As illustrated by *Rompilla v. Beard*, a mental health mitigation case and a residual doubt argument are not mutually exclusive. *See Rompilla v. Beard*, 545 U.S. 374, 378, 386, 389–90 (2005) (reversing for failure to present mitigation evidence when the defense theory at sentencing was "residual doubt"). Because mental illness can render a defendant less morally blameworthy, capital defense attorneys who possess compelling evidence of mental defects have an obligation to make a reasonable and fully-informed decision about presenting that evidence to the jury. Counsel's decision in this case was less than reasonable and fully-informed.

We are likewise not persuaded by the State's argument that opening the door to Mr. Davidson's mental health records would be a two-edged sword that hurt Mr. Davidson at sentencing more than it helped. By the time of the sentencing hearing, the jury was already exposed to the State's aggravation evidence that Mr. Davidson had prior convictions for assault and battery with intent to rape in

1971; felonious crime against nature in 1983; felonious sexual battery in 1983; and assault and battery with intent to ravish and to have unlawful carnal knowledge of a female over twelve years of age in 1976. The jury therefore already knew Mr. Davidson had a long history of sexual violence against women. The evidence from Mr. Davidson's mental health records held little potential to demean him further in the jury's eyes. However, it had great potential to help explain the invisible mental machinations that made him behave this way. Keeping Mr. Davidson's brain damage, cognitive disorders, and mental illnesses secret under these circumstances was deficient performance.

We also find that counsel's deficient performance prejudiced Mr. Davidson at his capital sentencing hearing. Much like *Sears v. Upton*, although the evidence of Mr. Davidson's profound personality disorder might not have made him "any more likable to the jury," the evidence could very well have helped the jury understand how Mr. Davidson could have committed "such horrendous acts." *Sears v. Upton*, 130 S. Ct. at 3264. An effective defense could have contextualized Mr. Davidson's prior hair-curling statements about women. *See Sears v. Upton*, 130 S. Ct. at 3264 (explaining that competent counsel can turn "adverse evidence" into something positive, such as "a cognitive deficiency mitigation theory"). Instead, the jury heard little that would "humanize" Mr. Davidson or help the jury "accurately gauge his moral culpability." Had his counsel been effective, the jury would have learned of the "kind of troubled history" that is "relevant to assessing a defendant's moral culpability.'" *Porter v. McCollum*, 558 U.S. at 41 (quoting *Wiggins v. Smith*, 539 U.S. at 535).

We cannot escape the fact that "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Mr. Davidson's] moral culpability" and led to a sentence less than death. *Wiggins v. Smith*, 539 U.S. at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). At least one member of the jury could have decided that Mr. Davidson was less morally blameworthy (and thus undeserving of death) in light of his lifelong history of psychosis, his frontal lobe dysfunction, and the fact that his mental functioning was in some respects equivalent to that of a nine- or ten-year old child. These post-conviction revelations sufficiently undermine our confidence in the verdict to merit post-conviction relief. We find a reasonable probability that, but for counsel's failure to present psychological mitigation evidence, the result of the sentencing trial would have been different.

We have considered the nature and extent of the mitigating evidence that was available but not presented, and find the evidence to be voluminous and compelling. We have considered whether substantially similar mitigating evidence was presented to the jury, and find that it was not. We have considered whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination, and have decided that evidence illuminating Mr. Davidson's mental health issues could have colored the jury's consideration of the aggravating factors in a way that favored Mr. Davidson. *See*

*Nichols v. State*, 90 S.W.3d at 598; *Goad v. State*, 938 S.W.2d at 371. Counsel's deficient performance therefore prejudiced Mr. Davidson.

*Id.* at 403–06.

The Tennessee Supreme Court nonetheless found that "it was reasonable for defense counsel to refrain from discussing Mr. Davidson's psychological diagnoses during the guilt phase of trial," *id.* at 304, holding:

> [W]e agree with the Court of Criminal Appeals that counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial. *Davidson v. State*, 2013 WL 485222, at *19–20. Counsel was legitimately concerned that presenting any psychological evidence could open the door for the State to show the jury the alarming statements from Mr. Davidson's mental health records that revealed his malignant misogyny and his propensity to commit sexual violence. Ensuring that this evidence remained inadmissible was a reasonable strategy.
>
> However, "[t]here is a world of difference between a decision not to introduce evidence at the guilt phase of a trial and a failure to investigate mitigating evidence that might be admissible at the penalty phase." *Wood v. Allen*, 558 U.S. 290, 305 (2010) (Stevens, J., dissenting). And a "cursory investigation" does not "automatically justif[y] a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins v. Smith*, 539 U.S. at 527.

*Id.* at 403–04 (second and third alterations in original).

The Tennessee Supreme Court unreasonably applied *Strickland* to reach this conclusion. In agreeing with the TCCA that Davidson's "counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial" *id.*, the Tennessee Supreme Court ignored *Strickland*'s "central teaching . . . that the investigation leading to the choice of a so-called trial strategy must itself have been reasonably conducted lest the 'strategic' choice erected upon it rest on a rotten foundation." *Ramonez*, 490 F.3d at 488 (citing *Wiggins*, 539 U.S. at 522–23); *see also Smith v. Lafler*, 175 F. App'x 1, 4 (6th Cir. 2006) (holding that state appellate court "unreasonably concluded that trial counsel's decision not to present [a psychiatric] report [about the victim] was a matter of strategy" because "counsel's failure to fully investigate [the

victim's] stay at [a psychiatric] [h]ospital fell below an objective standard of reasonableness"). "Buttressed by a reasonably adequate investigation," counsel's decision to challenge the sufficiency of the state's evidence instead of further investigating Davidson's intellectual limitations and mental health history before trial "might have been justified as the product of strategic choice. But that is not what happened here." *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008).

