JERRY RAY DAVIDSON,               )
                                  )
          Petitioner,             )          Case No. 3:16-cv-01334
                                  )
v.                                )
                                  )          Judge Eli J. Richardson
KEVIN GENOVESE,                   )          Magistrate Judge Alistair E. Newbern
                                  )
          Respondent.             )

## MEMORANDUM OPINION AND ORDER

Pending before this Court[1] is a report and recommendation of the Magistrate Judge (Doc. No. 90, "R&R"), wherein the Magistrate Judge recommends that this Court GRANT IN PART and DENY IN PART Petitioner Jerry Davidson's ("Davidson") amended petition for habeas corpus relief (Doc. No. 25, "Amended Petition"). Respondent has filed objections to the R&R (Doc. No. 94, "Objections"),[2] arguing that the Magistrate Judge did not properly defer to the state court's determination of Davidson's trial counsel's performance as required by 28 U.S.C. § 2254(d)(1) and erred in her prejudice analysis by failing to consider the totality of the circumstances (both aggerating and mitigating evidence). (Doc. No. 94, *generally*). Davidson did not file any objections to the R&R.

For the reasons stated herein, the Court will adopt the R&R in part, decline to adopt the R&R in part, and deny the Amended Petition.

---

[1] Herein, "the Court" refers to the undersigned District Judge, as opposed to the Magistrate Judge who authored the R&R.

[2] Herein, a given use of the term "Objections" may refer to the document (Doc. No. 94) itself, to the purported objections contained therein (i.e., the "objections" to the R&R contained within the "Objections"), or both.

# LEGAL STANDARD FOR REVIEW OF A REPORT AND RECOMMENDATION

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which a *proper* objection is made. Fed. R. Civ. P. 72(b)(3); 28 U.S.C.A. § 636(b)(1).[3] The district judge may accept, reject, or modify

---

[3] Significantly, and perhaps surprisingly, the statute does not actually direct the district judge to expressly rule on the objections themselves (i.e., expressly sustain or reject the objector's *specific* criticism(s) of what the magistrate judge did). Instead of requiring the district judge to determine *the* validity of the objections to what the magistrate judge did, the statute requires the district judge to make a determination—de novo, which inherently means ultimately without reference to whether what the magistrate judge did was objectionable—of the portion(s) of the report and recommendation to which objection was made. Moreover, since the review of the objected-to portions of the report and recommendation is de novo, any critiquing of what the magistrate judge did ultimately would be dicta (albeit relevant and probative dicta to the extent that such critiquing explains the analysis underlying the district judge's determination of the objected-to portions of the R&R). Additionally, district judges in this Circuit not infrequently either decline to rule (or, to the same effect, deny as moot) a particular objections on the specific ground that so doing is unnecessary to rule on the objected-to portion of the report and recommendation. *E.g., Collins v. Bright*, No. 213CV02987JPMCGC, 2021 WL 5205622, at *3 (W.D. Tenn. Nov. 9, 2021) ("[T]his objection does not affect or alter the conclusions of the Magistrate Judge and is overruled as moot."); *Lashuay v. Fornwalt*, No. 1:15-CV-1109, 2017 WL 4160947, at *1 (W.D. Mich. Sept. 20, 2017) ("This Court need not resolve all of the objections," because only some of them needed to be addressed in order to resolve the motion that was the subject of the report and recommendation); *Weatherspoon v. Williams*, No. 2:14-CV-108, 2016 WL 6070994, at *1 (W.D. Mich. Oct. 17, 2016) ("Plaintiff's objections are irrelevant and will be denied."); *Bowers v. Burnett*, No. 1:08-CV-469, 2011 WL 1047343, at *2 n.1 (W.D. Mich. Mar. 18, 2011) (noting that the Court need not resolve an objection to the extent that the objector's position on the R&R has other fatal deficiencies); *Powell v. Alcoa High Sch.*, No. 3:10-CV-212, 2010 WL 2598260, at *2 (E.D. Tenn. June 24, 2010) (Because this objection is irrelevant to [the magistrate judge's] recommendations, it is hereby overruled.") *Cline v. Kelly*, No. 09CV859, 2010 WL 1006529, at *9 (N.D. Ohio Mar. 16, 2010) ("The Court acknowledges [the petitioner's] objection, but need not resolve it because that specific fact is not relevant to the resolution of any of the grounds for relief set forth in the petitioner that the magistrate judge had recommended be denied").

Thus, although it seems clear that the district judge *can* expressly rule on the objections, the Court concludes that a district judge is not required to do so. And herein, the Court declines to do so, focusing instead on the required de novo review and determination of the objected-to parts of the R&R—albeit in part by taking account of any ways in which the objections (and response thereto) shed light on what the Court's ultimate determination should be.

the recommended disposition, review further evidence, or return the matter to the magistrate judge with instructions. *Id.*

Only "specific written objections" to the magistrate judge's proposed factual findings and legal conclusions are "proper" under Federal Rule of Civil Procedure 72(b). *Frias v. Frias*, No. 2:18-cv-00076, 2019 WL 549506, at *2 (M.D. Tenn. Feb. 12, 2019). Furthermore, Local Rule 72.02(a) provides that such objections must be written and must state with particularity the specific portions of the Magistrate Judge's report or proposed findings or recommendations to which an objection is made. *See* Fed. R. Civ. P. 72(b)(2); L.R. 72.02(a).

As the R&R noted, "Davidson's principal arguments in favor of a writ of habeas corpus address the effectiveness of his representation by trial counsel." (Doc. No. 90 at 20). The R&R also set forth the following discussion of such claims:

> The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Supreme Court held in *Strickland v. Washington*[, 466 U.S. 668 (1984),] that "the right to counsel is the right to the effective assistance of counsel." 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); see also id. at 685 ("An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair."). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).

> Deficient performance under *Strickland* is "measured against an 'objective standard of reasonableness' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Strickland*, 466 U.S. at 687, 688); see also *Wiggins*, 539 U.S. at 521 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." (alteration omitted) (quoting *Strickland*, 466 U.S. at 688)). "[I]n applying *Strickland* [ ] , hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' [ ] decisions are made and by giving a 'heavy measure of deference to counsel's judgments[.]'" *Rompilla*, 545 U.S. at 381 (quoting *Strickland*, 466 U.S. at 689, 691).

(Doc. No. 90 at 20). The Court adopts the Magistrate Judge's cogent statements here regarding *Strickland* and its standards relevant to claims of ineffective assistance of counsel. Notably, *Strickland* happened to be a capital case, although it is apparent that its teachings apply likewise to non-capital cases.

 *Strickland* made clear, among other things, that counsel has a duty to investigate matters relevant to a case as appropriate. *See* 466 U.S. at 690. *Strickland* then noted that counsel's performance should almost never be deemed deficient when it is the result of "strategic choices made after made after thorough investigation of law and facts relevant to plausible options"; such choices are "virtually unchallengeable." *Id*. at 690-91. *Strickland* then addressed the extent to which strategic choices could be deemed reasonable—and thus not grounds for a finding of deficient performance—when "made after less than complete investigation." *Id.* at 691. *Strickland* explained that such strategic choices "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* And, the Supreme Court noted, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."[4] *Id.*

---

[4] In *Strickland*, the Supreme Court seemed to use interchangeably the terms "complete" and "thorough" to refer to an investigation that is sufficient to render virtually unchallengeable strategic decisions made after the investigation. That is, a "complete" (or "thorough") investigation in this context is one that is adequate under the circumstances to make subsequent strategic decisions reasonable. Below, the Court will use the term "complete" to describe such an investigation. As to where the line is between an investigation that is "complete" and one that is not, *Strickland* did not say, and presumably the placement of the line is a very case-specific matter, and subjective matter that is in the eye of the beholder. It appears to be the job of the habeas court to call it like it sees it, deciding whether a particular investigation by counsel should be deemed adequate to make subsequent strategic choices virtually unchallengeable.

 One additional note about terminology: it appears that in a couple of places, to refer to a "reasonable" strategic decision (i.e., the kind of strategic choice that would be "virtually unchallengeable" due to its

## <u>LEGAL STANDARD FOR HABEAS RELIEF UNDER THE AEDPA</u>

Petitioner's right to relief under the Amended Petition as governed by 28 U.S.C. § 2254(d),

as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L.

No. 104-132, 110 Stat. 1214 (1996). That subsection provides:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). The R&R correctly and cogently sets forth the United States Supreme

Court's elucidation of these provisions:

> The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

> Under § 2254(d)(1), a state court's decision is "contrary to" clearly established federal law only "if the state court applies a rule different from the governing law set forth in" the Supreme Court's holdings "or if it decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A state court's "decision is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case[.]" *White v. Woodall*, 572 U.S. 415, 426 (2014). To be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error

---

being entitled to the deference given that it followed a complete investigation), the R&R used the term "strategic decision" without qualifying the term in any way. (Doc. No. 90 at n.5; 41). But despite this terminology, the Magistrate Judge appeared to be fully aware that what is at issue was whether trail counsel made a reasonable strategic decision, and not just a decision that could be called strategic irrespective of whether it was reasonable.

will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419); see also *Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Under § 2254(d)(2), habeas relief is available if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court. proceeding." 28 U.S.C. § 2254(d)(2). The statute provides that a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1); see also *Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006))).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66 (2011) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011)). The AEDPA "standard is difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102; see also *Burt*, 571 U.S. at 20; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle "that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)); see also *Woods*, 575 U.S. at 316.

AEDPA also imposes a "total exhaustion requirement," providing that "'[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State'" with respect to each claim, or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005) (second and third alterations in original) (quoting 28 U.S.C. § 2254(b)(1)(A)); see also 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented."). This "exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts[.]" *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). AEDPA therefore requires a petitioner to "properly present[] his or her claims through one 'complete round of the State's established appellate review process.'" *Woodford v. Ngo*, 548 U.S. 81, 92 (2006) (quoting id. at 845). A petitioner incarcerated in Tennessee exhausts all available state remedies

under AEDPA once the TCCA denies a claim of error. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39 (exhaustion of remedies)).