Here, the Tennessee Supreme Court's own findings based on the evidence and testimony presented at Davidson's post-conviction proceedings show that trial counsel did not make a reasonably informed decision to limit the pretrial investigation of Davidson's mental capacity for any purpose. The Tennessee Supreme Court recognized that "[t]he records that defense counsel possessed pre-trial (including the CT and EEG reports from MTMHI) raised clear red flags that Mr. Davidson's mental functioning and social capabilities were quite impaired." *Davidson v. State*, 453 S.W.3d at 404. As the court found, "[c]ounsel held in their hands compelling evidence that Mr. Davidson has a broken brain and a tragic past." *Id.* The court found that trial counsel's failure to perform more than "a cursory investigation of Mr. Davidson's mental and social history" to develop that evidence was the result of counsel's "inattention and [ ] disturbing lack of time and resources" and not "a reasonable determination that further investigation would have been fruitless." *Id.* at 398, 404.

Having so found, the Tennessee Supreme Court's conclusion that trial counsel's same failures led to a "reasonable tactical decision" not to investigate Davidson's mental functioning in preparation for the guilt phase of trial is an unreasonable application of *Strickland*. *Id.* at 403. Under *Strickland* and *Wiggins*, counsel are "'not in a position to make . . . reasonable strategic choice[s]'" when "'the investigation supporting their choice[s] was unreasonable.'" *Johnson*, 544

F.3d at 603 (alterations in original) (quoting *Wiggins*, 539 U.S. at 536); *see also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) ("A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991))). Trial counsel could not make "a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial" because counsel had not conducted sufficient investigation to know what that decision entailed. *Davidson v. State*, 453 S.W.3d at 403–04. As the dissenting justice concluded, "[b]ecause of their inadequate preparation as to [Davidson's] medical history, his trial attorneys were unable to make an informed choice to forgo the presentation of this important evidence at trial." *Id.* at 409 (Wade, J., concurring in part and dissenting in part).

The Tennessee Supreme Court relies on Justice Stevens's assertion in a dissenting opinion that "[t]here is a world of difference between a decision not to introduce evidence at the guilt phase of a trial and a failure to investigate mitigating evidence that might be admissible at the penalty phase." *Davidson*, 453 S.W.3d at 404 (quoting *Wood v. Allen*, 558 U.S. 290, 305 (2010) (Stevens, J., dissenting)).[5] That statement is true to some extent: what defense counsel must establish to create reasonable doubt at the guilt phase of a capital case is different from what defense counsel must establish to mitigate the aggravating factors that invoke the death penalty at sentencing. But what the quoted passage neglects—and what *Strickland* plainly requires—is that the "'decision

---

[5]     The Court notes that *Wood* considered whether a state court's finding that counsel made a strategic decision not to admit psychological evidence at trial or in the penalty phase of a capital case was "'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding'" under 28 U.S.C. § 2254(d)(2). *Wood*, 558 U.S. at 293 (quoting 28 U.S.C. § 2254(d)(2)). The Supreme Court was not asked to and did not consider the question of "whether the state court's resolution of Wood's ineffective-assistance-of-counsel claim was 'contrary to, or involved an unreasonable application of, clearly established Federal law' under § 2254(d)(1) and *Strickland*." *Id.* at 300 (quoting 28 U.S.C. § 2254(d)(1)).

not to introduce evidence at the guilt phase of a trial'" must also be the result of a reasonable investigation. *Id.* "Constitutionally effective counsel must develop trial strategy in the true sense— not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *Ramonez*, 490 F.3d at 489.

Prevailing professional norms dictated that, because their client was charged with first-degree murder, Davidson's counsel had a duty to conduct a thorough pretrial investigation to determine if Davidson "had the requisite intent and capacity" for premeditation. Standard 4-4.1 commentary, 1993 ABA Standards for Criminal Justice at 183; *see also Williams*, 529 U.S. at 415. If there was evidence to show that Davidson did not have such requisite intent or capacity, counsel had a duty to pursue it because "[s]uch information may [have] lead the prosecutor to defer or abandon prosecution and [would have been] relevant at trial *and* at sentencing." Standard 4-4.1 commentary, 1993 ABA Standards for Criminal Justice at 183 (emphasis added). Here, "[c]ounsel held in their hands compelling evidence that Mr. Davidson has a broken brain and a tragic past." *Davidson v. State*, 453 F.3d at 404. And counsel set that evidence aside and did not develop it through investigation because of "inattention and a disturbing lack of resources." *Id.*

Because Davidson's trial counsel's investigation was deficient, they did not know what Dr. Auble would have "actually testif[ied] to" if she had been given Davidson's full mental health records and time to conduct the neuropsychological testing she considered mandatory. *Ramonez*, 490 F.3d at 489. Trial counsel did not know the universe of evidence offered at post-conviction regarding Davidson's mental health and intellectual capacity that spoke directly to his capacity for premeditation—the issue on which two of the five justices of the Tennessee Supreme Court found insufficient evidence to support Davidson's conviction on direct appeal. Without that

information—which a reasonable investigation would have developed—trial counsel's "strategic" decision that opening the door to the State's use of Davidson's unfavorable mental health records outweighed the benefit of testimony that would call Davidson's ability to form the requisite intent into question was only a partly informed assumption.[6] Davidson's trial counsel simply did not know enough to make that call.