> "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). Under the doctrine of procedural default, a petitioner who may no longer present claims in state court because he or she failed to meet state procedural requirements must "demonstrate cause for his [or her] state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). The one exception to this doctrine "is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that [the federal habeas court's] failure to review his [or her] federal claim will result in a fundamental miscarriage of justice." *Id.*

(Doc. No. 90 at 17-19). Notably, "AEDPA requires the petitioner to prove that the state court's error is 'an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States.'" *Davenport v. MacLaren*, 975 F.3d 537, 544–45 (6th Cir. 2020) (quoting § 2254(d)(1)). The Court discerns that in practical application, a petition meets this "burden" of "prov[ing]" the unreasonableness of the state court's application of clearly established federal law whenever the court is able to clearly perceive such unreasonableness, based either on the petitioner's argument or otherwise.

## **PROCEDURAL BACKGROUND**

Neither Davidson nor Respondent disputes the factual determinations of the state courts or the cogently statement of the procedural background of this matter set forth in the R&R (in large part by quoting the Tennessee Supreme Court). Therefore, the Court adopts that background in its entirety and includes it here for reference:

> On direct appeal, the Tennessee Supreme Court provided the following summary of the evidence introduced during [Davidson]'s trial, which the Tennessee Court of Criminal Appeals (TCCA) adopted on post-conviction review:

Between 8 and 9 p.m. on September 26, 1995, the victim, Virginia Jackson, and her dog arrived in a taxi cab at Bronco's Bar in Dickson, Tennessee. Jackson was carrying a large purse and a white bed pillow and wearing multicolored hair clips. When Jackson arrived at Bronco's Bar, the defendant, Jerry Ray Davidson, was sitting quietly by himself drinking beer. Jackson spent the next [few] hours at the bar drinking two beers and talking with the bartender, Carol Owens, and other bar patrons. Although Jackson and Davidson sat next to one another at one point, the two did not converse, and the evidence does not suggest that they were acquainted. By closing time, only Jackson, Davidson, and Owens remained in the bar. Owens tried to call a cab for Jackson, but the cab company was closed for the night. Jackson accepted a ride home from Davidson and was last seen alive around 11:30 p.m., carrying her purse and pillow as she got into Davidson's red pickup truck with her dog.

Members of Jackson's family became worried when they did not hear from her for several days. On October 1, 1995, her family filed a missing person report with law enforcement officials, who began an investigation of her disappearance.[5]

On September 30, 1995, only a few days after Jackson was last seen, Jackson's brother-in-law observed a pile of clothing lying along a farm road leading to her house. At that time, he did not connect the clothing with her disappearance. On October 18, however, he reported the clothing to law enforcement authorities. On October 18 and 19, law enforcement officers found the following items belonging to Jackson along the farm road: hair clips, a cell phone, panties, a pillow, a sweatshirt, and a sock. On October 19, 1995, two deer hunters found Jackson's decomposing, nude body. The body was partially buried in a shallow grave several miles from her house in a wooded area off an old logging road along the Houston/Dickson County line.

At trial, the condition of Jackson's body was described by Dr. Murray Marks, the forensic anthropologist who disinterred the body, and by Dr. Charles Harlan, the forensic pathologist who performed the autopsy on the body. Dr. Marks stated that the body was found lying chest down. The head was missing, although it appeared that a space had originally been dug for it in the grave. Part of the torso and left arm of the body were exposed, and the left hand was missing. There was evidence that animals had gnawed on the left arm, the neck, and the shoulder area. However, other trauma to the

---

5 "Jackson's dog was found at her home." *State v. Davidson*, 121 S.W.3d 600, 605 n.2 (Tenn. 2003).

body was inconsistent with animal activity. Dr. Harlan observed that the skin at the front and back of the neck had been cut; the trachea exhibited a clean, sharp cut; the hyoid bone, which is located in the upper throat, had also been cut; and there was clear disarticulation of the cervical vertebral column. In addition, the torso, including the breast bone, had been cleanly cut open with some type of sharp instrument. This incision ran almost the entire length of the torso from the sternum to the navel and exposed the internal organs. Several superficial cuts had been made in the soft tissue next to the large incision. Dr. Harlan opined that both the major incision and the lesser cuts were inflicted after death. Toxicology tests revealed the presence of alcohol and Prozac in the body, although the quantity of these substances was not determined. According to Dr. Marks, it was possible that Jackson's neck had been cut and her head removed after death by either animal or human activity. Dr. Harlan opined that a human being, not an animal, had removed the head after death. Relying on changes in the body's color and texture, Dr. Marks concluded that Jackson had been dead for four to six weeks. Based on the degree of the body's decomposition, Dr. Harlan testified that death had probably occurred within twenty-four hours of Jackson's departure from Bronco's Bar on September 26, 1995. A cause of death could not be determined from Jackson's remains. Dr. Harlan, however, expressed his belief that her death was a result of homicide and that she could have died from wounds to her neck or head.

All of the evidence regarding Davidson's role in the killing is circumstantial. For example, Davidson was a janitor in a hospital department where surgical instruments were cleaned. Although he had been a good and reliable employee, he did not return to work as scheduled after September 26, 1995. He did not contact anyone at work about his absence, and he was eventually fired. In addition, he did not return to his residence at his mother's home for almost three weeks after Jackson's disappearance. On October 2, 1995, Davidson's mother informed the Dickson police that he was missing. Mrs. Davidson withdrew the missing person report on October 8, 1995, after Davidson telephoned her. Davidson later returned to his mother's house, once spending the night, and a second time retrieving a camper top for his pickup truck.

There was also evidence that Davidson was in the area where the body was found in the days following Jackson's disappearance. Between October 4 and 6, 1995, approximately a week after Jackson disappeared, Melinda Jones saw Davidson driving a red truck very slowly down Old Yellow Creek Road in Dickson County. Jones saw an object in the passenger seat that was tightly wrapped in a white sheet and was about as high as Davidson's shoulder. As the truck

went by, Jones saw the white object fall over onto Davidson, who pushed it away. Later that evening, Jones observed the same truck traveling in the opposite direction at a high rate of speed. Jones also testified that she remembered seeing the same truck go down the road a few days to a week earlier, shortly after Jackson disappeared. At that time, the truck was going very slowly, and Jones, who was able to see inside the vehicle as it passed, noticed that "there was something that wasn't right about the passenger's seat." Jackson's body was discovered about one and a half miles from Jones's home.

Additionally, between October 2 and 6, 1995, around 8 to 9 a.m., Davidson came into Kim's One Stop Market not far from Jones's home. He was wearing work pants and was covered with dirt to his waist. According to one witness, Davidson looked "like he'd been digging in like a garden or something." Davidson sat in the store drinking a cup of coffee for about an hour before driving away in a red pickup truck with a camper top. A week later he returned to the market to purchase a soft drink.

The State's proof also showed that on September 29 and 30, 1995, Davidson made purchases at a grocery store and at a Wal–Mart in Waverly, Tennessee, in the county just southwest of the area where Jackson's body was found. On October 4, 1995, around the time Melinda Jones saw Davidson driving his truck down Old Yellow Creek Road, Davidson also made a withdrawal from an automatic teller at a bank in Erin, Tennessee, in Houston County. All of these transactions place Davidson in the vicinity where Jackson's body was found at a time shortly after her disappearance.

Other sightings of Davidson after Jackson's disappearance also connect him with the killing. For example, on October 9, 1995, Davidson reappeared at Bronco's Bar in Dickson. When Owens, the bartender, asked him where he had taken Jackson on September 26, 1995, Davidson told her that he had dropped Jackson off at a Kroger grocery store. Later that same day, when Timothy Eads of the Dickson County Sheriff's Department went to Bronco's Bar to speak with Owens, Davidson was still there. After Owens identified Davidson as the man who had taken Jackson home, Eads questioned Davidson about Jackson for several minutes. Davidson informed Eads that he had left Jackson at the Kroger parking lot around midnight. Davidson appeared nervous and uncomfortable during his conversation with Eads and left the bar soon after Eads. When Eads tried to contact Davidson again, Davidson could not be located. On October 18, 1995, Eads executed a search warrant at Davidson's residence. He seized an expended 20–gauge shotgun shell that was

later determined to have been fired from a shotgun found in Davidson's truck.

On October 12, 1995, Davidson came into the Lakeview Tavern in Cumberland City and ordered a beer. The bartender, Darla Harvey, testified that his pants and shoes were covered with dirt. For over an hour, Davidson sat in the bar and stared at Harvey while sipping his beer. Disturbed by Davidson's appearance and behavior, Harvey went outside and examined Davidson's truck. At that time, the bed of the truck was covered with a camper top that had been spray painted red everywhere but the back window. Harvey looked inside the camper and saw a dirty sleeping bag, a dirty shovel, a chain, and two Rubbermaid containers. According to Harvey, the truck was "very messy," as if Davidson had been living in it. Harvey informed some of the bar patrons that she was afraid of Davidson, who then left the bar at the patrons' request.

On October 19, 1995, Davidson was arrested at Robert's Creek Bar near Cuba Landing in Humphreys County. At the time of the arrest, Investigator Ted Tarpley spoke with Davidson. Davidson denied giving Jackson a ride on September 26. After Officer Eads joined the interrogation, Davidson changed his story and stated that he had left Jackson at the Kroger parking lot before driving to Nashville. He claimed that he stayed in Nashville until 3 or 4 a.m., returned home, and then left the next morning for East Tennessee. Eads and Tarpley did not inform Davidson that Jackson's body had been found. When asked to hypothesize about what might have happened to Jackson, Davidson responded, "Maybe somebody got her and chained her to a tree." Davidson also told Eads and Tarpley that they might find Jackson with her head and hands missing to keep anyone from identifying the body. After Davidson was informed that the body had been found, he was asked what he had done with the head, and he replied, "I haven't told you that I killed her yet." Davidson later said that he might have something to say but could not say it yet. He also told the officers that he had quit his job because "things were just getting tense" and he decided to leave.