Counsel's failure to investigate Davidson's intellectual limitations and mental health history before trial fell below the objective standard of reasonableness for effective assistance of counsel at trial and at sentencing. *See Strickland*, 466 U.S. at 687; *Harrington*, 562 U.S. at 105. The Tennessee Supreme Court's determination that a strategic decision could be supported by a plainly inadequate investigation is an unreasonable application of *Strickland*.

### iii. Prejudice

*Strickland* also requires that a petitioner show prejudice resulting from counsel's deficient representation by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Rompilla*, 545 U.S. at 390 (quoting *id.*). "Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo* . . . ." *Rompilla*, 545 U.S. at 390 (citation omitted); *see also Wiggins*, 539 U.S. at 534 (holding that "our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis").

---

[6]     Notably, the current version of the ABA Standards for Criminal Justice provides that counsel's "duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence[.]" Standard 4-4.1(b), Duty to Investigate and Engage Investigators, ABA Standards for Criminal Justice (4th ed. 2015).

Again, the Tennessee Supreme Court's own findings demonstrate that *Strickland*'s prejudice prong is satisfied here.

The requisite intent for Davidson's first-degree murder charge was premeditation, which Tennessee law defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1995). The relevant statute provided that:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.*

In its review of Davidson's conviction on direct appeal, the Tennessee Supreme Court found that, "[b]ecause premeditation involves the defendant's state of mind, concerning which there is often no direct evidence, Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence." *State v. Davidson*, 121 S.W.3d at 614–15. The court identified "the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing" as "circumstances that may warrant the trier of fact to find or infer premeditation[.]" *Id.* at 615.

Examining the proof at Davidson's trial, the court found "the question [ ] close in this case" as to whether "the evidence is sufficient for a rational trier of fact to have found the element of premeditation beyond a reasonable doubt." *Id.* Ultimately, the court held that, "while no single piece of evidence was sufficient in and of itself to establish premeditation in this case, we believe that the facts and circumstances as a whole were sufficient for a rational trier of fact to have found

the elements of premeditated first degree murder beyond a reasonable doubt. *Id.* at 616. Two of the court's five justices dissented on the issue of premeditation, finding "no evidence of the defendant's planning, the defendant's prior relationship with the victim, the cause or manner of the victim's death, or any other evidence from which a rational trier of fact could have inferred beyond a reasonable doubt that the crime was premeditated, *i.e.*, committed 'after the exercise of reflection and judgment.'" *Id.* at 625 (Anderson, J., dissenting); *id.* at 629 ("[T]he proof of premeditation is woefully lacking" and "not only fails to show premeditation, but demonstrates instead that the homicide resulted from impulsive behavior.") (Birch, Jr., J., dissenting).

Given the Tennessee Supreme Court majority's finding that the sufficiency of the evidence supporting premeditation was a "close" question and the dissenting justices' finding that such evidence was "woefully lacking," trial counsel's investigation of Davidson's mental capacity was critical. Trial counsel's deficient investigation left evidence that could have altered the outcome of his trial undiscovered. As the Tennessee Supreme Court found on post-conviction appeal,

> [h]ad Dr. Auble been given Mr. Davidson's MTMHI Records and adequate time to conduct neuropsychological testing, she could also have discovered before trial that Mr. Davidson had the executive function of a fourth grader, and she could have framed his chilling statements about women in the context of his troubled past and his misshapen psyche.

*Davidson v. State*, 453 S.W.3d at 404. After examining Davidson and reviewing his mental health records in full, neuropsychologist Dr. Spica testified that Davidson "was 'a man of limited internal resources, limited cognitive power, and his reasoning is more like a much younger individual. It's nine or ten years old, although at other times he performed far below that. It's the picture of brain dysfunction." *Id.* at 400–01. The psychiatrist who testified at post-conviction, Dr. Brown, "found that Mr. Davidson exhibited 'clear, consistent, and severe deficits' in regard to reasoning, abstraction and generalization, and executive function" and "'significant impairments in his capacities to plan, consider or evaluate and effectively carry out behavior'—a condition he

described as 'frontal lobe dysfunction (or "functional lobotomy").'" *Id.* at 401. Dr. Brown also found that "Davidson's 'cognitive processes are not only defective but fragile,' and 'particularly vulnerable to external influences, such as situations that produce strong emotions,' which seriously compromised his ability to, for example, premeditate." *Id.*

Had counsel properly investigated the leads in Davidson's medical records, including by simply providing the MTMHI records to Dr. Auble with sufficient time for her to conduct the neuropsychological examination for which she was retained, counsel could have presented relevant evidence regarding Davidson's intent to the prosecution before trial and to the jury. Based on the Tennessee Supreme Court's findings alone, there is a reasonable probability that, but for trial counsel's failure to thoroughly investigate Davidson's intellectual capacity and mental health history before trial, Davidson would not have been convicted of first-degree, premeditated murder. *See Strickland*, 466 U.S. at 694; *see also Rompilla*, 545 U.S. at 390 (quoting *id.*). Davidson can satisfy *Strickland*'s prejudice prong.