Searches of Davidson, his truck, and the area where the body was discovered yielded several items linking him to the killing. On his person, the arresting officers found a .25 caliber automatic pistol, a chrome knuckle knife with the blade open, a pair of handcuffs, a box of .25 caliber bullets, and a live 20–gauge shell. The pistol was loaded and ready to fire. At the time of his arrest, Davidson's truck did not have a camper top on it. His truck appeared to have been driven through mud and vegetation. Moreover, the truck contained the following items: an Ozark Trails tent, two shotguns, a knife,

handcuff keys, clothing, flashlights, cans of red spray paint, and Marlboro cigarettes. Officers also found numerous items at the campsite or grave site[6] that belonged to either the defendant or to Jackson. The items included a box for an Ozark Trails tent, shells that had been fired from the shotgun found in Davidson's truck, a knife, handcuffs that matched the keys discovered in the Davidson's truck, packages and fragments of Marlboro cigarettes, a tool box resembling one previously seen on Davidson's truck, cans of red spray paint, clothing and flashlights similar to those in Davidson's truck, and two receipts reflecting a withdrawal from Davidson's bank account on October 4, 1995, at an automatic teller in Erin, Tennessee. Personal items belonging to Jackson, such as her sandals, billfold, a hair clip, a brush, a prescription bottle, and cigarette case, were found at the campsite as well.

In addition, the bottom of the passenger seat in Davidson's truck had been cut out. A chain and padlock found around the passenger seat were arranged in such a manner that they could be used to restrain a passenger. Blood on the passenger seat and head rest tested positive for human blood. DNA testing indicated that the blood samples from the truck did not match Davidson's DNA. Instead, the samples were consistent with Jackson's DNA. According to a report from LabCorp, Inc., only one in 265,000 people would be expected to have DNA matching that of Jackson.

The defense presented evidence attempting to counter the prosecution's circumstantial evidence. There was testimony that two tires on Jackson's truck had been punctured by a knife about two days before she disappeared. In addition, a forensic pathologist who testified for the defense criticized the manner in which the State's forensic pathologist had performed the autopsy and preserved the body. The defense pathologist also complained that the quantity of alcohol and Prozac in Jackson's body should have been determined. The defense introduced Jackson's medical records reflecting her hospitalizations between 1978 and 1995 for depression and drug and alcohol abuse in an attempt to show that Jackson might have died from an overdose of alcohol and/or Prozac. Her medical records include a report that she had once overdosed on the drug Soma and had been pronounced dead. In addition, a bottle labeled for a prescription for thirty pills of Prozac dispensed on September 25, 1995, contained only five tablets when found at Jackson's home after her disappearance. To counter the inference that Davidson could have used a surgical instrument from his workplace to cut

6 "For purposes of investigation, the general location where the body and other evidence was found was broken down into two areas: the grave site area where the body was actually found and the campsite area across the logging road from the grave." *State v. Davidson*, 121 S.W.3d at 608 n.3.

Jackson's body, the defense presented testimony that no surgical instruments had been reported missing from Davidson's place of employment. Finally, the defense presented the testimony of a DNA expert who was unable to corroborate the findings of the State's experts. The expert challenged the opinion that the DNA test ruled out Davidson as the source of the blood found on the passenger seat of his truck. The defense expert admitted, however, that she had made no independent examination or analysis and was only reviewing LabCorp, Inc.'s findings.

*State v. Davidson*, 121 S.W.3d 600, 605–09 (Tenn. 2003); *see also State v. Davidson*, No. M2010-02663-CCA-R3-PD, 2013 WL 485222, at *1–5 (Tenn. Crim. App. Feb. 7, 2013) (same), *aff'd in part and rev'd in part*, 453 S.W.3d 386.

…

The Tennessee Supreme Court [, mostly adopting language from the TCCA,] summarized Davidson's conviction and sentencing proceedings as follows:

At the conclusion of the evidence, the jury convicted Davidson of first degree premeditated murder and aggravated kidnapping. The trial then moved to the sentencing phase to determine the punishment.

During the sentencing phase, the State presented proof that Davidson had been convicted in 1971 for assault and battery with the intent to commit rape, in 1976 for assault and battery with the intent to ravish and to have unlawful carnal knowledge of a female over 12 years of age, and in 1983 for felonious crime against nature and for felonious sexual battery. A Tennessee Bureau of Investigation agent testified that Jackson's body had been mutilated by cutting the neck area and torso. Photographs showing the mutilation were re-introduced.

In mitigation, the defense presented the testimony of Davidson's mother, several of his co-workers, and his minister. Davidson's mother related that, as a child, he had lived with his grandparents and had not completed school because he was always in trouble with the law. She described her son as a quiet boy who had few friends. He had no contact with his father throughout his life. At some indefinite time in the past, he had spent one to two years at Central State Hospital for mental problems. Davidson's mother testified about how badly Davidson had taken his younger brother's death in Vietnam and how he had helped her at home. Next, several of Davidson's co-workers testified that he was a good worker, a good

friend, and a nice, considerate man who would help anyone. They found Davidson's involvement in Jackson's murder inconsistent with his behavior when he was around them. The last witness for the defense was Joe Ingle, a minister, who described Davidson as quiet and passive, with an interest in the Bible's prophetic books and an openness to learning new things. Ingle opined that Davidson would not be a threat in prison and would participate in work or educational programs.

Based on this proof the jury found that the State had proven beyond a reasonable doubt the following statutory aggravating circumstances: (1) the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed by the defendant while in the commission of a kidnapping; and (3) the defendant knowingly mutilated the body of the victim after death. Tenn. Code Ann. § 39–13–204(i)(2), (7), (13) (1991 & Supp. 1995). In addition, the jury found that the State had proven that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. As a result, the jury sentenced Davidson to death for the murder of Virginia Jackson.

*State v. Davidson*, 121 S.W.3d at 609–10 (footnote omitted); *see Davidson v. State*, 2013 WL 485222, at *5.
…

Davidson appealed his conviction and sentence with the assistance of counsel. The TCCA summarized the issues Davidson raised on appeal as follows:

(1) Whether the trial [court] erred when it denied the appellant's motions to change venue, strike the venire and grant additional peremptory challenges;
(2) Whether the evidence is sufficient to sustain the convictions;
(3) Whether a witness for the prosecution should have been allowed to offer opinion testimony;
(4) Whether the trial court correctly instructed the jury about the unanimity of its verdict;
(5) Whether the jury's verdict is proper;
(6) Whether the prosecutor has unlimited discretion in seeking the death penalty;
(7) Whether the death penalty is imposed in a discriminatory manner; and
(8) Whether Tennessee courts employ an adequate proportionality review.

*State v. Davidson*, 2002 WL 15381, at *1.

The TCCA affirmed Davidson's convictions and sentence. *Id*. at *21. Because Davidson received a death sentence, his appeal was automatically docketed before the Tennessee Supreme Court. *State v. Davidson*, 121 S.W.3d at 604. A divided Tennessee Supreme Court affirmed the TCCA's decision, *id*. at 623, with two justices dissenting on grounds that, among other things, the State had not introduced sufficient evidence to show that Davidson engaged in the kind of premeditation necessary to sustain a conviction for first-degree murder under Tennessee law, *id*. at 625–29 (Anderson, J., dissenting); *id*. at 629–31 (Birch, Jr., J., dissenting).

Davidson filed a pro se petition for post-conviction relief in Dickson County Circuit Court on August 12, 2004. (Doc. No. 37-1.) The post-conviction court summarized Davidson's pro se claims for relief as follows:

> (1) That Davidson's conviction was based upon the use of a coerced confession;
> (2) That Davidson's conviction was based upon the use of evidence gained
> pursuant to an unconstitutional search and seizure;
> (3) That Davidson's conviction was based upon the use of evidence obtained pursuant to an unlawful arrest;
> (4) That Davidson's conviction was based upon a violation of the privilege against self-incrimination;
> (5) That Davidson's conviction was based upon the unconstitutional failure of the prosecution to disclose to Davidson evidence favorable to Davidson;
> (6) That Davidson was denied the effective assistance of counsel;
> (7) That Davidson's conviction was based upon the use of illegal evidence;
> (8) That introduction of victim impact evidence at the trial of innocence or guilt violates due process and fair trial protections found in the Sixth and Fourteenth Amendments and the analogous Tennessee Constitution provisions;
> (9) There was prosecutorial misconduct committed by the prosecutor arguing that the jury should rely on victim impact evidence and conjecture at the closing argument in the innocence or guilt trial which violated Davidson's right to due process and a fair trial under the Sixth and Fourteenth Amendments and analogous Tennessee Constitution provisions.
> (10) That the prosecutor committed misconduct in violation of Davidson's right to due process and a fair trial by denigrating Davidson's DNA expert in the innocence/guilt trial closing argument and making arguments not based upon her testimony.

(Doc. No. 37-4, [5-6].)

The post-conviction court appointed counsel to represent Davidson (Doc. No. 37-1), and counsel filed an amended petition on Davidson's behalf adding the following claims for relief:

(11) Denial of a fair trial venue;
(12) Jury tampering/jury misconduct;
(13) Prosecutorial misconduct;
(14) Unconstitutionally conducted Voir Dire;
(15) Victim Impact evidence;
(16) Execution of Davidson would violate the Constitution as he is severely mentally ill;
(17) Additional grounds for ineffectiveness of counsel;
(18) The evidence introduced at trial was insufficient to sustain Davidson's convictions;
(19) Davidson's Due Process rights were violated;
(20) The record of the proceedings against Davidson were incomplete;
(21) The Tennessee death penalty is unconstitutional;
(22) Substantive Proportionality Claim;
(23) Procedural Proportionality Claim;
(24) Davidson's jury was not required to reach a unanimous verdict regarding all factual findings concerning aggravating and mitigating circumstances under *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000),] and Ring [v. Arizona, 536 U.S. 584 (2002)];
(25) Failure to sequester prospective jurors during the voir dire process and prior to the commencement of the trial;
(26) Execution by lethal injection violates the United States and Tennessee Constitutions;
(27) The death sentence violates Davidson's fundamental right to life;
(28) The death penalty system is so broken, so fraught with errors and inequities, that imposition [of] death in this case violates the State and Federal Constitutions;
(29) The absolute discretion vested in the prosecutor to seek the death penalty violates due process, equal protection, effective assistance of counsel, and freedom from cruel and unusual punishment;
(30) The death penalty is in violation of International Law; [and]
(31) The cumulative effect of all errors at trial violated Davidson's constitutional rights.