Habeas relief should be granted on these IATC claims.

### b. Claim 2g1: Failure to Object to "Intentional" Jury Instruction

Davidson argues that his trial counsel was ineffective for failing to object to the court's "intentional" jury instruction. (Doc. Nos. 25, 47, 80.) Specifically, Davidson argues that "[t]he 'intentional' instruction given permitted the jury to convict [him] of the specific intent crime of intentional, premeditated murder without requiring specific intent to kill, but only intent to engage in conduct that may have caused death" and that the same argument applies "to the aggravated kidnapping charge, which also required proof of an intentional act." (Doc. No. 80, PageID# 11202, 11203.) The State concedes that Davidson exhausted this IATC claim by presenting it to the TCCA and Tennessee Supreme Court on post-conviction appeal, but argues that this claim fails because

the TCCA decided it on the merits and Davidson cannot show that the TCCA contradicted or unreasonably applied *Strickland*.[7] (Doc. Nos. 38, 83.)

The trial record, which the TCCA considered, shows that the court provided the following jury instructions for first-degree premeditated murder and aggravated kidnapping:

> Any person who commits the offense of first degree murder is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> 1. that the defendant unlawfully killed the alleged victim; and
>
> 2. that the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and
>
> 3. that the killing was premeditated.
>
> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with premeditation, it is immaterial that the accused may have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.
>
> . . .
>
> Any person who commits an aggravated kidnapping is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:

---

[7] The Tennessee Supreme Court adopted the TCCA's reasoning with respect to this IATC claim. *Davidson v. State*, 453 S.W.3d at 392, 406.

1. that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty; and

2. that the defendant acted with the intent to inflict serious bodily injury on or to terrorize the alleged victim or another.

The definition of "removal or confinement" has previously been provided for you.

"Serious bodily injury" means bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain, protracted or obvious disfigurement; or protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

The definition of "knowingly" has previously been provided for you.[8]

The definition of "intentionally" has previously been provided for you.[9]

(Doc. No. 34-5, PageID# 943, 955.)

The TCCA analyzed Davidson's IATC claim regarding his counsel's failure to object to

the intentionality instructions as follows:

The Petitioner contends counsel should have objected to the trial court's definition of the term "intentionally" when it instructed the jury on the elements of first degree murder. Specifically, the Petitioner argues that murder is an offense which requires that the culpable mental state accompany the result of the conduct rather than the nature of the conduct and thus an instruction which defined "intentionally" as related to the nature of the conduct as well as the result of the conduct was erroneous. The supreme court has concluded that the alleged error with respect to the instruction at issue is not constitutional in nature. *See State v. Faulkner*, 154

---

[8]     The trial court's jury instructions for the murder charges provided that:

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

(Doc. No. 34-5, PageID# 945, 948.)

[9]     The trial court's jury instructions for the murder charges provided that: "'Intentionally' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." (Doc. No. 34-5, PageID# 945, 949.)

S.W.3d 48, 60 (Tenn. 2005) ("The entire charge on first degree premeditated murder eliminated any risk of the jury applying the wrong definition."). Accordingly, as the post-conviction court concluded, counsel cannot be deemed ineffective for failing to object to the charge.

. . .

Similarly, the Petitioner contends counsel should have objected to the trial court's definition of "intentionally" with respect to its instructions on . . . aggravated kidnapping . . . . With respect to the inclusion of both the nature of conduct and result of conduct language in the definition of "intentionally" in relation to the instruction on aggravated kidnapping, the trial court, citing the reasoning of the supreme court in *Faulkner*, concluded that any error in the instruction was harmless. We agree. *See State v. [ ] Mayfield*, No. E2007–01453–CCA–R3–CD, 2008 WL 4876568 at *5 (Tenn. Crim. App. Nov. 12, 2008), *perm. to app. denied*, (Tenn. Apr. 27, 2009). Thus, counsel cannot be deemed ineffective for failing to object.

*Davidson v. State*, 2013 WL 485222, at *39.

With respect to the aggravated kidnapping intentionality instruction, the post-conviction

trial court found that:

In defining "intentionally" as it related to the offenses of especially aggravated kidnaping and aggravated kidnaping, the trial court adopted the definition of "intentionally" as defined in its instructions for first degree murder. The appellate courts have differed as to whether kidnaping offenses are "nature of conduct" or "result of conduct" crimes. *See e.g.*, *State v. [ ] Mayfield [ ]*, No. E2007-01453-CCA-R3-CD[, 2008 WL 4876568] (Tenn. Crim. App. [ ] Nov[.] 12, 2008) (suggesting that aggravated kidnaping could be a "result of conduct" offense); *State v. [ ] Hooper[,] [ ]* No. M2007-00094-CCA-R3-CD[, 2008 WL 2521592] (Tenn. Crim. App. [ ] June 24, 2008) (concluding that aggravated kidnaping is a "nature of conduct" offense). However, this distinction does not matter in the instant case because the trial court included both the "nature of conduct" and the "result of conduct" definitions of "intentionally". Thus, the trial court included the proper mens rea for the offense and the inclusion of the incorrect mens rea was harmless. *See Faulkner*, 154 S.W. 3d at 58–9. Thus, trial counsel were not ineffective for not objecting to this instruction.