(Doc. No. 37-4, [6-7].)

After holding an evidentiary hearing over five days between 2006 and 2009, the postconviction court denied Davidson's amended petition in a 188-page opinion issued on November 10, 2010. (Doc. No. 37-4.) The TCCA affirmed the post-

conviction court's denial of Davidson's amended petition. *Davidson v. State*, 2013 WL 485222, at *48; (Doc. No. 37-25).

The Tennessee Supreme Court affirmed Davidson's convictions, but vacated his death sentence on ineffective-assistance-of-counsel grounds. *Davidson v. State*, 453 S.W.3d at 406. The four-justice majority held that Davidson's trial "counsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial" but that "counsel's investigation and presentation of mitigation evidence" related to [Davidson]'s "brain damage and cognitive disorders" during sentencing "fell short of [the] competence demanded of attorneys in criminal cases" and "prejudiced [ ] Davidson at his capital sentencing hearing." *Id.* at 403–05. One justice concurred in part and dissented in part, finding that "the majority [ ] properly ruled that the failure of trial counsel to present mental health evidence as mitigation during the penalty phase resulted in prejudice to [Davidson]" and "that the same rationale should extend to the guilt phase of trial. Because of their inadequate preparation as to [Davidson's] medical history, his trial attorneys were unable to make an informed choice to forgo the presentation of this important evidence at trial." *Id.* at 409 (Wade, J., concurring in part and dissenting in part).

On remand, Davidson waived his right to a second sentencing hearing and accepted a sentence of life imprisonment without the possibility of parole for the first-degree murder conviction. (Doc. Nos. 37-32, 37-33.) He is currently serving that sentence, with the sentence for aggravated kidnapping to run consecutively. (Doc. No. 37-33.)

…

Davidson initiated this action by filing a pro se petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. No. 1.) The [Magistrate Judge] appointed counsel, "finding that Davidson has significant cognitive impairments that would significantly hinder his ability to effectively litigate his case, that Davidson's case presents unusual complexities, and that his case is not without merit." (Doc. No. 60, PageID# 11084 (citing Doc. Nos. 3, 19).) Davidson filed an amended petition with the assistance of counsel. (Doc. No. 25.) The amended petition includes nineteen enumerated claims for relief, many with multiple sub-claims that raise the total number of asserted claims to more than sixty. (*Id.*) Among other issues, Davidson's amended petition addresses ineffective assistance of trial counsel (IATC), sufficiency of the premeditation evidence underlying his first-degree murder conviction, ineffective assistance of post-trial and appellate counsel, discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and the prosecution's failure to disclose evidence to his counsel under *Brady v. Maryland*, 373 U.S. 83 (1963). (*Id.*)

The State of Tennessee filed the state-court record and answered the amended petition. (Doc. Nos. 34–38.) The State argues that Davidson has not exhausted state review procedures for all of the claims he asserts as AEDPA

requires, that Davidson has not shown that he is entitled to relief on any of the claims he has properly exhausted, and that Davidson has not shown the required cause and prejudice for the [Magistrate Judge] to excuse his failure to exhaust the remaining claims in his amended petition. (Doc. No. 38.)

Davidson filed a reply, arguing, among other things, that ineffective assistance of postconviction counsel excuses his procedurally defaulted claims under *Martinez v. Ryan*, 566 U.S. 1 (2012). [7] (Doc. No. 47.)

Davidson moved for discovery to develop the evidence related to some of his IATC claims. (Doc. No. 51.) The Court denied the motion, finding that Davidson had failed to establish good cause for the requested discovery. (Doc. No. 60.) Davidson then moved for an evidentiary hearing under *Martinez* regarding his procedurally defaulted claims. (Doc. No. 70.) The [Magistrate Judge] denied the motion, finding that Davidson had failed to "explain why an evidentiary hearing is necessary to establish cause and prejudice for his procedurally defaulted claims" and failed to "identify or describe any new evidence regarding his post-conviction counsel's ineffectiveness or the substantial nature of [his] underlying IATC claims that he would offer at a hearing." (Doc. No. 75, PageID# 11174.) The [Magistrate Judge] further found that it is prohibited from considering new evidence regarding claims in [Davidson]'s amended petition that the state post-conviction court considered on the merits. (Doc. No. 75.)

After resolving these motions, the [Magistrate Judge] found that, "[i]n his filings made to date, Davidson ha[d] offered legal argument to support only a subset of the more-than-sixty claims presented in his amended petition" and that the forty claims for which he "ha[d] made no legal argument [were] waived." (Doc. No. 76, PageID# 11183.) The [Magistrate Judge] found "that Davidson ha[d] provided sufficient argument to allow the following claims to proceed" for further briefing:

- Exhausted Claims:
  - 1a: that there was insufficient evidence to support Davidson's first-degree murder conviction;
  - 2d, 2e, 2f, 2aa: IATC claims regarding failure to fully investigate and argue Davidson's mental health and competency;
  - 2g1: IATC claim regarding failure to object to the trial court's "intentional" jury instruction;
  - 2h & 2y: IATC claims regarding failure to object to the victim's daughter sitting at the prosecution table during jury selection and failure to object to testimony from the victim's daughter during the guilt phase of trial;
  - 2ab: IATC claim regarding failure to object to the prosecution's attacks on defense witness Dr. Foreman;

---

[7] In *Martinez*, the Supreme Court held that ineffective assistance of post-conviction counsel may, in some circumstances, establish cause to overcome the procedural default of a substantial IATC claim. 566 U.S. at 17.

- o 19: that the cumulative effect of all errors in the trial and appeal deprived [Davidson] of a fair and reliable trial and direct appeal.
- Procedurally Defaulted Claims:
  - o 2a: IATC claim regarding failure to investigate gender discrimination in the selection of the grand jury foreperson;
  - o 2b: IATC claim regarding failure to move to quash the indictment or to move to dismiss the charges because the grand jury did not comprise thirteen members;
  - o 2c: IATC claim regarding failure to make a complete and supported Batson objection to the prosecution's striking of Juror Springer;
  - o 2g2: IATC claim regarding failure to object to guilt-phase jury instructions on the prosecution's burden of proving all essential elements of the offense beyond a reasonable doubt;
  - o 2g3: IATC claim regarding failure to object to the trial court's failure to instruct the jury on the lesser included offense of reckless homicide;
  - o 2ad: IATC claim regarding failure to raise any or all of the constitutional challenges in Davidson's amended petition;
  - o 4: that women were discriminated against, systematically excluded, and underrepresented in the selection of and service as grand jury foreperson in violation of due process, equal protection, and the right to a grand jury selected from a fair cross section of the community;
  - o 5: that the grand jury only had twelve members instead of the thirteen members required by Tennessee law;
  - o 6: that Juror Springer was unconstitutionally excluded from the jury based on her race;
  - o 7: that the guilt-phase jury instructions relieved the prosecution of its burden of proving all elements beyond a reasonable doubt;
  - o 8: that Davidson was incompetent to stand trial;
  - o 9: that Davidson's conviction was based on the use of a coerced confession;
  - o 10: that Davidson's conviction was based on a violation of his constitutional right against self-incrimination;
  - o 11: that the prosecution withheld notes from District Attorney Investigator Tarpley's interview with Witness Jones in violation of *Brady v. Maryland*;
  - o 12: that the prosecution improperly relied on victim impact evidence to induce the jury to convict Davidson;
  - o 13: that Davidson was deprived of a fair trial because of extensive pre-trial publicity in the areas from which the jury was selected;
  - o 14: that Davidson was deprived of a fair trial and a fair and impartial jury because of comments that a bailiff and a correctional officer made to jurors about Davidson;

- o 15: that the prosecution engaged in various kinds of misconduct during opening and closing statements and while questioning witnesses;
- o 16: that the trial court failed to adequately determine the extent of pretrial publicity and its impact on jurors; improperly allowed the victim's daughter to sit at the prosecution table; and failed to excuse Juror Jackson for cause;
- o 17: that the guilt phase of Davidson's trial was improperly tainted with victim impact evidence, including emotional reactions by the victim's daughter while testifying.

(*Id*. at PageID# 11184–86 (footnotes omitted).)

(Doc. No. 90, 1-16). The Magistrate Judge ordered the parties to file supplemental briefs to address the claims listed above, adding that "[t]he parties also may address the [Magistrate Judge]'s finding that [Davidson] has waived the unargued claims in his amended petition." (*Id*. at 7). Davidson filed a supplemental brief making specific arguments regarding the identified exhausted claims and general arguments regarding the procedurally defaulted claims, but did not address or challenge the Magistrate Judge's finding that he waived the remaining claims in his amended petition. (Doc. No. 80). The State also filed a supplemental brief, reiterating its arguments that Davidson failed to show that any of his exhausted claims have merit, and furthermore, that cause and prejudice existed to allow the Magistrate Judge to consider any of Davidson's procedurally defaulted claims. (Doc. No. 83). Davidson filed a reply stating that he "rests on his previous briefing[.]" (Doc. No. 86 at 1).