(Doc. No. 37-4, PageID# 7295.)

Davidson argues that, with respect to the first-degree murder instruction, his counsel was

ineffective for failing to object to the intentionality instruction because the instruction "allowed

the jury to convict [Davidson] of the specific intent crime of intentional, premeditated murder

without requiring specific intent to kill, but only intent to engage in conduct that may have caused death." (Doc. No. 25, PageID# 319.) In *Faulkner*, the Tennessee Supreme Court held "that a proper instruction defining 'knowingly' or 'intentionally' does not include the nature-of-conduct and circumstances-surrounding-conduct language because second degree murder and first degree premeditated murder are result-of-conduct offenses." 154 S.W.3d at 58. However, the Tennessee Supreme Court further held that where, as here, "the trial court [also] instructed" that "'the element of premeditation requires a previously formed intent to kill[,]'" any error in including the nature-of-conduct language in the first degree murder instructions "was harmless" because "[t]he entire charge on first degree premeditated murder eliminated any risk of the jury applying the wrong definition." *Id.* at 60.

Davidson has not shown that the TCCA unreasonably applied *Strickland* by relying on *Faulkner* to deny Davidson's IATC challenge to the first-degree premeditated murder intentionality instruction.

Davidson argues that "[c]ounsel's failure to object to the 'intentionally' instruction was similarly deficient and prejudicial as to the aggravated kidnapping charge, which also required proof of an intentional act." (Doc. No. 80, PageID# 11203.) The TCCA agreed with the post-conviction trial court that counsel was not ineffective for failing to object to the inclusion of nature-of-conduct language in the aggravated kidnapping charge because Tennessee law is unsettled "as to whether kidnaping offenses are 'nature of conduct' or 'result of conduct' crimes." (Doc. No. 37-4, PageID# 7295 (first citing *Mayfield*, 2008 WL 4876568; and then citing *Hooper*, 2008 WL 2521592).)

There is thus a reasonable argument that trial counsel's representation satisfied *Strickland*'s

deferential standard, and Davidson has not shown that the TCCA unreasonably applied *Strickland*

in denying this IATC claim. *See Harrington*, 562 U.S. at 105.

> ### c.  Claims 2h and 2y: Failure to Object to Victim's Daughter Sitting at Prosecution Table During Voir Dire and to Daughter's Trial Testimony

Davidson argues that trial counsel was ineffective for failing to object to the victim's

daughter sitting at the prosecution table during voir dire and failing to object to the victim's

daughter's trial testimony. (Doc. Nos. 25, 47, 80.) The State concedes that Davidson exhausted

these IATC claims by presenting them to the TCCA and Tennessee Supreme Court on post-

conviction appeal, but argues that they fail because the TCCA decided them on the merits and

Davidson cannot show that the TCCA contradicted or unreasonably applied *Strickland*.[10] (Doc.

Nos. 38, 83.)

The TCCA analyzed these IATC claims as follows:

> The Petitioner contends trial counsel should have objected to Jennifer Koch, the victim's daughter, sitting at the table with the prosecutor during jury selection. The trial court noted that the appellate courts of this state "have long rejected assertions that the presence of a victim's family member at or near the prosecution's table at trial or during voir dire would somehow unfairly prejudice a defendant." *See, e.g., State v.* [ ] *Hodges*, No. 01C01–9212–CR–00382, 1995 WL 301443 at *17–20 (Tenn. Crim. App., May 18, 1995), *aff'd*, *State v. Hodges*, 944 S.W.2d 346 (Tenn. 1997). Accordingly, the Petitioner has not demonstrated how counsel's failure to object to the mere presence of the victim's daughter was deficient. As this Court recognized in *Hodges*, "there is a common law rule which permits the prosecutor or an interested witness to sit at counsel table with the assistant district attorney general prosecuting the accused. This has been the practice for many years." *Id.* at 19. Nevertheless, the trial court properly instructed the jury on the law in this case and the Petitioner has failed to highlight any apparent problems in the record which could be attributed to the victim's daughter sitting at the table. *See id.* at 20. The Petitioner has thus failed to show any resulting prejudice.

---

[10]     The Tennessee Supreme Court adopted the TCCA's reasoning with respect to these IATC claims. *Davidson v. State*, 453 S.W.3d at 392, 406.

. . .

The Petitioner contends that the prosecutor solicited improper victim impact evidence from the victim's daughter during the guilt phase of the trial to which defense counsel should have objected. The trial testimony in question relates to the victim's appearance at a family wedding, the type of clothing and shoes the victim enjoyed wearing, and the victim's affinity for featherbeds. As to each challenged area of the victim's daughter's testimony, the trial court concluded that the testimony did not cause undue sympathy for the victim or prejudice the Petitioner. More importantly, though, the trial court noted that counsel was not asked during the evidentiary hearing why he did not object to that line of questioning. As noted above, decisions about whether to voice objections are left to the discretion of trial counsel and absent a showing the decision was made for a valid tactical reason, such as avoiding drawing undue attention to certain evidence, trial counsel's decision will not be questioned. *See, e.g.*, [*State v.*] *Sexton*, [No. M2004-03076-CCA-R3-CD,] 2007 WL 92352, at *5 [(Tenn. Crim. App. Jan. 12, 2007)]. Accordingly, the trial court did not err in denying relief on this ground.