## THE R&R's RECOMMENDATIONS

The R&R recommends that the Court grant in part and deny in part Davidson's request for habeas corpus relief; finding that the Amended Petition should be granted with respect to four ineffective assistance of trial counsel ("IATC") claims (2d, 2e, 2f, and 2aa), and denied with respect to the remaining exhausted claims (1a, 2g1, 2h, 2y, 2ab, 19) and procedurally defaulted

claims. (Doc. No. 90 at 58). As for what the relief should be, the R&R made no recommendation, although it plainly contemplated relief as to the guilt phase only.[8]

Specifically on the procedurally defaulted claims, the R&R found there was no excuse for the default as is required to allow those claims to survive. Davidson's reliance on *Martinez v. Ryan*, 566 U.S. 1 (2012), to excuse the procedural default of Claims 4 through 17 fails because none of those claims are IATC claims. *See Zagorski v. Mays*, No. 3:99-cv-01193, 2018 WL 4352705 at *4 (M.D. Tenn. Sept. 12, 2018) (Precedent in this circuit is clear "that *Martinez* does not apply to any claims other than claims of ineffective assistance [of counsel] at trial."). Then on Claims 2a, 2b, 2c, 2g2, 2g3, 2ad, which *are* IATC claims, the R&R determined that Davidson failed to assert any specific argument or evidence to overcome procedural default. (Doc. No. 90 at 54-58).

As to the four IATC claims, 2d, 2e, 2f, 2aa, the Magistrate Judge first summarized their overarching nature, describing them as claims (1) "that his trial counsel was ineffective under *Strickland* because they failed to timely and adequately investigate, obtain, and present evidence of Davidson's intellectual limitations and mental health history during the guilt phase of his trial and that such investigation would have led to evidence showing that Davidson was incapable of premeditation, an essential element of first-degree murder under Tennessee law"[9]; and (2) that in concluding otherwise, "the state courts unreasonably applied Strickland." (*Id.* at 21).

---

[8] Typically, when habeas relief is granted as to the guilt phase of a case, it is typically in the form of a *conditional* grant of the writ, meaning that the court orders that the petitioner either be retried in a reasonable period of time or released. *See, e.g.*, *Eddleman v. McKee*, 586 F.3d 409, 413 (6th Cir. 2009); *Patterson v. Haskins*, 470 F.3d 645, 649 (6th Cir. 2006).

[9] It is telling, and consistent with a footnote above, that the Magistrate Judge described these claims as an attack only on the first-degree murder conviction, and not also as an attack on the aggravated kidnapping conviction.

After conducting her analysis, the Magistrate Judge recommends granting habeas corpus relief, finding that the Tennessee Supreme Court unreasonably applied *Strickland* in making a determination (which the Court at times below refers to as the "Guilt-Phase Decision") that the Magistrate Judge described in two different ways: (i) "that [trial] counsel's investigation of Davidson's mental health and intellectual capacity was adequate for purposes of [the guilt phase of] trial, (*id*. at 25), (ii) that trial counsel "made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial,"[10] (*id.* at 37) (quoting *Davidson*, 453 S.W.3d at 403-404)); and (iii) "that a strategic decision could be supported by a plainly inadequate investigation is an unreasonable application of *Strickland*," (*id.* at 41).

As for what was unreasonable about the Guilt-Phase Decision, the Magistrate Judge initially explained it in terms of a sort of internal inconsistency in the Tennessee Supreme Court's opinion. That is, she first stated that the Guilt-Phase Decision "cannot be squared with its holding that the same investigation was inadequate for purposes of sentencing." (*Id.* at 25). (Notably, the Court below at times refers to the Tennessee Supreme Court's determination at sentencing the "Sentencing-Phase Decision"). But it seems to the Court that the Magistrate Judge instead, or at least alternatively, found the Guilty-Phase Decision unreasonable because she believed it was flawed in its own right. This is apparent from the Magistrate Judge's remarks in the R&R, right at the place where she found trial counsel's performance deficient as alleged in the four IATC claims; there she addressed whether the Guilty-Phase Decision was unreasonable on its own terms, without

_____

[10] It is clear that the Magistrate Judge was faulting the Tennessee Supreme Court in connection with what she viewed as a single decision. And it is also clear that the Magistrate Judge was describing that decision in two different ways. The Court accepts that what the Tennessee Supreme Court did—unreasonably, in the view of the Magistrate Judge—so as to warrant relief (in the Magistrate Judge's view) was a single thing. As for the most appropriate way to describe the Guilty-Phase Decision—something that is important to identify for purposes of analyzing whether what the Tennessee Supreme Court did was unreasonable— the Court will make its own determination as part of its *de novo* review and will conduct its *de novo* analysis accordingly.

necessarily tying the other to that question to whether the Guilty-Phase Decision was *consistent* with the Sentencing-Phase Decision:[11]

> Counsel's failure to investigate Davidson's intellectual limitations and mental health history before trial fell below the objective standard of reasonableness for effective assistance of counsel at trial and at sentencing. The Tennessee Supreme Court's determination that a strategic decision could be supported by a plainly inadequate investigation [one of the Magistrate Judge's three ways of describing the Guilty-Phase Decision] is an unreasonable application of *Strickland*.

(*Id*. at 41) (citations omitted). This language also revealed (albeit not with the express granularity the Court feels compelled to, and will, set forth immediately below) the Magistrate Judge's view as to *why* the Guilty-Phase Decision was unreasonable. The reason, which was two-fold, was prefaced on a proposition on which the Magistrate Judge and Tennessee Supreme Court actually agreed: "[c]ounsel[ ] fail[ed] to investigate Davidson's intellectual limitations and mental health history before trial."[12] (Doc. No. 90 at 41). Given this failure, the Magistrate Judge in effect was saying, the Guilty-Phase Decision was unreasonable because it embodies the views (both of which the Magistrate Judge believed to be unreasonable) that (i) trial counsel could have and did make a strategic decision not to introduce Davidson's intellectual limitations and mental health history at the guilt phase, and (ii) trial counsel's performance therefore was not deficient at the guilt stage.

---

[11] True, the Magistrate Judge did indicate that she viewed counsel's performance at the guilty phase as being deficient for the same reason that (as found by the Tennessee Supreme Court) it was deficient at the sentencing phase: "Counsel[ ]fail[ed] to investigate Davidson's intellectual limitations and mental health history before trial . . . ." (Doc. No. 90 at 41). But this is not the same thing as saying that if a court found the performance deficient at sentencing based on failure to investigate, the court would necessarily *have to* find that the performance was deficient also at the guilt phase because otherwise the decision as to the guilt phase would automatically be unreasonable. At this point of the R&R, the Magistrate Judge did not say such a thing and thus did not rely on such a thing. What the Magistrate Judge appeared to be saying instead was that the performance was deficient at the guilty phase just as it was deficient at the sentencing phase, and for the same reason—an insufficient investigation of Davidson's intellectual limitations and mental health history before trial.

[12] In context, it seems clear that the Magistrate Judge's reference here to a failure to investigate was a reference not to a failure to do any investigation whatsoever, but rather to a failure to do a *complete* investigation.

It is worth noting here four things. First, in the Court's view, what the Court has just recounted *is* the Guilty-Phase Decision. That is, to state it in reverse order, the Guilt-Phase Decision is the two-fold determination that (a) trial counsel's performance was not deficient at the guilt phase (b) because trial counsel made the strategic determination not to introduce at the guilt phase evidence of Davidson's intellectual limitations and mental health history. Second, only one of the two parts of the Guilt-Phase Decision is *independently* denounced by the R&R. That is, the R&R does not dispute that if part (b) of the Guilt-Phase Decision survives scrutiny under the AEDPA, then part (a) also survives such scrutiny. Third, and conversely, if part (b) of the Guilty-Phase Decision does not survive such scrutiny, then part (a) does not survive such scrutiny, either. And fourth, the upshot of all of this is that whether the Guilt-Phase Decision survives scrutiny turns entirely on whether part (b) survives such scrutiny.

The Magistrate Judge concluded that part (b) does not survive such scrutiny. As indicated above, the Magistrate Judge concluded that Davidson's trial counsel simply could not have known *enough*, based on a mere "cursory investigation," to make a strategic decision in either the guilt phase or the sentencing phase. (Doc. No. 90 at 38, 40-41). This reasoning is reminiscent of the opinion (concurring in part and dissenting in part) of Justice Wade:

> While the majority has properly ruled that the failure of trial counsel to present mental health evidence as mitigation during the penalty phase resulted in prejudice to [ ] [Davidson], I believe that the same rationale should extend to the guilt phase of the trial. Because of their inadequate preparation as to [ ] [Davidson]'s medical history, his trial attorneys were unable to make an informed choice to forgo the presentation of this important evidence at trial. As stated, premeditation is an essential element of first degree murder. Severe mental defects might be considered by a jury as having an adverse effect upon the ability to exercise "reflection and judgment" as required by statute.

*Davidson*, 453 S.W.3d at 406-10. Sharing Justice Wade's perspective, the Magistrate Judge concluded that the Tennessee Supreme Court unreasonably applied *Strickland* in determining that

a strategic decision could be and was made in the guilt phase when it was based on an investigation into Davidson's intellectual limitations and mental health history that was—as the Tennessee Supreme Court found in granting relief with respect to the sentencing phase—"plainly inadequate." (Doc. No. 90 at 41). The Magistrate Judge also said something somewhat different (and more specific) about what was wrong with the Tennessee Supreme Court's view:

> The Tennessee Supreme Court's holding that counsel's investigation of Davidson's mental health and intellectual capacity was adequate for purposes of trial cannot be squared with its holding that the same investigation was inadequate for purposes of sentencing and constitutes an unreasonable application of *Strickland*.

(Doc. No. 90 at 25). This block quotation reflects the Magistrate Judge's view that the Guilt-Phase Decision was unreasonable for the specific reason that (in the Magistrate Judge's view) it was irreconcilable with the Sentencing-Phase Decision.[13]

In finding that Davidson made a showing of deficient performance at trial *as well as* sentencing, the Magistrate took the sequential step to the prejudice prong under *Strickland*. However, Davidson did not challenge the Tennessee Supreme Court's finding in relation to the sentencing phase. That analysis was conducted by the Magistrate Judge *de novo*, which was proper because the Tennessee Supreme Court (having found no deficient performance at the guilt phase) never reached the issue of prejudice at the guilt phase.