*Davidson v. State*, 2013 WL 485222, at *31, 36.

In light of the authority relied on by the TCCA which shows that objections on these grounds would have been, at best, unsuccessful and, at worst, meritless, Davidson has not satisfied the applicable "doubly deferential" standard to show that he is entitled to habeas relief on these IATC claims. *See Cullen*, 563 U.S. at 190.

### d. Claim 2ab: Failure to Object to Prosecution's Attacks on Defense Witness Dr. Foreman During Closing Arguments

Davidson argues that trial counsel was ineffective during the prosecution's closing argument for failing to object when the prosecution commented on the defense's DNA expert witness's involvement in the O.J. Simpson trial and stated that the expert believed people in the area where the trial was taking place were inbred. (Doc. Nos. 25, 47, 80.) The State concedes that Davidson exhausted this claim by presenting it to the TCCA and Tennessee Supreme Court on collateral appeal, but argues that the claim fails because the TCCA decided it on the merits and

Davidson cannot show that, in so doing, the TCCA contradicted or unreasonably applied *Strickland*.[11] (Doc. Nos. 38, 83.)

The TCCA analyzed this claim as follows:

Next, the Petitioner asserts that trial counsel should have objected to alleged improper comments the prosecutor made about Dr. Lisa Forman, the defense's DNA expert. During closing argument at the guilt phase, the prosecutor argued:

> Use your common sense. Do you all know of any reason why somebody would cut the seat of their truck? What is that consistent with? Does that take a Rhodes scholar to figure that out? Why of course not. You know, I don't know about Dr. Forman. I got the impression that she thought she was smarter than the sum total of everybody in the courtroom, the jury, the judge and me included. That's my impression of her. Somebody that would volunteer to get involved in the O.J. Simpson case, I've got to have a little bit of question about them. And I don't know what you all think about the O.J. Simpson case, but whoever's involved in that I don't have much to do with them. And she volunteered to jump in that one.
>
> That tells you a little bit it [sic] and frankly, she thinks most of our family trees don't fork around here. That's my impression, she kind of—you know, she kind of [thinks] that we're an inbred bunch and that, you know, we're not normal around here. I don't know, but assume that she's telling us, you know, just like it is, there's still human blood in the seat of this truck and it's cut out.

At trial, Dr. Forman disputed the State's expert's opinion that DNA testing ruled out the Petitioner as the source of the blood found on the passenger seat of his truck. Dr. Forman admitted, though, that she did not conduct an independent analysis but was only reviewing the findings of the State's expert.

The trial court found that some of the remarks quoted above were "over the top." The court otherwise concluded, however, that they were not so inflammatory as to have affected the verdict to the prejudice of the Petitioner. We agree. The Petitioner neglects to argue how counsel's failure to object to these statements resulted in any prejudice. As the trial court held, these few comments were not enough to cause the jury to become so prejudiced toward the Petitioner that they were more likely than not going to convict him regardless of the evidence introduced at trial. Moreover, the jury was properly instructed on its duty under the law, that is, arguments of

---

[11]    The Tennessee Supreme Court adopted the TCCA's reasoning with respect to this IATC claim. *Davidson v. State*, 453 S.W.3d at 392, 406.

counsel are not evidence and their verdict must be based solely on the evidence introduced at trial. The Petitioner is not entitled to relief on this ground.

*Davidson v. State*, 2013 WL 485222, at *37 (alterations in original).

Davidson has not shown that the TCCA unreasonably applied *Strickland*, particularly because the TCCA found that Davidson "neglect[ed] to argue how counsel's failure to object to these statements resulted in any prejudice." *Id.* In this proceeding, Davidson has similarly failed to argue prejudice related to this IATC claim with any specificity. He argues only generally that, "[h]ad counsel not been inefficient [sic] and protected his client's interests during this outrageous closing argument, there is a 'reasonable probability' that 'the result of the proceeding would have been different.[']" (Doc. No. 80, PageID# 11207 (quoting *Strickland*, 466 U.S. at 694).) In ordering the parties to file supplemental briefing, the Court warned that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." (Doc. No. 76, PageID# 11184 (second alteration in original) (quoting *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016)). Davison has not carried his burden to show that there is no reasonable argument that counsel satisfied *Strickland*'s deferential standard. *See Harrington*, 562 U.S. at 105. He therefore is not entitled to habeas relief on this IATC claim.

### 2. Claim 1a: Sufficiency of First-Degree Murder Evidence

Davidson argues that the circumstantial evidence of premeditation presented at trial was insufficient to convict him of first-degree, premeditated murder and that the Tennessee Supreme Court unreasonably applied *Jackson v. Virginia*, 443 U.S. 307 (1979), in holding otherwise on direct appeal. (Doc. Nos. 25, 47, 80.) The State concedes that Davidson exhausted this claim, but

argues that Davidson cannot show that the Tennessee Supreme Court unreasonably applied *Jackson*. (Doc. Nos. 38, 83.)