Relying in large part on "the Tennessee Supreme Court majority's finding that the sufficiency of the evidence supporting premeditation was a 'close' question and the dissenting justices' finding that such evidence was 'woefully lacking,'" (*id*. at 43), the Magistrate Judge concluded that there is a reasonable probability that but for trial counsel's failure to thoroughly

---

[13] But whatever the rationale for the Magistrate Judge's finding that the Guilt-Phase Decision was unreasonable, the Court's task here is to assess the Guilty-Phase Decision *de novo*, without necessarily undertaking to critique the Magistrate Judge's particular rationale for her finding.

investigate Davidson's intellectual capacity and mental health history before trial, Davidson would not have been convicted of first-degree, premeditated murder. (*Id*. at 44) (citations and quotation marks omitted). Therefore, the Magistrate Judge determined *de novo*[14] that Davidson was prejudiced by trial counsel's deficient performance at the guilt phase. (*Id*. at 41, 44).

## OBJECTIONS

In his objections, Respondent addresses only the four IATC claims on which the Magistrate Judge recommends granting relief to Plaintiff. As to the R&R's treatment of those claims, Respondent raises two objections: (1) the Magistrate Judge failed to properly defer to the Tennessee Supreme Court's application of the performance prong under *Strickland*; and (2) the Magistrate Judge erroneously assessed the prejudice prong under *Strickland*. (Doc. No. 94 at 3, 7).

First, Respondent objects to the Magistrate Judge's findings regarding trial counsel's deficient performance, claiming that the Magistrate Judge improperly evaluated the reasonableness of the Tennessee Supreme Court's application of *Strickland* by "essentially conduct[ing] an independent analysis" of trial counsel's performance to arrive at the conclusion she believes to be correct, rather than properly deferring to the Tennessee Supreme Court's application of the performance prong under *Strickland*. (Doc. No. 94 at 2-3).

Second, Respondent objects to the Magistrate Judge's analysis of the prejudice prong under *Strickland*. (*Id*. at 7). Respondent asserts that the R&R "failed to account for any of the possible rebuttal evidence, instead focusing 'solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable.'" (*Id*. at 9) (quoting

---

[14] As to why her examination of prejudice at the guilt phase was *de novo*, the Magistrate Judge explained that *de novo* review of prejudice is required whenever—as in the present case with respect to the guilt phase—the state courts, contrary to the federal judge, found the representation adequate and thus never reached the issue of prejudice. (Doc. No. 90 at 41). As discussed below, the Magistrate Judge was correct to review the issue of prejudice *de novo*.

*Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)). Respondent argues that this approach is improper, as "a reviewing court must 'consider all the evidence—the good and the bad—when evaluating prejudice.'" (*Id.*) (quoting *Wong v. Belmontes*, 558 U.S. 15, 26 (2009) (citing *Strickland*, 466 U.S. at 695-96) (remaining citations omitted)).

## DISCUSSION

The Court above has described not just the Magistrate Judge's findings as to which objection has been made, but also the rationale for those findings. Describing such rationale is helpful for placing into context the issues raised for the Court via Respondent's objections. It is also helpful for indicating potential resolutions of those issues; that is, to the extent that the Court ends up agreeing with the Magistrate Judge's rationale, the discussion of her rationale has indicated the Court's view of how the issues raised by the objections should be resolved. But the Court notes that under 28 U.S.C. § 636(b), its task is not actually to critique, or to approve or disapprove, the rationale of the Magistrate Judge; and its task certainly is not to decide whether the Magistrate Judge's rationale was reasonable. Rather, its task is to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C).  And so that is what the Court will do below, providing a *de novo* review of the two issues as to which the Magistrate Judge made a recommendation to which Respondent objected, without dwelling much on what the Magistrate Judge had to say about those issues and without deferring to the Magistrate Judge's decision in any way.

The Court has reviewed the objections, the Magistrate Judge's findings, and other relevant parts of the record, to assess *de novo* the parts of the R&R implicated by the Objections, namely (i) the finding that the Guilt-Phase Decision was unreasonable; (ii) the finding that such deficient performance was prejudicial to Davidson; and (iii) the corresponding finding that Davidson should

be granted habeas relief (in a form that, as noted in a footnote above, the R&R did not specify). On *de novo* review, the Court does not fully agree with Respondent's objections to the R&R. But when assessing *de novo* the parts of the R&R implicated by those objections, the Court finds it cannot adopt the Magistrate Judge's recommendation to grant Davidson relief as to the guilt phase.

As an initial matter, the text of the Amended Petition makes clear to the Court that Davidson contests only his convictions (primarily the one for first-degree murder and secondarily the one for aggravated kidnapping), seeking a new trial as to guilt,[15] and does not independently contest his sentence. (Doc. No. 25 at 1). That is, except to the extent that the vacatur of his conviction naturally would result in the vacatur of any sentence from that conviction, Davidson does not challenge his sentence (and certainly, and unsurprisingly, does not challenge the

---

[15] In the Amended Petition, Davidson asserts that "this Court should grant the petition for writ of habeas corpus, declare unconstitutional Petitioner's convictions for first-degree murder and aggravated kidnapping," (Doc. No. 25 at 1). This raises the question of the extent to which the Court's analysis herein should focus on the conviction for aggravated kidnapping separately from the conviction for first-degree murder. In addressing this question, the Court keeps in mind that the Court herein is addressing objections that relate *solely* to the four IATC claims.

Davidson refers to his aggravated kidnapping conviction in one (and only one) of the four IATC claims (2e) in the Amended Petition (*id.* at 12), but the reference does not appear in relation to the four IATC claims in any filings that post-date his Amended Petition, including Davidson's reply to Respondent's response to the Amended Petition (Doc. No. 47) and Davidson's supplemental briefing (Doc. No. 80). The recent absence of such reference suggests to the Court that Davidson has abandoned a challenge to the aggravated kidnapping conviction *on any grounds other than grounds related to his first-degree murder conviction*. Moreover, a mere reference to this conviction—unaccompanied by any substantive argument or evidence—does not suffice to make a habeas claim. It is not the responsibility of this Court to flesh out skeletal claims. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."), quoted in *Warman v. Mount St. Joseph Univ.*, 144 F.4th 880, 896 (6th Cir. 2025).

Thus, for purposes of reviewing Davidson's remaining IATC claims for which he seeks habeas corpus relief and as to which Respondent has lodged objections, the Court will consider trial counsel's performance only as it relates to Davidson's first-degree murder conviction. To be clear, however, were the Court to find relief warranted as to Davidson's first-degree murder conviction based on arguments that Court believes apply also to the aggravated kidnapping conviction, the Court would grant relief also on the aggravated kidnapping charge.

Tennessee Supreme Court's decision to vacate his death sentence). Accordingly, the Court's review is limited to the guilt phase (at which Davidson was convicted).

As indicated above, Davidson's entitlement to federal habeas relief requires that the state court's resolution of his claim of ineffective assistance of trial counsel under *Strickland* "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d). As further indicated above, to be actionable under § 2254(d)(1), a state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'"[16] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "This standard, we recently reminded the Sixth Circuit, is difficult to meet." *White*, 572 U.S. at 419 (internal quotation marks omitted). Due to this highly deferential standard for evaluating state-court rulings, state-court decisions must be given the benefit of the doubt. *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (per curiam).

### (1) Trial counsel's performance at the guilt phase

---

[16] Herein, the Court at times uses (as did the Magistrate Judge) the shorthand term "unreasonable" to describe a decision that "involved an unreasonable application of[ ] clearly established federal law, as determined by the Supreme Court of the United States."

Respondent's first objection to the R&R asserts that the Magistrate Judge eschewed properly deferring to the Tennessee Supreme Court's application of *Strickland*, by "essentially conduct[ing] an independent analysis" of trial counsel's performance to arrive at the conclusion she believes to be correct. (Doc. No. 94 at 6). This objection calls for a *de novo* review of Davidson's IATC claim as to the guilt phase—i.e., the claim (contrary to the Tenneessee Supreme Court's Guilt-Phase Decision) that at the guilt phase Davidson's trial counsel provided ineffective assistance of trial counsel that was prejudicial.

Under the AEDPA, to establish the deficient-performance requirement, Davidson must demonstrate that it was objectively unreasonable for the Tennessee Supreme Court to conclude that Davidson had not overcome the strong presumption of competence of his trial counsel during the guilt phase of his trial in relation to his first-murder conviction. *Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 688-89). Put in more case-specific terms, the pivotal question for the Court is whether the Tennessee Supreme Court's application of that requirement was unreasonable, which is far different from the Court asking (itself) whether (in its own view) trial counsel's performance fell below *Strickland*'s standard. *See Harrington*, 562 U.S. at 101. "Were [the latter question] the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court." *Id*. Moreover, "[a]n unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (internal quotation marks omitted). That is to say, it is something rarer and harder for a petitioner to demonstrate the former (as required) than the latter (which is insufficient).

To assess *de novo* whether the Guilt-Phase Decision was unreasonable, the Court begins by setting forth, in full, the Tennessee Supreme Court's justification for it:

> [C]ounsel made a reasonable tactical decision to abstain from presenting psychological evidence during the guilt phase of trial. Counsel was legitimately concerned that presenting any psychological evidence could open the door for the State to show the jury the alarming statements from Mr. Davidson's mental health records that revealed his malignant misogyny and his propensity to commit sexual violence. Ensuring that this evidence remained inadmissible was a reasonable strategy.