Because this claim concerns evidence of premeditation, it is inextricably intertwined with Davidson's IATC claims that counsel failed to sufficiently investigate Davidson's intellectual limitations before trial, including investigating whether or not he had the mental capacity to engage in premeditation. The Magistrate Judge has already recommended that the Court grant habeas relief from Davidson's first-degree, premeditated murder conviction based on these IATC claims. The Court therefore does not need to address Davidson's alternative claim regarding the sufficiency of the premeditation evidence presented at trial. *See, e.g.*, *Haynes v. Burke*, 115 F. Supp. 2d 813, 819–20 (E.D. Mich. 2000) ("[I]n light of this Court's finding that counsel was ineffective in failing to advise petitioner of the prosecutor's right to appeal, it is unnecessary to address petitioner's remaining claims concerning the involuntariness of his guilty plea and this Court declines to do so.").

### 3. Claim 19: Cumulative Effect of All Errors At Trial and On Appeal

Davidson argues that the cumulative effect of all errors during trial and on direct appeal deprived him of his constitutional right to due process. (Doc. Nos. 25, 47, 80.) He relies on two cases decided before AEDPA's enactment to support his argument that cumulative error claims are cognizable on habeas review, *Taylor v. Kentucky*, 436 U.S. 478 (1978), and *Walker v. Engle*, 703 F.2d 959 (6th Cir. 1983). (Doc. Nos. 47, 80.) As the State argues, however, the Sixth Circuit has "held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005); *see also id.* (distinguishing *Walker* as "pre-AEDPA").

Davidson is therefore not entitled to habeas relief on this claim.

### B. Procedurally Defaulted Claims

Davidson does not contest that the remaining unwaived claims in his amended petition—

Claims 2a, 2b, 2c, 2g2, 2g3, 2ad, and 4 through 17—are procedurally defaulted. (Doc. No. 80.) He

argues, however, "that he overcomes any procedural default for his claims under *Martinez*." (*Id.*

at PageID# 11208; *see also id.* ("Davidson submits that all of his defaulted claims laid out in his

Amended Complaint meet [the *Martinez*] standard [of substantiality].").) Precedent in this circuit

is clear "that *Martinez* does not apply to any claims other than claims of ineffective assistance [of

counsel] at trial." *Zagorski v. Mays*, No. 3:99-cv-01193, 2018 WL 4352705, at *4 (M.D. Tenn.

Sept. 12, 2018). Davidson therefore may not rely on *Martinez* to excuse the procedural default of

Claims 4 through 17, none of which are IATC claims. Davidson's supplemental briefing does not

advance any other arguments to excuse the procedural default of these claims. He therefore has

not shown that he is entitled to habeas relief on Claims 4 through 17.

Claims 2a, 2b, 2c, 2g2, 2g3, and 2ad are all IATC claims, and the Court will address

Davidson's *Martinez* arguments with respect to these claims.

The Court explained the *Martinez* exception in a prior memorandum order:

> Generally, "[n]egligence on the part of a prisoner's postconviction attorney
> does not qualify as 'cause'" to overcome procedural default. *Martinez*, 566 U.S. at
> 10 (alteration in original) (quoting *Maples v. Thomas*, 565 U.S. 266, 280 (2012));
> *see also Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("Attorney ignorance or
> inadvertence is not 'cause' because the attorney is the petitioner's agent when
> acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear
> the risk of attorney error.'" (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986))).
> In *Martinez*, the Supreme Court carved out an exception to this rule, holding that
> "[i]nadequate assistance of counsel at initial-review collateral proceedings may
> establish cause for a [petitioner's] procedural default of a claim of ineffective
> assistance at trial." 566 U.S. at 9. Specifically, the Supreme Court held that

>> [w]here, under state law, claims of ineffective assistance of trial
>> counsel must be raised in an initial-review collateral proceeding, a
>> procedural default will not bar a federal habeas court from hearing
>> a substantial claim of ineffective assistance at trial if, in the initial-

review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17. A "substantial" claim in this context is one that "has some merit." *Id.* at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The Supreme Court explained that its holding in *Martinez* "acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Id.* The Supreme Court broadened *Martinez* in *Trevino v. Thaler*, 569 U.S. 413 (2013), holding that *Martinez* also applies where, although state procedural law may permit defendants to raise IATC claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal[.]" 569 U.S. at 429. The Sixth Circuit has held that *Martinez* and *Trevino* apply to IATC claims that are procedurally defaulted in Tennessee state courts. *Sutton v. Carpenter*, 745 F.3d 787, 792–96 ([6th Cir. ]2014); *see id.* at 795–96 ("[I]neffective assistance of postconviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial.").

To determine whether a petitioner can overcome procedural default of an IATC claim based on ineffective assistance of post-conviction counsel under *Martinez* and *Trevino*, courts consider:

(1) whether state post-conviction counsel was ineffective [during initial collateral review proceedings]; and (2) whether [the petitioner's] claims of ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [the petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [the petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits.

*Atkins* [*v. Holloway*], 792 F.3d [654,] 660 [(6th Cir. 657)] (citations omitted).

(Doc. No. 75, PageID# 11172–73.)