453 S.W.3d at 403–04 (citations omitted). Consistent with the Magistrate Judge's view, the Court believes that this rationale is highly questionable because it is based on the conclusion that trial counsel made a "reasonable tactical choice," which in this context is to say a reasonable strategic choice.[17] That conclusion is itself highly questionable. As the Tennessee Supreme Court itself found, trial counsel did not make a complete investigation (which in this context is synonymous with "reasonable" investigation) into Davidson's psychological condition. And as noted above, strategic choices "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691. "In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* In the Court's view, there is no question that trial counsel did not make a reasonable investigation into Davidson's psychological condition,[18] and so trial counsel could not have made a reasonable strategic choice not to present evidence of Davidson's psychological condition *unless* they did at least one of two different (albeit similar-sounding)

---

[17] The term "tactical" generally means something different from "strategic," with the former generally referring to more narrow or limited considerations, and the latter to broader or more sweeping considerations. But here, there is no indication that the Tennessee Supreme Court meant for the term to mean anything other than "strategic," the term usually used in this sort of context.

[18] It appears undisputed that, as the Tennessee Supreme Court found, counsel "perform[ed] a cursory investigation of Mr. Davidson's mental and social history, and briefly enlisted the help of others." *Davidson*, 453 S.W.3d at 398. And since the investigation was only "cursory" (or "truncated," to use the Tennessee Supreme Court's other descriptor for it), it indisputably was not "reasonable."

things: (1) made a reasonable professional judgment to limit the investigation; and (2) made "a reasonable decision that ma[de] [a reasonable] investigation[ ] unnecessary." *Id.*

Here, based on the findings of the Tennessee Supreme Court itself, there is no basis to conclude that trial counsel did either of these things. As the Tennessee Supreme Court found, "[w]hen he appeared at a November 2006 post-conviction hearing, Mr. Goodlett was unable to give a satisfactory explanation for his truncated investigation other than that he was harried and overworked." 453 S.W.3d at 399.

The record thus fails to support (and runs directly counter to) the conclusion that trial counsel made a reasonable professional judgment (or indeed *any* professional judgment) to limit the investigation. The investigation was truncated due to trial counsel being harried and overworked, not based on any judgment by trial counsel about anything whatsoever.

The record likewise fails to support (and runs directly counter to) the conclusion that trial counsel made a reasonable decision (about something relevant) that somehow made a reasonable investigation unnecessary. Most pertinently, the record fails to support (and runs directly counter to) the conclusion that trial counsel made a reasonable decision not to present mental-health evidence and that this somehow made a reasonable mental-health investigation unnecessary; that is because in the Court's view, a decision not to present mental-health evidence could not be reasonable unless it was based on a reasonable mental-health investigation. True, the record reflects that trial counsel's decision not to present mental-health evidence was based on trial counsel's reasonable concerns that such a presentation could result ultimately in a presentation to the jury of evidence damaging to Davidson. And since trial counsel's decision was based on a reasonable concern, one might be tempted to conclude that the decision was reasonable. But to say that a decision is based on a reasonable concern is not to say that the decision was reasonable.

By way of illustration,[19] imagine someone—based solely on concerns regarding reported risks of sunscreen use—declining to wear any sunscreen while regularly sitting out on a beach for many hours at a time, with most skin exposed to a blazing sun, for many years. The concern underlying the decision not to wear sunscreen may well be a reasonable one. But that does not necessarily mean that the decision was reasonable under the circumstances, i.e., the regular and prolonged exposure to the sun; it strikes the undersigned as reasonable only to the extent that the decision takes into account the countervailing benefits of wearing sunscreen (which in this example clearly could be) after a reasonable inquiry into those benefits. In other words, a decision that is based on a reasonable concern about the costs of a particular course of action (here, wearing sunscreen) is not *necessarily* (and in many cases surely is *not)* reasonable, if it fails to balance the costs against the benefits of that course of action as perceived by the decision-maker after a reasonable investigation of the extent of those benefits.

So too in the case of Davidson's trial counsel deciding not to present mental-health evidence. Though based on a reasonable concern about the risks of such presentation, trial counsel's decision was not necessarily (and in the Court's view was not) reasonable, because it failed to account for the potential benefits of such presentation—and indeed could not have accounted for those potential benefits, because there was no reasonable investigation into those

---

[19] The following is among many sources that provide background for this example:

> "The recent findings that sunscreen ingredients can be found in the bloodstream after use and that some sunscreens contain benzene give consumers reason for concern," notes Dr. [Alok] Vij. "While it's hard to prove or disprove a link between sunscreen and cancer, we know that for most people, the benefits of using a mineral-based sunscreen — like lowering the risk of skin cancer and slowing down the aging process — far outweigh the risks."

*Is Sunscreen Bad for You*?, https://health.clevelandclinic.org/is-sunscreen-bad-for-you (last accessed October 1, 2025).

potential benefits. This conclusion strikes the Court as entirely unexceptional because it is no mystery that strategic decisions at trial must account for both the (potential) costs *and* the (potential) benefits of the options between which trial counsel is choosing, based on a reasonable understanding of those potential benefits (as informed by a reasonable investigation as necessary). This conclusion also strikes the Court as entirely consistent with the Tennessee Supreme Court's decision regarding trial counsel's non-presentation of mental-health evidence at the sentencing phase. For whatever reason, the Tennessee Supreme Court took a different approach as to the guilt phase, but the Court perceives it to apply to the guilt phase just as it did to the sentencing phase.

In summary, the Court agrees with the Magistrate Judge that the Tennessee Supreme Court's Guilt-Phase Decision was erroneous. But under the AEDPA, it is not enough that the decision is erroneous; mere erroneousness is insufficient. The Court will re-state here verbatim what it stated above because it bears repeating:

A state court's unreasonable application of Supreme Court precedent "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'"[20] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)); *see also Williams*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."). Instead, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "This standard, we recently

---

[20] Herein, the Court at times uses (as did the Magistrate Judge) the shorthand term "unreasonable" to describe a decision that "involved an unreasonable application of[ ] clearly established federal law, as determined by the Supreme Court of the United States."

reminded the Sixth Circuit, is difficult to meet." *White*, 572 U.S. at 419 (internal quotation marks omitted). Due to this highly deferential standard for evaluating state-court rulings, state-court decisions must be given the benefit of the doubt. *Woodford,* 537 U.S. 24. Indeed, since not even *clear* error will suffice to meet this standard, it is fair to say that the standard is *very* difficult to meet, and that state-court decisions must be given the benefit of even *major* doubts. Again focusing on the reality that something beyond even *clear* error is necessary, and believing that a decision that is beyond clearly erroneous (and for that matter beyond *any possibility* for fair-minded disagreement) is a decision that borders on the absurd, the Court is constrained to conclude that that a state-court decision meets this standard only if it approaches absurdity. Respectfully disagreeing with the learned Magistrate Judge, the Court cannot conclude that the Tennessee Supreme Court's Guilt-Phase Decision—erroneous though it was—was flawed to this enormous extent. For one thing, the Court's conclusion (which matches the Magistrate Judge's conclusion) that the Guilt-Phase Decision was erroneous is not one that is glaringly erroneous; the Court can aver that reaching that conclusion took the Tennessee Supreme Court a great deal of thought, analysis, and reflection. Second, in the Court's view, the nature of its analysis above reveals that it is relatively easy to commit an analytical mistake that would lead to the Guilt-Phase Decision; although erroneous, a jurist's embracing of the Guilt-Phase Decision did not require—and was not the result of—something well-nigh absurd like, for example, (a) ignoring an obviously applicable analytical approach  or controlling case, (b) overlooking or misperceiving an obvious crucial fact, or (c) making the most elementary of mistakes in logical reasoning.[21]

---

[21] One such mistake, for example, would be along the lines of erroneously concluding that because all squares are rectangles, all rectangles are squares; another would be erroneously concluding that if A=B and B=C, it is not necessarily true that A=C.

Accordingly, the Court cannot adopt the Magistrate Judge's recommendation to find, contrary to the Guilt-Phase Decision, that trial counsel's performance was deficient for purposes of *Strickland*. The Court notes that things might be different if its review was deferential rather than *de novo*; if the question for the Court was whether the Magistrate Judge had a substantial basis for her conclusion that the Guilt-Phase Decision met this very demanding standard, perhaps the Court would adopt the Magistrate Judge's recommendation. But unfortunately for Davidson, that is not the nature of the Court's review, and that is not the question. The law (for better or for worse) is very clear: in the federal habeas context, a state-court decision is entitled to deference—*enormous* deference—and a magistrate judge's recommendation is entitled to *none*.

Given the strictures of the AEDPA, the Court cannot find that trial counsel's performance was deficient for purposes of *Strickland*. Therefore, the Court must deny Davidson relief. Next, the Court considers whether, Davidson must be denied relief *alternatively* for failure to show prejudice within the meaning of *Strickland*.

### (2) Prejudice at the guilt phase

Respondent raised one other objection, this one to the Magistrate Judge's prejudice analysis under *Strickland*. (Doc. No. 94 at 7). As background, the Court notes that the Magistrate Judge, having found deficient performance at the guilt phase, went on to find that such deficient performance was prejudicial to Davidson within the meaning of *Strickland*. Respondent asserts that this finding is flawed and should not be adopted by the Court.

The Tennessee Supreme Court reached the prejudice prong as it relates to the *sentencing* phase, finding that Davidson had been prejudiced by the deficient performance of trial counsel at the sentencing phase and vacated Davidson's death sentence:

> We also find that counsel's deficient performance prejudiced Mr. Davidson at his capital sentencing hearing. Much like *Sears v. Upton*, although the evidence of Mr.

Davidson's profound personality disorder might not have made him "any more likable to the jury," the evidence could very well have helped the jury understand how Mr. Davidson could have committed "such horrendous acts." *Sears v. Upton*, 130 S. Ct. at 3264. An effective defense could have contextualized Mr. Davidson's prior hair-curling statements about women. *See Sears v. Upton*, 130 S. Ct. at 3264 (explaining that competent counsel can turn "adverse evidence" into something positive, such as "a cognitive deficiency mitigation theory"). Instead, the jury heard little that would "humanize" Mr. Davidson or help the jury "accurately gauge his moral culpability." Had his counsel been effective, the jury would have learned of the "kind of troubled history" that is "relevant to assessing a defendant's moral culpability.'" *Porter v. McCollum*, 558 U.S. at 41, 130 S. Ct. 447 (quoting *Wiggins v. Smith*, 539 U.S. at 535 [ ]).