### 1.     Claim 2a: Trial Counsel's Failure to Investigate Gender Discrimination in the Selection of the Grand Jury Foreperson

Davidson argues that his trial counsel was ineffective for failing to investigate Dickson County's long-standing practice of excluding women from serving as grand jury forepersons and that his post-conviction counsel was ineffective for failing to raise this claim in initial post-

conviction proceedings. (Doc. Nos. 25, 47.) The State argues that this claim lacks substantiality under *Martinez* and that Davidson therefore cannot overcome procedural default because, as a man, Davidson lacks standing to challenge the exclusion of women from grand jury foreperson selection. (Doc. No. 38.) The State relies on *Castaneda v. Partida*, 430 U.S. 482 (1977), for the proposition that, to raise this equal protection and due process claim Davidson "must show that the procedure employed resulted in substantial underrepresentation 'of the identifiable group *to which he belongs*.'" (*Id.* at PageID# 10977 (quoting *Castaneda*, 430 U.S. at 494).) The Supreme Court's subsequent decision in *Campbell v. Louisiana*, 523 U.S. 392, 400 (1998), held that a white defendant had standing to challenge the exclusion of black grand jurors. But Davidson was indicted in 1996 (Doc. No. 34-1), two years before the Supreme Court issued its decision in *Campbell*, and the Sixth Circuit held in *Henley v. Bell*, 487 F.3d 379 (6th Cir. 2007), that a male defendant indicted in 1985 could not retroactively rely on *Campbell* to challenge the systematic exclusion of women from the position of grand jury foreperson in a Tennessee county. 487 F.3d at 384–87.

Further, Davidson's argument regarding this IATC claim is entirely conclusory. He has not provided any specific argument or evidence to satisfy *Martinez*, much less *Strickland*. He therefore has not shown that he can overcome procedural default or that he is entitled to habeas relief with respect to this claim.

2.      **Claim 2b: Trial Counsel's Failure to Move to Quash the Indictment or Dismiss the Charges Based on Grand Jury Composition**

Davidson argues that his trial counsel was ineffective for failing to move to quash the indictment or dismiss the charges against him on the grounds that the grand jury was composed of only twelve and not thirteen members in violation of Tennessee law and that his post-conviction counsel was ineffective for failing to raise this claim in initial post-conviction proceedings. (Doc. Nos. 25, 47, 80.) The State argues that this claim lacks substantiality under *Martinez* because

Davidson did not have a right to a grand jury quorum under federal or Tennessee law. (Doc. Nos. 38, 83.) Davidson argues that his trial counsel should have objected under Tennessee law. (Doc. Nos. 47, 80.) But the TCCA has held that, under Tennessee law, "[a]ll that is required" for a grand jury to return a valid indictment "is twelve affirmative votes." *Bolen v. State*, 544 S.W.2d 918, 920 (Tenn. Crim. App. 1976). Davidson has not provided any specific argument or evidence to satisfy *Martinez* and *Strickland*. He therefore has not shown that he can overcome procedural default or that he is entitled to habeas relief with respect to this claim.

> **3.** **Claim 2c (Trial Counsel's Failure to Make a Complete and Supported *Batson* Objection to the Prosecution's Striking of Juror Springer); Claim 2g2 (Trial Counsel's Failure to Object to Guilt-Phase Jury Instructions About the Prosecution's Burden of Proving All Essential Elements Beyond a Reasonable Doubt); Claim 2g3 (Trial Counsel's Failure to Object to the Trial Court's Failure to Instruct the Jury on the Lesser Included Offense of Reckless Homicide); Claim 2ad (Trial Counsel's Failure to Raise Any or All of the Constitutional Challenges in Davidson's Amended Petition)**

Davidson further argues that his trial counsel was ineffective for: (1) failing to make a complete and supported *Batson* objection to the prosecution's striking of the only African-American juror in the venire (Claim 2c); (2) failing to object to the guilt-phase jury instruction that "[a] reasonable doubt sufficient for acquittal had to be a 'doubt based on reason and common sense'" (Doc. No. 25, PageID# 322) (Claim 2g2); (3) failing to object to the trial court's failure to instruct the jury regarding reckless homicide as a lesser-included offense of first-degree murder (Claim 2g3); and (4) failing to raise any or all of the constitutional challenges included in Davidson's amended petition for a writ of habeas corpus under § 2254 (Claim 2ad). (Doc. Nos. 25, 47, 80.) The State argues that *Martinez* does not apply to Claims 2c and 2g2 because Davidson's post-conviction counsel presented these claims to the initial state post-conviction court and the claims were only defaulted on post-conviction appeal. (Doc. Nos. 38, 83.) And the State argues

that the Court may not consider Davidson's remaining procedurally defaulted IATC claims on the merits because they lack substantiality under *Martinez*. (Doc. Nos. 38, 83.)

The Court finds that Davidson's arguments regarding these claims are conclusory and that he has not presented sufficient argument or evidence to overcome procedural default under *Martinez* and to show that he is entitled to habeas relief based on *Strickland*'s deferential standard, especially when viewed through AEDPA's deferential lens.

## IV.     Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Davidson's amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Doc. No. 25) be GRANTED IN PART. The amended petition should be GRANTED with respect to Claims 2d, 2e, 2f, and 2aa. The amended petition should be DENIED with respect to all other claims.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 2nd day of March, 2023.


ALISTAIR E. NEWBERN
United States Magistrate Judge