We cannot escape the fact that "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Mr. Davidson's] moral culpability" and led to a sentence less than death. *Wiggins v. Smith*, 539 U.S. at 538 [ ] (quoting *Williams v. Taylor*, 529 U.S. at 398 [ ]). At least one member of the jury could have decided that Mr. Davidson was less morally blameworthy (and thus undeserving of death) in light of his lifelong history of psychosis, his frontal lobe dysfunction, and the fact that his mental functioning was in some respects equivalent to that of a nine- or ten-year old child. These post-conviction revelations sufficiently undermine our confidence in the verdict to merit post-conviction relief. We find a reasonable probability that, but for counsel's failure to present psychological mitigation evidence, *the result of the sentencing trial* would have been different.

*Davidson v. State*, 453 S.W.3d at 405–06 (emphasis added). In short, at the sentencing phase, the Tennessee Supreme Court found not only deficient performance, but also prejudice. But as noted herein, Davidson's challenge is not to the results of his sentencing phase, but rather to the results of his guilt phase. And it was prejudice only at the *guilt* phase that the Magistrate Judge addressed in the R&R. Notably, because it found no deficient performance at the guilt phase, the Tennessee Supreme Court did not address prejudice at the guilt phase. So when the Magistrate Judge—having found deficient performance at the guilt phase—examined prejudice at the guilt phase, she examined the issue of prejudice *de novo*, without any deference to the state courts under the AEDPA or otherwise. (Doc. No. 90 at 41) (quoting *Rompilla*, 545 U.S. at 390 ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we

examine this element of the Strickland claim *de novo* . . . .) and *Wiggins*, 539 U.S. at 534 (stating that federal-court "review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis")). In employing a *de novo* analysis of prejudice, the Magistrate acted entirely in line with Supreme Court precedent.

Upon such examination, the Magistrate Judge concluded that "there is a reasonable probability that, but for trial counsel's failure to thoroughly investigate Davidson's intellectual capacity and mental health history before trial, Davidson would not have been convicted of first-degree, premeditated murder." (Doc. No. 90 at 44). It falls to the Court to review this conclusion *de novo*, assuming *arguendo* (contrary to the Court's determination above) that Davidson has shown deficient performance by his trial counsel in the guilt phase. Just as indicated by the Magistrate Judge in the R&R, to establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 692).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Harrington*, 562 U.S. at 104 (quoting *Strickland* 466 U.S. at 694). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

It bears mentioning the uncertainty of the outcomes of the test for "reasonable probability." The uncertainty is fostered by several things. First, there seem to be three different verbal formulations of the test for reasonable probability, not all of which necessarily would come out the same way in the eyes on any particular jurist. Asking whether there is reasonable probability

that, but for trial counsel's errors, the result of the proceeding would have been different is *different* from asking whether trial counsel's errors were "so serious as to deprive the defendant of a fair trial," which in turn is *different* from asking whether trial counsel's errors were so serious as to deprive the defendant of a trial whose result is reliable. So when the rubber meets the road, what is the assigned judge supposed to ask himself or herself when assessing whether the errors were prejudicial? The Court perceives no clear answer to this question. Given that it is unclear what question the Court is supposed to ask itself, the outcome of the inquiry into prejudice is naturally subject to uncertainty.

The problem is compounded by the subjective nature of the key terms in each of the respective tests. When/how/why does a result cross over the line between "reliable" and "unreliable"? When/how/why does a trial cross over the line between "fair" and "unfair"? When/how/why should a court's confidence be "undermined"? Reasonable jurists often could disagree as to how the quoted terms apply in a particular case and indeed could disagree (even more fundamentally) about how to view these terms generally.

The Court opts not to embrace any of the three particular tests for "reasonable probability." Still less does the undersigned opt to attempt to apply multiples of these tests. Each of these approaches strikes the Court as a fool's errand, since it risks inconsistent outcomes that vary based on the particular test used. Instead, the Court will ask itself the overarching question: was there (in the Court's view) a "reasonable probability" that the guilt-phase result would have been different but for trial counsel's errors, i.e., that Davidson would not have been convicted of first-degree murder? This approach has its own drawbacks in terms of subjectivity. For one thing, what is a "reasonable" probability? Also, how is a court to assess whether circumstances take a particular

case over the line into "reasonable probability? What the undersigned jurist must do is apply the "reasonable probability" standard as best he knows how, calling it like he sees it.

As Respondent alludes to via its objections, the probability of a different outcome at the guilt phase is assessed, under *Strickland*, in light of the totality of the available exculpatory evidence—both adduced at trial and in the habeas proceeding—and then weighed against the inculpatory evidence. *Sears v. Upton*, 561 U.S. 945, 955–56 (2010) (citation and quotation marks omitted). Respondent points to a strong example of this: had trial counsel introduced Davidson's mental health records, the jury (very likely) would have considered evidence of Davidson's fantasies of "chain[ing] a woman in his vehicle," *Davidson*, 2013 WL 485222, at *10, and this evidence would have dovetailed with the State's circumstantial evidence that Davidson had "a chain with a padlock around the passenger seat" of his truck and that he "told the police that [the victim] may have been chained to a tree." *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn. 2003). The Court agrees that this combination of evidence would "strongly suggest that [Davidson] fulfilled his fantasy and would corroborate the physical evidence recovered from his truck and his police statement." (Doc. No. 94 at 9-10) (citing *Davidson*, 121 S.W.3d at 608, 615). That is, it would strongly suggest the existence of premeditation—the very element of first-degree murder that, according to Davidson, would have been missing (negated) but for trial counsel's allegedly deficient performance.

To explain why, the Court first notes that the *mens rea* required to convict Davidson of first-degree murder was premeditation. Under Tennessee law, an act was done with "premeditation" if it was "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d) (1995). The applicable statute provided, more specifically, that for the defendant to

have acted with "premeditation," "the intent to kill must have been formed prior to the act itself."[22] *Id.* The combination of evidence mentioned in the prior paragraph suggests that Davidson acted as he did because he was *motivated in advance* to do so because of his fantasies. It therefore suggests that he acted after the "exercise of reflection [on his fantasies] and judgment."[23]

Respondent identifies additional evidence in Davidson's mental health records that would have reinforced the existence of premeditation by suggesting that Davidson acted *after* he exercised such reflection and judgment: (1) Davidson is "inclined to commit rape and murder in the future, and (2) Davidson identified his favorite activity was raping women and that he claimed to have raped over one hundred women. (Doc. No. 94 at 10) (citing *Davidson*, 2013 WL 485222, at *10)). "Although the records from Mr. Davidsons stay at MTMHI acknowledge his mental illness and his troubled social history, his evaluators did not find that he was incompetent to stand trial or incapable of committing a premeditated murder." *Davidson*, 453 S.W.3d 390. In the Court's view, the record does not suggest a "reasonable probability"—as the Court construes that term— of a different outcome from the jury regarding the first-degree murder. This is true even if the aspects of Davidson's mental-health record that tend to refute a theory of premeditation suggest a *possibility* that a different outcome would have occurred had Davidson's trial counsel presented Davidson's mental-health record. Therefore, the Court cannot find, assuming *arguendo* that trial

---

[22] The statute also provided that conviction required the defendant to have been "sufficiently free from excitement and passion as to be capable of premeditation." Tenn. Code Ann. § 39-13-202(d) (1995). This provision is unhelpful in that it gives no indication as to just *how* free from excitement a defendant must be in order to be deemed to have acted with premeditation. And more to the point, it is not implicated by the instant set of issues because no investigation of Davidson's psychological condition would have shed any light on the extent to which Defendant was "free from excitement" at the time the victim was murdered.

[23] The "exercise of judgment" suggested by the evidence—though absolutely horrific and tragic—is indeed "exercise of judgment" of a kind—namely, the exercise of the (dreadful) judgment that committing the acts would be worth pursuing and consummating in order to fulfill Davidson's fantasies.

counsel's deficiency was indeed deficient at the guilt phase in not presenting Davidson's mental-health history, and that such deficiency was prejudicial within the meaning of *Strickland*.[24] So, for this alternative reason, Davidson is not entitled to relief on the Amended Petition.

## CONCLUSION

After the required *de novo* review of the portions of the R&R (Doc. No. 90) to which an objection has been made, the Court adopts in part and declines to adopt in part the R&R.

As for declining to adopt the R&R in part, the Court concludes that despite agreeing with many aspects of the R&R, it cannot adopt the recommendation of the R&R to grant Davidson's Amended Petition with respect to the IATC claims at the guilt phase (Claims 2d, 2e, 2f, and 2aa). On the other hand, absent an objection to the portions of the R&R recommending denial of all of Davidson's other claims, those portions of the R&R are adopted.

As a result, the Amended Petition (Doc. No. 25) is DENIED in full, and the ruling of the Tennessee Supreme Court is affirmed.

The Clerk is DIRECTED to enter judgment under Rule 58 and close the file.


*Eli Richardson*

ELI RICHARDSON
UNITED STATE DISTRICT JUDGE

---

[24] Had its review of the Magistrate Judge's (contrary) conclusion on this point been deferential, the Court potentially could have adopted that conclusion because that conclusion is far from plainly wrong—especially considering the malleable standards under which the Magistrate Judge was operating. But the law dictates that the Court afford the Magistrate Judge no deference in this regard, and the Court happens to see things differently. So (at least for now), the Court's conclusion prevails even though the Court on the instant *de novo* review does not need to and does not critique the Magistrate Judge's reasoning—and does not presume to say that the Magistrate Judge was "wrong." The precise instant task for the Court is not to determine whether (in its view) whether the Magistrate Judge was wrong on the issues of counsel's performance and prejudice, but rather to determine what (in the Court's independent view) is the correct resolution of those issues.